# APPENDIX A

Benjamin Heikali (SBN 307466)
E-mail: bheikali@faruqilaw.com
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: (424) 256-2884
Facsimile: (424) 256-2885

*Attorneys for Plaintiffs Ethan Young and Greg Young*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ETHAN YOUNG and GREG YOUNG, Derivatively on Behalf of Nominal Defendant, DPW HOLDINGS, INC., | CASE NO.: 2:18-cv-06587-SJO-PLA |
| Plaintiffs, | FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT |
| vs. | |
| MILTON C. AULT, III, AMOS KOHN, WILLIAM B. HORNE, JEFF BENTZ, MORDECHAI ROSENBERG, ROBERT O. SMITH, and KRISTINE AULT, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| DPW HOLDINGS, INC., | |
| Nominal Defendant. | |

**INTRODUCTION**

Plaintiffs Ethan Young and Greg Young ("Plaintiffs"), by and through their undersigned attorneys, submit this First Amended Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein. Plaintiffs allege the following based upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, the investigation conducted by and under the supervision of their counsel which included, among other things: (a) a review and analysis of regulatory filings filed by DPW Holdings, Inc. ("DPW" or the "Company")[1] with the United States Securities and Exchange Commission ("SEC"), including other related SEC reporting companies; (b) a review and analysis of press releases and media reports issued and disseminated by DPW and other related companies; (c) a review of other publicly available information concerning DPW and other related companies, including articles in the news media and analyst reports; (d) complaints and related materials in litigation commenced against some or all of the Individual Defendants (as identified below) and/or the Company and/or other related companies; and (f) applicable rules and regulations.

**SUMMARY OF THE ACTION**

1.     This is a shareholder's derivative action brought for the benefit of Nominal Defendant DPW. DPW is a holding company that owns subsidiaries engaged in commercial and defense solutions, cryptocurrency blockchain mining, commercial lending, and advanced textile technology. The Company was formerly called Digital Power Corporation. DPW is incorporated in Delaware and headquartered in Newport Beach, California. This derivative action is brought

---

[1]     References to DPW encompass DPW Holdings, Inc. and all of its subsidiaries, as well as Digital Power Corporation, the Company's former name.

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

against certain current and former members of the Company's Board of Directors (the "Board") and certain of its current executive officers (collectively, the "Individual Defendants") seeking to remedy the Individual Defendants' violations of state law and breaches of fiduciary duty.

2.     In September 2016, Defendants Milton "Todd" Ault ("T. Ault") and his wife Kristine Ault ("K. Ault" and collectively, the "Aults") acquired a controlling interest in DPW through a change of control transaction involving their company, Philou Ventures, LLC ("Philou Ventures"). In exchange for $1.5 million in cash, Philou Ventures received DPW common stock representing 40.4% of the Company's common stock (the "Securities Purchase Agreement"). In addition, the Securities Purchase Agreement provided Philou Ventures with the right to appoint a number of directors to DPW's Board.

3.     Prior to the Aults taking control of DPW, the Company had a positive working capital of over $2.5 million. *See* DPW Form 10-Q for period ending September 30, 2016. By the end of the second quarter of 2017 (period ending June 30, 2017), that had all changed and the Company had negative working capital, rendering it technically insolvent. In its 2017 2Q Form 10-Q filed with the SEC on August 21, 2017, the Company admits that "[i]f the Company is unable to raise additional capital, it may be required to curtail operations and take additional measures to reduce costs, including reducing its workforce, eliminating outside consultants and reducing legal fees in order to conserve cash in amounts sufficient to sustain operations and meet its obligations. These matters raise substantial doubt about the Company's ability to continue as a going concern."

4.     After taking control of the Company, T. Ault became Chief Executive Officer ("CEO") and Chairman of the Board. Under his leadership, the Company has entered into financing arrangements that have saddled DPW with significant short-term liabilities, including large loans ostensibly secured by the Company's

future receipts. For example, during the second half of 2017 and first quarter of 2018, Defendants T. Ault, William Horne ("Horne"), the Company's Chief Financial Officer ("CFO"), and Amos Kohn ("Kohn"), DPW's President, all three of whom are officers and directors of the Company (collectively, referred to as the "Officer/Director Defendants"), caused DPW to raise $6,989,000 in exchange for purported future receipts of $9,836,900, paying interest of approximately 41% for short term financing over usually a ten-week pay out period. These transactions are prima facie unfair to the Company and its shareholders and are the type of financing that would be offered by a loan shark or other predatory lender.

5.      The Individual Defendants have also caused the Company to issue tens of millions of additional shares of DPW common stock at lower than market price in order to pay off debt, use it as currency to satisfy vendor and consultant obligations, and in many cases have failed to disclose the identity of the vendor/consultant and the services provided. Indeed, in little over a year from April 2017 until May 2018, the Company has issued over 50 million shares, thereby diluting shareholder interest.

6.      T. Ault however, has potentially protected his ownership interest through a Preferred Stock Purchase Agreement that provides for Philou Ventures to purchase 500,000 shares of Series B Preferred Stock that can be converted into 7,142,857 shares of common stock and an equal number of warrants that can be converted into an additional 7,142,857 shares. Thus, the Aults, through Philou Ventures, potentially can increase their ownership interest by an additional 14,285,714 shares of DPW common stock. More importantly, according to the Individual Defendants, the Preferred Stock Purchase Agreement permits Philou Ventures to "participate in . . . future financings under substantially the same terms and conditions as other investors in those respective financings in order to maintain its then percentage ownership interest. Philou Ventures' right to participate in such

3

1  financings shall accrue and accumulate provided that it still owns at least 100,000

2  shares of Preferred Stock." *See* DPW 2017 Form 10-K. ~~To date~~As of April 25, 2018,

3  Philou Ventures owns 125,000 shares of Series B Preferred Stock. The Preferred

4  Stock Purchase Agreement was entered into in early 2017.

5      7.    The Board has permitted the Officer/Director Defendants to funnel

6  millions into several Ault-related entities, with Avalanche International Corp.

7  ("AVLP") receiving over $5.5 million in cash and DPW having a total investment

8  in ALVP valued at $10.7 million as of March 31, 2018. Philou Ventures owns 80%

9  of AVLP's preferred stock giving it voting control over the company. AVLP's

10 Chairman is T. Ault and ~~its~~the CFO is Defendant Horne. Also, DPW does business

11 with other Ault-related entities.

12     8.    According to the Company's SEC filings, AVLP owns MTIX Ltd.

13 ("MTIX") who has a purchase order with DPW purportedly valued at $50 million,

14 entered in March 2017. As of March 31, 2018, a year later, the Company has only

15 recognized $2,141,000 of revenue, none of which DPW has been paid. DPW has

16 also loaned money to Alzamend Neuro, Inc., ("Alzamend") another Ault-related

17 entity, where T. Ault is Chairman and Defendant Horne ~~is~~was CFO. Phil Mansour,

18 a non-party, is CEO at ~~both~~AVLP and was CEO at Alzamend.

19     9.    Moreover, no one really knows the true financial condition of AVLP,

20 MTIX or Alzamend. The last publicly filed financial statements for AVLP were for

21 the ~~first~~second quarter of 2016, Alzamend is a private company, and MTIX is in

22 reality AVLP. Thus, the DPW shareholders have no idea what the true financial

23 condition of these Ault-related entities really are.

24     10.   While the Company has struggled, all of the Individual Defendants

25 have permitted and/or caused DPW to invest millions in Ault-related party entities,

26 ~~and~~ shareholder interest has been heavily diluted, and the Officer/Director

27 Defendants are taking home at least $1 million in cash compensation each year, as

28

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT**

well as stock and option incentive awards. For example, Defendant T. Ault ha~~s~~d a base salary for 2018 of $400,000 cash compensation per annum; Defendant Horne receive~~s~~d a base salary for 2018 of $250,000 per annum; and Defendant Kohn is being paid $350,000 in cash compensation per annum. Further, the most recent compensation information publicly available indicates that as of February 29, 2016, T. Ault is receiving $240,000 per annum as Chairman of AVLP. Although Defendant Horne is CFO of AVLP, there has been no disclosure concerning his compensation.

11.     The Company has also had to restate its financial statements during T. Ault's tenure. On November 14, 2017, the Company filed a Form 8-K, informing the public marketplace that its independent auditor had informed DPW on October 10, 2017 that it had misclassified related party real estate transactions and failed to provide adequate disclosure regarding those related party transactions, including a suspicious purchase of property in Israel for the benefit of Defendant Kohn's daughter. The Company also failed to disclose certain subsequent events.   The restatement was for the financial statements for the 2017 2Q ending June 30, 2017. The Company continues to inform the public that its internal controls over financial reporting are not effective.

12.     ~~Just recently~~In addition, DPW indicated interest in acquiring a majority interest in WSI Industries, Inc. ("WSI") for $6.00 per share through a tender offer. The response by the WSI Board was damning. In a letter dated March 19, 2018, WSI's Chairman and its Special Committee rejected the proposal and discussed the lack of quality of the information in DPW's SEC filings, including that: (i) "On October 10, 2017, DPW's auditors informed DPW that DPW had misclassified related party real estate transactions and failed to provide adequate disclosure regarding related party transactions. As disclosed by DPW, DPW's auditors reached the conclusion that because of these misstatements, DPW's previously issued

5

unaudited quarterly financial statements as of and for the fiscal quarter ended June 30, 2017, as presented in DPW's Quarterly Report on Form 10-Q filed with the SEC should no longer be relied upon"; (ii) "On November 20, 2017, the NYSE American stock exchange admonished DPW for 'failure to make immediate public disclosure of all material information concerning its affairs' relating to failure to report board and management changes as required by SEC rules"; and (iii) "From December 15, 2017 to February 12, 2018, DPW filed five amendments to five prior filings with the Securities and Exchange Commission to disclose the required additional details regarding DPW's capital transactions, including the fact that each of these transactions had closed on previously undisclosed dates."

13.     Further, WSI requested on multiple occasions that DPW provide additional information to substantiate its good faith and bona fide intention to acquire WSI shares through the tender offer. Despite multiple requests in writing and in person, DPW failed to provide the requested financial information. This is not surprising given T. Ault's prior history of misconduct concerning investors.

14.     T. Ault has been previously suspended by FINRA, fined $75,000 and ordered to pay restitution of $312,916.06 pursuant to a settlement agreement with FINRA ("FINRA Settlement"). T. Ault violated the FINRA Settlement. Both T. Ault and one of his companies have filed for bankruptcy protection pursuant to the U.S. Bankruptcy Code.  Neither T. Ault nor his company received discharges and both bankruptcies were dismissed. In fact, in the Zealous Holdings, Inc. bankruptcy proceeding, the U.S. Trustee filed a motion to dismiss for: (a) debtor's failure to file any schedules and a statement of financial affairs; (b) failure to satisfy any U.S. Trustee compliance requirements; and (c) failure to appear at an Initial Debtor Interview scheduled by the U.S. Trustee.

15.     In his own personal bankruptcy, T. Ault fared no better. He failed to appear at the scheduled § 341(a) meeting of creditors. The U.S. Trustee also argued

that T. Ault had allegedly committed fraud against investors of Zealous Holdings, Inc., and may have co-mingled investor funds with related Ault-controlled companies and his personal finances. T. Ault has also had a plethora of other lawsuits filed against him and/or his companies by investors alleging misconduct. It certainly appears he's at it again.

16.    Finally, demand is futile in this case as there does not exist a majority of independent directors as conceded by the Company in its latest SEC filing. The Company has six directors. According to the Schedule 14A Preliminary Proxy Statement filed with the SEC on July 30, 2018, DPW admits that: "none of Messrs. Horne, Kohn or Ault meets the independence standards." As officers of the Company, whose misconduct is the gravamen of the complaint, the Board lacks a majority of independent directors necessary to field a shareholder demand.

17.    The Individual Defendants breached their duties of loyalty, care and good faith by: (i) failing to act in the best interests of the Company; (ii) participating in transactions for the benefit of the ~~Individual~~Officer/Director Defendants that harmed the Company; (iii) mismanaging the Company's finances; (iv) failing to implement and maintain a system of effective internal controls and procedures; (v) failing to adhere to the Company's applicable Code of Ethics; (vi) improperly awarding themselves generous and excessive compensation; and (vii) permitting the Company to issue materially false and misleading financial statements and other SEC filings.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity among the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

19.    This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

operations in this District, or is an individual who has sufficient minimum contact with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

20.   Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding in violation of fiduciary duties owed to DPW occurred in this District and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that have an effect in this District.[2]

_____

[2]   The Company's Schedule 14A filed with the SEC on November 17, 2017 (the "2017 Proxy Statement") refers to a Delaware forum selection provision in the Company's Certificate of Incorporation and Bylaws.  The Delaware Certificate of Incorporation dated September 22, 2017, attached to the 2017 Proxy Statement, does not have a Delaware forum selection clause.  The Bylaws with an effective date of September 25, 2017, attached to the 2017 Proxy Statement, also do not have a Delaware forum selection clause.   DPW attached the same Certificate of Incorporation and Bylaws as exhibits to its Form 10-K for the period ended December 31, 2017 filed with the SEC on April 17, 2018, including links to the documents on SEC.gov.  Based on Plaintiffs' investigation, the Certificate of Incorporation dated September 22, 2017 and the Bylaws with an effective date of September 25, 2017 are the current governing documents for the Company, at the time of the filing of the Verified Shareholder Derivative Complaint on July 31, 2018. Plaintiffs are unaware of any public filing that includes a Delaware forum selection clause within the Company's Certificate of Incorporation or Bylaws.  Thus, DPW does not have an effective and enforceable Delaware forum selection clause.

8

## PARTIES

**Plaintiffs**

21.     Plaintiff Ethan Young is currently and has continuously been a stockholder of DPW throughout all relevant times hereto. Ethan Young is a citizen of Ohio.

22.     Plaintiff Greg Young is currently and has continuously been a stockholder of DPW throughout all relevant times hereto. Greg Young is a citizen of Ohio.

**The Company**

23.     Nominal Defendant DPW is incorporated under the laws of the State of Delaware and maintains its headquarters in Newport Beach, California.  DPW was initially formed in California in 1969 with the name Digital Power Corporation and held its initial public offering in 1996.

24.     On September 18, 2017, the DPW Board voted unanimously to recommend a proposal to approve a change in domicile from California to Delaware (the "Reincorporation"). On December 27, 2017, Digital Power Corporation approved the Agreement and Plan of Merger (the "Merger Agreement") providing for the merger (the "Merger") of Digital Power Corporation with and into its wholly-owned subsidiary DPW. The Reincorporation was approved by the shareholders at the meeting held the next day on December 28, 2017 and consummated a day later on December 29, 2017. Following the Merger, the Company's corporate existence is governed by the laws of the State of Delaware. The existing shareholders retained their stake in the Company at the same percentage and share ownership as prior to the Merger and name change. In addition, the officers and directors of the Company remained the same.

25.     According to the Company's SEC filings, DPW operates as a diversified holding company owning subsidiaries engaged in the following operating

9

businesses: commercial and defense solutions, commercial lending, cryptocurrency blockchain mining and advanced textile technology.  DPW's shares are listed and traded on the NYSE American Stock Exchange under the ticker "DPW."  As of May 18, 2018, the Company had 59,256,783 shares of the Company's common stock outstanding.

FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Defendants**

**Milton "Todd" C. Ault, III**

26. Defendant Milton "Todd" C. Ault, III ("T. Ault") has served as DPW's Chief Executive Officer ("CEO") since December 28, 2017 and its Executive Chairman of the Board since March 17, 2017. T. Ault has served as Executive Chairman of Alzamend Neuro, Inc., a company he founded, since February 16, 2016. No information concerning T. Ault's compensation at Alzamend Neuro, Inc. is publicly available. He also has served as Chairman of Ault & Company, a holding company, since December 2015, and Avalanche International Corp. since September 2014, a company whose shares are registered under the Exchange Act of 1933 and a company who DPW has made an investment of at least $10 million since September 2016, when T. Ault became a controlling shareholder of DPW through Philou Ventures, LLC. Since January 2011, T. Ault has also been the Vice President of Business Development for MCKEA Holdings, LLC, a family office. He was the President, CEO, Director and Chairman of the Board of Zealous, Inc. from August 2007 until June 4, 2010 and again from February 2011 through May 1, 2011. Previously, T. Ault became majority shareholder of Franklin Capital Corp. (whose name was changed to Patient Safety Technologies, Inc in April 2005), was elected as a director in July 2004 and became its Chairman and CEO in October 2004 serving until January 2006, and again from July 2006 to January 2007. Upon information and belief, T. Ault is a citizen of California.

27. Pursuant to an Independent Contractor Agreement executed by the Company and T. Ault and dated September 22, 2016, T. Ault began receiving $15,000 in cash per month as a consultant to DPW commencing on November 1, 2016. On April 13, 2018 the Company and T. Ault executed an Amended and Restated Independent Contractor Agreement ("Restated Agreement") that paid T. Ault $33,333 in cash per month effective November 15, 2017, which was nearly six

11

months prior to the actual date of the Restated Agreement. The Restated Agreement had a termination date of April 30, 2018 but was renewable on a monthly basis by agreement of the parties. Subsequently, T. Ault signed an employment agreement with the Company on June 17, 2018 in his capacity as CEO of DPW ("T. Ault Executive Employment Agreement"), that pays him $400,000 in cash per annum plus annual bonuses, 1,000,000 shares of Company stock that vest ratably over 48 months beginning on January 1, 2020, options to purchase 500,000 shares of common stock at $.80 per share, along with other performance awards. The initial term of the T. Ault Executive Employment Agreement runs through June 16, 2028.

28. Thus, from November 1, 2016 through December 31, 2016, T. Ault received $30,000 in cash compensation. For 2017, T. Ault received $207,500 in cash compensation and option awards valued at $461,250 for total compensation of $668,750. For 2018, T. Ault is to receive $400,000 in cash compensation ~~and will have received $33,333.33 per month through July 31, 2018 or $233,333.33.~~ for his base salary.

29. T. Ault has a checkered past. T. Ault once held series 7, 24, and 63 licenses and managed several domestic hedge funds and a bond fund. As a result of a FINRA review, on April 26, 2012, T. Ault agreed to a settlement that included restitution and a suspension from association with a FINRA member firm for a period of two years (the "FINRA Settlement").

30. According to the FINRA Settlement, in addition to the two-year suspension from associating with any member of FINRA in any capacity, T. Ault was to pay a fine of $75,000 and make restitution to certain investors of $312,916.06 plus interest to run from certain dates in 2008. T. Ault was to submit satisfactory proof of payment of the restitution, or of reasonable and documented efforts undertaken to effect restitution, to FINRA's compliance department within 120 days of the April 26, 2012 settlement date. If for any reason, T. Ault was unable to locate

12

any of the certain investors after reasonable and documented efforts, T. Ault was to forward any undistributed restitution and interest to the appropriate escheat, unclaimed-property or abandoned-property fund for the state in which the investor is known to have resided.

31.     The Company admits in its Schedule 14A filed with the SEC on November 17, 2017 (the "2017 Proxy Statement"), that T. Ault violated the terms of the FINRA Settlement by failing to make restitution to certain investors within the prescribed time allegedly because he was unable to locate them, nor did he forward the undistributed restitution to the state where the investor was known to have resided, as required.

32.     In connection with the FINRA investigation that led to the FINRA Settlement, it was found that during the review period (January 1, 2008 through December 1, 2008 or the "Review Period"), T. Ault: (a) effected 43 transactions in the accounts of four investors (and the spouses of two of those investors), without the investors' prior knowledge, authorization or consent in violation of NASD Rule 2110 and IM-2310-2; (b) failed to remit to another investor payment for a securities transactions in violation of NASD Rule 2110; and (c) failed to deliver securities to an investor in violation of NASD Rule 2110.

33.     T. Ault was also CEO, President and Chairman of Zealous Holdings, Inc. (the "Debtor") that filed for bankruptcy protection under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code") on February 20, 2009, in the United States Bankruptcy Court, Central District of California docketed at No. 8:09-bk-11425. On March 12, 2009, pursuant to 11 U.S.C. §1112(b), the U.S. Trustee filed a motion to dismiss the bankruptcy case for: (a) debtor's failure to file any schedules and a statement of financial affairs; (b) failure to satisfy any U.S. Trustee compliance requirements; and (c) failure to appear at an Initial Debtor Interview scheduled by the U.S. Trustee. On April 30, 2009, a status conference was held concerning: (i)

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

status of Chapter 11 case; and (ii) requiring a report on the status of the Chapter 11 case. At the status conference it was determined that the case was to be converted to a Chapter 7 because of the debtor's substantial failure to comply with the requirements of the U.S. Trustee, failure to file status report and failure to appear at the status conference. On May 7, 2009, the U.S. Trustee's motion to dismiss was vacated and the case converted to Chapter 7 by order of the bankruptcy court.

34.   Four days later on May 11, 2009, the Debtor filed an emergency motion to dismiss the Chapter 7 bankruptcy claiming that the Debtor, a wholly owned subsidiary of Zealous, Inc., a public company where T. Ault also served as President, CEO, Director and Chairman of the Board, will be able to bring in more capital and that its Board had agreed to assist Debtor in paying off all of Debtor's creditors because Zealous, Inc. had just begun executing on two exclusive distribution contracts in California and another of Zealous, Inc.'s wholly owned subsidiaries had launched an online retail store whose "business popularity is growing, as described in recent press releases." That emergency motion was denied by the court without hearing one day later on May 12, 2009.

35.   Ultimately, on August 27, 2010, the Chapter 7 Trustee filed a Report of No Distribution stating that the Trustee had neither received any property nor paid any money on account of the estate and after diligent inquiry into the financial affairs of the Debtor determined that there is no property available for distribution over and above that exempted by law. After no further activity for almost nine months, the case was closed, and the Debtor was not discharged.

36.   On the heels of the Debtor's filing for protection under the Bankruptcy Code, T. Ault filed for personal bankruptcy pursuant to Chapter 11 of the Bankruptcy Code on December 8, 2009 in the U.S. Bankruptcy Court, Central District of California docketed at No. 8:09-bk-23696. On January 22, 2010, the U.S. Trustee moved to have the case converted from Chapter 11 to Chapter 7 for: (a)

14

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

failure of T. Ault to comply with the requirements set forth in the U.S. Trustee's Notice of Requirements; (b) failure of T. Ault to appear at the scheduled § 341(a) meeting of creditors; and (c) T. Ault's failure to comply with Rule 1006(b). **On March 30, 2010, the U.S. Trustee filed supplemental arguments in support of the motion, arguing that T. Ault had allegedly committed fraud against investors of Zealous Holdings, Inc., and may have co-mingled investor funds with related Ault-controlled companies and his personal finances.** On April 26, 2010, the bankruptcy court converted the case to Chapter 7. On May 19, 2011, the case was dismissed without prejudice with a 24-month restriction against refiling. T. Ault and his companies have had numerous lawsuits filed against them based on fraud, breach of fiduciary duties and other improprieties, which remain undisclosed by the Company.

**William B. Horne**

37.     Defendant William B. Horne ("Horne") has served as CFO of the Company since January 25, 2018.  Horne has also served as a Company director since October 13, 2016, at which time he was appointed to the Board by T. Ault and Philou Ventures, LLC after the change of control transaction occurred on September 5, 2016, between Philou Ventures, LLC, Telkoor Telecom Ltd. and DPW.  Until Horne was appointed CFO of DPW on January 25, 2018, he served as Chairman of the Audit Committee, and as a member of the Compensation Committee and Nomination and Governance Committee ("NG Committee").  Horne also serves as CFO and a director of Avalanche International Corp., a related party to DPW, as admitted by the Company in its SEC filings.  He has also served as CFO of Targeted Medical Pharma, Inc. since 2013. Targeted Medical Pharma, Inc. is an SEC reporting company whose last periodic filing containing any company financial information was its 2015 Form 10-K filed with the SEC on April 14, 2016, in which it was reported that Horne was paid cash compensation of $257,154 and $20,371 in

stock and option awards, for total compensation of $277,525 for 2015. For 2014, Horne was paid $325,000 cash compensation by Targeted Medical Pharma, Inc. It is unknown what Horne's compensation was for 2016, 2017 and 2018 because Targeted Medical Pharma, Inc. has not filed any financial information with the SEC since April 14, 2016.  Horne ~~is currently~~was CFO of Alzamend Neuro, Inc., a private company founded by T. Ault. It is unknown what his compensation ~~is~~was as CFO of Alzamend, Inc. Horne also served as CFO of Patient Safety Technologies, Inc., another company majority owned by T. Ault, from June 2005 to October 2008 and as the interim CEO from January 2007 to April 2008. Upon information and belief, Horne is a citizen of California.

38.     From the date of his appointment as a non-employee director of the Company on October 13, 2016, through December 31, 2016, Horne was paid $3,333 in cash compensation and option awards valued at $32,145. For 2017, as a Company director, Horne received $80,000 in cash compensation and option awards valued at $92,250. No other Company non-employee director, other than Horne, received more than $30,000 in cash compensation for 2017. On January 25, 2018, Horne signed an Executive Employment Agreement ("Horne Executive Employment Agreement") to serve as the Company's CFO and Executive Vice President. Pursuant to the Horne Executive Employment Agreement, which has a five-year term, Horne receives $250,000 in cash compensation per annum (or $20,833.33 per month) and is eligible for cash bonuses and equity awards based on performance criteria adopted by the Compensation Committee. Horne also received 1 million shares of DPW common stock under the Horne Executive Employment Agreement, which vest in installments of 200,000 shares annually over 5 years beginning on January 1, 2019. Horne received a $25,000 signing bonus in connection with the Horne Executive Employment Agreement. ~~Thus far, for~~ For 2018, Horne ~~has received $20,833.33 per month~~is to receive $250,000 in cash compensation ~~from~~

16

January 1, 2018 through July 31, 2018, totaling approximately $145,833.33 for his base salary.

17

**Amos Kohn**

39.     Defendant Amos Kohn ("Kohn") has served as a director of the Company since 2003 and President since 2008. He also served as DPW's CEO from 2008 to December 2017, when T. Ault took over as CEO.   From March 2011 until August 2013 and again from July 2017 until January 2018, Kohn also served as interim CFO. Kohn is currently the Company's President and also the CEO of the Company's subsidiary, Coolisys Technologies, Inc. Upon information and belief, Kohn is a citizen of California.

40.     For 2016, Kohn received $234,866 in cash compensation, option awards valued at $366,409, and other compensation of $36,269, for total compensation of $637,544. Kohn signed an Executive Employment Agreement ("Kohn Executive Employment Agreement") with the Company dated November 30, 2016, with an effective date of September 22, 2016 ("Effective Date"), having a 24-month term and continuing thereafter for an indefinite term until a new agreement has been entered into between Kohn and DPW. Kohn's base salary under the Kohn Executive Employment Agreement is $300,000 in cash per annum increasing to $350,000 per annum provided that the Company achieves revenues in the aggregate amount of at least $10 million for the trailing four calendar quarters. The Kohn Executive Employment Agreement also provides for cash performance bonuses and stock option or other equity incentive grants as determined by the Compensation Committee.

41.     In addition, Kohn received a stock option grant signing bonus pursuant to the Kohn Executive Employment Agreement under which he received a ten-year option to purchase 1 million shares of DPW common stock at $0.65 per share under the following  vesting conditions: (a) options to purchase 500,000 shares of DPW common stock vest on September 22, 2016 (the Effective Date); (b) options to purchase 250,000 shares of DPW common stock vest ratably over six months

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

beginning with the first month after the Effective Date; and (c) options to purchase 250,000 shares of DPW common stock vest ratably over twelve months beginning with the first month after the Effective Date. The Kohn Executive Employment Agreement was amended on February 22, 2017, to also provide Kohn a ten-year warrant to purchase 317,460 shares of DPW common stock at an exercise price of $0.01 subject to vesting.

42.   For 2017, Kohn received $300,000 salary in cash, option awards valued at $92,250 and other compensation of $36,269, for total compensation of $425,250. Mysteriously, the Company had aggregate revenues of $10,001,000, triggering a $50,000 increase in salary to $350,000 per annum. ~~Thus far in 2018 through July 31,~~For 2018, Kohn ~~has received $204,166.67~~is to receive $350,000 in cash compensation ~~per the Kohn Executive Employment Agreement.~~for his base salary.

**Kristine Ault**

43.   Defendant Kristine Ault ("K. Ault") is the spouse of T. Ault. Through the change of control transaction whereby Philou Ventures, LLC became controlling shareholder of DPW in September 2016, K. Ault was appointed as a DPW director on October 13, 2016. In 2016, K. Ault received option awards valued at $32,145. In 2017, K. Ault received total compensation of $112,250 in cash and common stock for serving as a director of the Company. She resigned from her position as a director of the Company on January 23, 2018. Upon information and belief, K. Ault is a citizen of California.

**Robert O. Smith**

44.   Defendant Robert O. Smith ("Smith") has served as a director of the Company since September 22, 2016 and previously served as a director of the Company from November 2010 until May 2015.  Smith is the Chairperson of the Audit Committee and a member of the Compensation Committee and NG Committee.  From 1990 until 2002, Smith served as the Company's President, CEO

and Chairman of the Board.  Smith served as a member of the Company's advisory board from 2002 until 2015.  For 2016, Smith received $5,000 in cash compensation and option awards valued at $32,145, for total compensation of $37,145. For 2017, Smith received $30,000 in cash compensation and options awards valued at $184,500, for total compensation of $214,500. The options awards represented double what any other non-employee director received in 2017. Upon information and belief, Smith is a citizen of California.

**Mordecai "Moti" Rosenberg**

45.    Defendant Mordechai "Moti" Rosenberg ("Rosenberg") has served as a director of the Company since 2015.  Rosenberg is a member of the Company's Audit Committee, Compensation Committee, and NG Committee. For 2016, Rosenberg received $11,666 in cash compensation and option awards valued at $33,355, for total compensation of $45,021. For 2017, Rosenberg received $20,000 in cash compensation and option awards valued at $92,250, for total compensation of $112,250. Upon information and belief, Rosenberg is a citizen of Israel.

**Jeff Bentz**

46.    Defendant Jeff Bentz ("Bentz") has served as a director of the Company since January 24, 2018.  Bentz is a member of the Company's Audit Committee, Compensation Committee, and NG Committee.  Upon information and belief, Bentz is a citizen of California.

47.    Defendants T. Ault, Kohn, Horne, Rosenberg, Smith and Bentz are sometimes collectively referred to herein as the "Current Director Defendants."

48.    Defendants T. Ault, K. Ault, Kohn, Horne, Rosenberg, Smith and Bentz are sometimes collectively referred to herein as the "Individual Defendants."

49.    Defendants T. Ault, Kohn and Horne are sometimes collectively referred to herein as the Officer/Director Defendants.

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

50.     Defendants Rosenberg, Smith and Bentz are sometimes collectively referred to herein as the "Audit Committee Defendants."

51.     Defendants Rosenberg, Smith and Bentz are sometimes collectively referred to herein as the "Compensation Committee Defendants."

52.     Defendants Rosenberg, Smith and Bentz are sometimes collectively referred to herein as the "NG Committee Defendants."

RELATED NON-PARTIES

## Related Non-Parties

### Philou Ventures, LLC

53.     Philou Ventures, LLC ("Philou Ventures") is a venture fund owned and controlled by Defendants T. Ault and K. Ault.   MCKEA Holdings, LLC is the majority member of Philou Ventures.  Defendant K. Ault is the manager and owner of MCKEA Holdings, Inc.  In September 2016 pursuant to a Securities Purchase Agreement dated September 4, 2016, Philou Ventures acquired a little over 40% interest in DPW from Telkoor Telecom Ltd. in a change of control transaction to which DPW was also a party.  The Securities Purchase Agreement also gave Philou Ventures the right to appoint multiple directors in exchange for $1,500,000, which constituted over 40% common stock ownership of the Company at the time.

54.     According to the Form 10-K for the period ended December 31, 2017 filed with the SEC on April 17, 2018 (the "2017 10-K"), as of April 13, 2018, Philou Ventures now owned approximately 12% of DPW's outstanding common stock on a fully diluted basis due to the Individual Defendants use of equity to raise capital, pay vendors in kind and loan much needed cash to related parties. Philou Ventures actually has much greater voting power over the election of directors then its 12% common stock ownership indicates.  Through a Preferred Stock Purchase Agreement entered into by DPW and Philou Ventures on March 9, 2017, Philou Ventures has purchased 125,000 shares of Series B Preferred Stock, which translates into an

FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  additional 1,785,714 votes, even without conversion into common stock when

2  voting solely for the election of directors. That same Preferred Stock Purchase

3  Agreement provides that for each share of Series B Preferred Stock purchased by

4  Philou Ventures it also has the right to purchase warrants representing the amount

5  of common stock the Series B Preferred Stock represents on an as converted basis.

6  Thus, Philou Ventures has the right under the Preferred Stock Purchase Agreement

7  to vote an additional 1.785 million shares of common stock along with their 12%

8  interest when electing directors.

9       55.    In May 2014, Philou Ventures acquired 73.96% of the outstanding

10  common stock of Avalanche International, Corp. in exchange for $150,000. Over

11  the course of T. Ault's control of DPW, the Company has invested more than $10

12  million in Avalanche International Corp.

13         **Avalanche International Corp.**

14       56.    Avalanche International Corp. ("AVLP"), now doing business as

15  MTIX International, was formed in 2011 and is publicly traded on the OTC under

16  the ticker symbol AVLP. In May 2014, Philou Ventures acquired 73.96% of AVLP

17  outstanding common stock in exchange for $150,000.  T. Ault then became AVLP's

18  Chairman of the Board.  Horne has been the CFO and a director of AVLP since June

19  2016, as well as AVLP's audit committee chairman.  DPW has invested over $10

20  million into AVLP and claims to own 83.8% of the company.  Philou Ventures

21  controls 80% of all AVLP shareholder votes through preferred stock that was issued

22  to Philou Ventures in March 2017.

23       57.    AVLP currently had only two holdings, MTIX Ltd. and Restaurant

24  Capital Group, LLC. as of July 31, 2018. Through the filing of the Verified

25  Shareholder Derivative Complaint on July 31, 2018, AVLP had not filed a periodic

26  filing with the SEC since its Form 10-Q for the period ending February 29, 2016,

27  filed with the SEC on August 7, 2017 ("2016 1Q Form 10-Q"), more than a year

28

after the due date.  As of its quarter ended February 29, 2016, AVLP had $156,870 in total assets, total liabilities of $2,287,230 and no revenues for the three months ended February 29, 2016. The 2016 1Q Form 10-Q also revealed that AVLP is in default on over 10 different promissory notes.

58.    AVLP admitted in its 2016 1Q Form 10-Q that "[a]s a result of the Company's continued losses, at February 29, 2016, the Company's current liabilities significantly exceed current assets, resulting in negative working of $2,129,516. Further, the Company does not have adequate cash to cover projected operating costs for the next 12 months. These factors raise substantial doubt about the ability of the Company to continue as a going concern."[3]

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

59.    By reason of their positions as officers, directors and/or fiduciaries of DPW at all or some of the relevant times hereto and because of their ability to control the business and corporate affairs of  the Company, the Individual Defendants owed DPW and its shareholders fiduciary obligations of  good faith, loyalty and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of DPW and its  shareholders so as to benefit all shareholders equally and not in furtherance of their personal  interest or benefit.

60.    Each director and officer of the Company owes to DPW and its shareholders  the fiduciary duty to exercise good faith and diligence in the administration of the Company's  affairs and in the use and preservation of its property and assets, and the highest obligations of  fair dealing.

[3] On December 6, 2018, AVLP filed its Form 10-Q for the period ended May 31, 2016, over two years late. AVLP continued to report that it had a going concern issue as of May 31, 2016. This is AVLP's most recent SEC filing containing detailed, but unaudited, financial information.

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

61.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of DPW, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Due to their positions with DPW, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

62.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of DPW were required to, among other things:

       a.     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

       b.     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal, state and foreign laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

       c.     Exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

       d.     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

e.       When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

63.       Moreover, DPW maintains a Code of Ethics, which "is designed to deter wrongdoing and to promote honest and ethical conduct and compliance with applicable laws and regulations." The Code of Ethics, which applies to all directors and officers of the Company, states the following, in relevant part:

> Each director, officer and employee must act with integrity and observe the highest ethical standards of business conduct in his or her dealings with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her job.
>
> Company personnel who violate the standards contained in this Code will be subject to disciplinary action, possibly including termination of employment.

***

**Corporate Opportunities**

> All directors, officers and employees owe a duty to the Company to advance its interests when the opportunity arises. Directors, officers and employees are prohibited from taking for themselves personally (or for the benefit of friends or family members) opportunities that are discovered through the use of Company assets, property, information or position. **Directors, officers and employees may not use Company assets, property, information or position for personal gain**

25

**(including gain of friends or family members). In addition, no director, officer or employee may compete with the Company.**

\*\*\*

**Fair Dealing**

The Company seeks to outperform its competition fairly and honestly through superior performance and not through unethical or illegal business practices. Company personnel must deal fairly with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her job. Company personnel cannot steal proprietary information, possess trade secret information obtained without the owner's consent, or induce such disclosures by past or present employees of other companies. You may not take unfair advantage of anyone through manipulation, concealment, abuse of confidential information, misrepresentation of material facts or any other intentional unfair practice. The knowing or deliberate falsification of any documents or data in connection with service to the Company will be the basis for immediate discharge and may subject the violator to civil and/or criminal penalties.

\*\*\*

**Protection and Proper Use of Company Assets**

Company personnel must endeavor to protect the Company's assets and property and ensure their efficient use. Theft, carelessness, and waste have a direct adverse impact on the Company's profitability and are prohibited. All payments with Company funds require approval by an

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

authorized officer who has knowledge of the purpose of the payment, adequate substantiation of the identity of the payee and written contracts establishing the payment obligation. Company personnel must report any suspected incident of fraud or theft immediately for investigation. Moreover, Company personnel must use all assets and property of the Company only for legitimate business purposes.

\*\*\*

**Compliance and Laws, Rules and Regulations**

Employees, officers and directors should comply, both in letter and spirit, with all applicable laws, rules and regulations in the cities, states and countries in which the Company operates. Although not all employees, officers and directors are expected to know the details of all applicable laws, rules and regulations, it is important to know enough to determine when to seek advice from appropriate personnel. Company personnel should contact the Compliance Officer with any questions as to the applicability of any law, rule or regulation or the appropriate manner of compliance therewith. The Compliance Officer will be responsible for conferring with legal counsel and resolving the issue.

\*\*\*

**Insider Trading**

Securities laws and regulations prohibit the misuse of material non-public ("inside") information when purchasing, selling or recommending securities.

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Inside information obtained by any Insider from any source must be kept strictly confidential. All inside information should be kept secure and access to files and computer files containing such information should be restricted. Insiders shall not use, act upon, or disclose to any third party including, without limitation, any Family Member, any material inside information, except as may be necessary for the Company's legitimate business purposes to the extent approved, in advance, by the Compliance Officer. Questions and requests for assistance regarding inside information should be promptly directed to the Compliance Officer.

Information is generally considered "material" if (a) there is a substantial likelihood that a reasonable investor would find the information important in determining whether to trade in a security, or (b) the information, if made public, would likely affect the market price of a company's securities. Inside information typically includes, but is not limited to, knowledge of pending Company business transactions, corporate finance activity, mergers or acquisitions, unannounced earnings and financial results and other significant developments affecting the Company.

Insiders and Family Members are prohibited from insider trading (buying or selling securities when in possession of material, nonpublic information) or tipping (passing such information on to someone who may buy or sell securities).

This prohibition on insider trading applies to Company securities and also to the securities of Business Associates if such person learns

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

material, nonpublic information about them as a result of his or her position with the Company.

***

**Compliance with Internal Controls and Disclosure Controls**

The Company has adopted a system of internal controls that must be strictly adhered to by all Insiders in providing financial and business transaction information to and within the Company. **The internal controls are the backbone of the integrity of the Company's financial records and financial statements.**

Each Insider shall promptly report to the Compliance Officer any actual or suspected breaches or violations of the Company's internal controls that come to the attention of the Insider. Each Insider shall promptly report to the Compliance Officer any actual or suspect fraudulent or questionable transactions or occurrences that come to the attention of the Insider. Potentially fraudulent transactions include, without limitation, embezzlement, forgery or alteration of checks and other documents, theft, misappropriation or conversion to personal use of Company assets, and falsification of records.

Each Insider is encouraged to bring to the attention of the Compliance Officer any changes that the Insider believes may improve the Company's system of internal controls. The Company has adopted a system of disclosure controls and procedures to assure that all important information regarding the business and prospects of the Company is brought to the attention of the Chief Executive Officer and Chief

Financial Officer of the Company. The accuracy and timeliness of compliance with those disclosure controls and procedures is critical to this system of disclosure controls is critical to enabling those officers to provide the financial statement and periodic report certifications required by Federal law.

Each Insider shall strictly adhere to the system of disclosure controls, including the internal reporting responsibilities assigned to him or her by the Company.

Each Insider shall promptly report in accordance with Company policy any significant event or occurrence (whether positive or negative) that arises in the course of the Insider's duties and responsibilities. Events or occurrences include those that affect or may affect the Company or its Business Associates, competitors or industry. General economic conditions need not be reported.

Each Insider shall be candid in discussing matters concerning internal controls and business disclosures with the Company's management, internal auditors, outside auditors, outside counsel and directors. Factual information is important. Opinions and observations are strongly encouraged.

***

**Compliance, Reporting and Enforcement**

If you are concerned about a possible ethical or illegal situation or any violation of this Code or are not sure whether specific conduct meets

30

applicable Company standards, you should discuss the situation with your immediate supervisor or contact the Company's Chief Financial Officer. Executive officers or members of the Company's board of directors should discuss the situation with a member of the Audit Committee.

Company personnel must report violations of laws, rules, and regulations of this Code to immediate supervisors, the Company's chief financial officer, or the chairman of the Audit Committee. Executive officers or members of the Board must report such matters to a member of the Audit Committee.

After receiving a report of an alleged prohibited action, the Audit Committee or the Chief Financial Officer must promptly take all appropriate actions necessary to investigate. All directors, officers and employees are expected to cooperate in any internal investigation of misconduct.

(Emphasis added.)

64.    Additionally, the Audit Committee is governed by the Audit Committee Charter, which states that the Audit Committee has the following responsibilities, in relevant part:

The Committee has sole responsibility for the retention, compensation, and oversight of the Auditors. The Auditors report directly to the Committee. **The Committee also serves as an independent monitor of the Company's financial reporting process and internal control over financial reporting.** The Committee shall adopt procedures to allow the free flow of information to the Committee regarding the

Company's internal control over financial reporting and any concerns by officers or employees of the Company or the Auditors regarding accounting and auditing matters. In discharging its oversight role, the Committee is empowered to investigate any matters brought to its attention. In such investigations, the Committee shall have full access to all books, records, facilities, and personnel of the Company, and the power to retain outside counsel, auditors, or other experts. The Committee shall receive the funding reasonably necessary to retain the Auditors to perform its audit, and to retain any other experts required by the Committee to carry out its responsibilities.

(Emphasis added.)

65.    Additionally, the Compensation Committee is governed by the Compensation Committee Charter, which states that the Compensation Committee has the following responsibilities, in relevant part:

[R]eviewing and recommending executive compensation policies and practices to the Board, reviewing and recommending to the Board salaries, bonuses and other benefits paid to Company officers, and administering Company stock option plans and other benefit plans.

66.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the fiduciary duty of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of DPW, the absence of good faith on their part and a reckless disregard for their duties to the Company and its shareholders that the Individual

1  Defendants were aware or should have been aware posed a risk of serious injury to

2  the Company.

3       67.    The Individual Defendants breached their duties of loyalty, care and

4  good faith by: (i) failing to act in the best interests of the Company; (ii) participating

5  in transactions for the benefit of the ~~Individual~~Officer/Director Defendants that

6  harmed the Company; (iii) mismanaging the Company's finances; (iv) failing to

7  implement and maintain a system of effective internal controls and procedures; (v)

8  failing to adhere to the Company's applicable Code of Ethics; (vi) improperly

9  awarding themselves generous and excessive compensation; and (vii) permitting the

10 Company to issue materially false and misleading financial statements and other

11 SEC filings.

12                      **SUBSTANTIVE ALLEGATIONS**

13 **Background**

14      68.    DPW is a Delaware corporation, initially formed in California in 1969

15 and reincorporated in Delaware in December 2017. As described in the Company's

16 ~~latest periodic filing, its~~ Form 10-Q for the first quarter ended March 31, 2018 filed

17 with the SEC on May 21, 2018 ("2018 1Q 10-Q"), DPW operates as a diversified

18 holding company owning subsidiaries engaged in the following operating

19 businesses: commercial and defense solutions, commercial lending, cryptocurrency

20 blockchain mining and advanced textile technology. The Company's wholly-owned

21 subsidiaries are Coolisys Technologies, Inc. ("Coolisys"), Digital Power Limited

22 ("DP Limited"), Digital Power Lending, LLC ("DP Lending"), Super Crypto

23 Mining, Inc. ("Super Crypto Mining") and Power-Plus Technical Distributors, LLC

24 ("Power Plus"). The Company also has a controlling interest in Microphase

25 Corporation ("Microphase"). The Company has three reportable segments – North

26 America with operations conducted by Microphase, Coolisys, Power Plus and DP

27

28

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Lending, Europe with operations through DP Limited and digital currency blockchain mining through Super Crypto Mining.

69.     According to the 2018 1Q 10-Q, as of March 31, 2018, the Company had cash and cash equivalents of $630,000, an accumulated deficit of almost $30 million and a negative working capital of approximately $4.8 million. The 2018 1Q 10-Q further reported that the Company has incurred recurring losses and reported losses for the three months ended March 31, 2018 and 2017, totaling approximately $6.1 million and $994,000, respectively. In the past the Company has financed its operations principally through issuances of convertible debt, promissory notes and equity securities. During 2018, the Company continued to obtain additional equity and debt financing and in restructuring existing debt.

70.     The 2018 1Q 10-Q also reported that the Company expects~~ed~~ to continue to incur losses for the foreseeable future and needs~~ed~~ to raise additional capital to continue its business development initiatives and to support its working requirements, and conceded that if the Company ~~is~~was unable to raise additional capital, it may be required to curtail operations and take additional measures to reduce costs, including reducing its workforce, eliminating outside consultants and reducing legal fees to conserve its cash in amounts sufficient to sustain operations and meet its obligations. The Company admits~~ted~~ that these matters raise substantial doubt about DPW's ability to continue as a going concern.

71.     Prior to the change of control transaction involving Philou Ventures, T. Ault and K. Ault, the Company was in much better financial condition. The Company's Form 10-Q for the quarter ending September 30, 2016, filed with the SEC on November 14, 2016, indicated cash and cash equivalents of almost $1.3 million, an accumulated deficit of $11.2 million, but a positive working capital of over $2.5 million and a net loss of only $165,000. The Company was solvent and had no going concern issues.

34

**FIRST AMENDED** **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

72.     Within three months with T. Ault and K. Ault (collectively, the "Aults") at the helm, the Company had cash and cash equivalents of $996,000 (almost $300,000 less than three months before), an accumulated deficit of almost $12.2 million ($1 million greater than three months prior), positive working capital of less than $2 million (a loss of over $500,000 from three months before), and a net loss of over $1.1 million (almost eight times as large a loss than suffered three months prior). The deterioration of the Company continues while the Officer/Director Defendants take home at least $1 million in cash compensation per annum, along with substantial stock and option awards from DPW alone. The Company currently is technically insolvent, has a going concern issue and is now financing its operations through short-term bridge financing at usurious rates of repayment. DPW admits that it needs to conserve cash.

**Philou Ventures**

73.     The Aults took control of DPW in September 2016.

74.     On September 4, 2016, Philou Ventures, T. Ault's family's private venture fund, entered into a Securities Purchase Agreement with DPW (at the time Digital Power Corporation) and Telkoor, pursuant to which Philou Ventures purchased all of Telkoor's 2,714,610 shares of DPW's common stock, constituting approximately 40.06% of DPW's outstanding shares of common stock (the "Securities Purchase Agreement").  In consideration, Philou Ventures paid Telkoor $1.5 million.

75.     T. Ault explained in his April 20, 2018 annual letter to the shareholders ("2018 Shareholder Letter"), "Philou Ventures, LLC, my family's private venture fund, purchased a controlling interest of the Company from its former Chairman for $1,500,000…Once we successfully acquired the control position of the Company in September 2016 and became its largest shareholder, we started the process of comprehensively reviving the Company…On March 16, 2017, I became the

35

Company's Executive Chairman and brought a team of professionals who would soon help reinvigorate the Company's operations and finances."

76.     As part of the Securities Purchase Agreement, all of DPW's directors other than Defendant Kohn were to resign and the Company would then appoint four designees of Philou Ventures choosing to the Company's Board.

77.     On September 20, 2016, Philou Ventures, in a letter signed by K. Ault, waived its right to require the resignation of Defendant Rosenberg as a director of the Company.  In addition, Philou Ventures amended its right to designate Company directors from four directors to two directors.  The letter also granted the right to the remaining two Board members, Defendants Kohn and Rosenberg, to appoint a Board member. The Company filed a Form 8-K on September 22, 2016, disclosing these changes to the Securities Purchase Agreement.

78.     In the September 22, 2016 Form 8-K, the Company disclosed that following the resignations of the other three board members, the Board consisted of Kohn and Rosenberg.  Kohn and Rosenberg then filled one of the open Board seats with Robert O. Smith.

79.     On October 13, 2016, pursuant to the Securities Purchase Agreement, Defendants Horne and K. Ault were designated as Company directors.   The Company then filed a Form 8-K on March 21, 2017 announcing that: "[o]n March 16, 2017, the Board of Directors appointed Mr. Milton "Todd" Ault, III, age 47, as Executive Chairman of the Board."

80.     According to the Company's 2017 Proxy Statement, in its Proposal No. 1 "Election of Directors", the Company states that pursuant to the September 5, 2016 Securities Purchase Agreement it has the right to designate up to four directors to the Board.  The Company discloses that it has used its right to designate T. Ault, K. Ault, and Horne.  This directly contradicts the publicly filed letter from September

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

20, 2016 and the Company's Form 8-K filed on September 22, 2016, stating that Philou Ventures only has the right to designate two directors.

81.    The Company has disclosed that the manager of Philou Ventures was K. Ault and upon her resignation, Ault & Company.  In a Form 4 filed with the SEC on April 25, 2018, K. Ault discloses that on theat same day she resigned from her position as the manager of Philou Ventures.  Then on a Form 4 filed with the SEC on June 5, 2018, K. Ault discloses that Ault & Company now is the manager of Philou Ventures.

82.    According to DPW's 2017 10-K: "Philou Ventures, LLC ("Philou Ventures") beneficially owns  approximately 12.0%  of our currently outstanding Common Stock on a fully diluted basis, as of April 13, 2018. As a result, it will be able to exert a significant degree of influence over our management and affairs and over matters requiring stockholder approval, including the election of directors, any merger, consolidation or sale of all or substantially all of the Company's assets, and any other significant corporate transaction. Its interests may not always coincide with those of our other stockholders."

83.    In order to maintain its control over DPW, Philou Ventures had previously entered into a Preferred Stock Purchase Agreement ("Preferred Stock Purchase Agreement") signed by Defendants Kohn and K. Ault dated March 9, 2017. The Preferred Stock Purchase Agreement provided that Philou Ventures: (a) has the right  to participate in future offerings in order to maintain its ownership interest while diluting the ownership interest of the Company's other existing shareholders; (b) the ability to purchase 500,000 shares of Series B Preferred Stock at $10 per share and then convert those shares to common stock at $0.70 per share, potentially increasing Philou Ventures ownership interest by 7,142,857 shares; (c) the right to vote the purchased Series B Preferred Stock in director elections on an as converted basis, although the shares had not yet been converted; and (d) the

FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

automatic right to receive warrants to purchase DPW common stock at $0.70 per share up to the amount of shares of Series B Preferred Stock purchased on an as converted basis, thereby potentially increasing Philou Ventures ownership by another 7,142,857 shares. According to SEC filings as of April 25, 2018, Philou Ventures has purchased 125,000 shares of Series B Preferred Stock, which on an as converted basis equals 1,785,714 shares of common stock and an equal amount of warrants.

84.     Further, pursuant to the Preferred Stock Purchase Agreement, should Philou Ventures exercise its right to purchase the 500,000 Series B Preferred Stock, convert at $0.70 per share and receive an equal number of warrants, it would increase its common stock ownership by 14,285,714 shares.

85.     In addition, pursuant to the Preferred Stock Purchase Agreement, Philou Ventures has the right to participate in future financing arrangements under substantially the same terms and conditions as other investors in those respective financing arrangements in order to maintain its ownership interest and this right "shall accrue and accumulate provided that it still owns at least 100,000 shares of Preferred Stock."

86.     The Company stated the following in its 2017 10-K regarding its related transactions with Philou Ventures concerning the Series B Preferred Stock:

> On March 9, 2017, we entered into a Preferred Stock Purchase Agreement (the "Purchase Agreement") with Philou Ventures. Philou Ventures is the Company's largest stockholder and Kristine L. Ault, a former director, controls and is a Manager of Philou Ventures. Pursuant to the terms of the Purchase Agreement, Philou Ventures may invest up to $5,000,000 in us through the purchase of Series B Preferred Stock ("Preferred Stock") over the Term, as specified herein. Each share of Preferred Stock shall be purchased at $10.00 up to a maximum issuance

of 500,000 shares of Preferred Stock. Philou Ventures guarantees to purchase by May 31, 2017, the greater of: (i) 100,000 shares of Preferred Stock or (ii) a sufficient number of shares of Preferred Stock to ensure that we have sufficient stockholders' equity to meet the minimum continued listing standards of the NYSE American. In addition, for as long as the Preferred Stock is outstanding, Philou Ventures agrees to purchase additional shares of Preferred Stock in a sufficient amount in order us to meet the NYSE American's minimum stockholders' equity continued listing requirement subject to the maximum number of 500,000 shares of Preferred Stock (collectively, "Guaranteed Purchases"). In addition, at any time during the Term, Philou Ventures may in its sole and absolute discretion purchase additional shares of Preferred Stock, up to the 500,000 share maximum ("Voluntary Purchases"). All consideration for Voluntary Purchases shall be delivered through a series of varying payments ("Payments") by Philou Ventures, at its sole and absolute discretion, during the period commencing on the closing date and ending 36 months therefrom (the "Term"). We have the right to request, with 90-day written notice to Philou Ventures, that Guaranteed Purchases be accelerated to meet deadlines for maintaining the minimum stockholders' equity required by the NYSE American. The Preferred Stock shall not be callable by us for 25 years from the closing date.

In addition, for each share of Preferred Stock purchased by Philou Ventures, Philou Ventures will receive warrants to purchase shares of common stock in a number equal to the stated value of each share of

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Preferred Stock of $10.00 purchased divided by $0.70 at an exercise price equal to $0.70 per share of common stock

Further, Philou Ventures shall have the right to participate in our future financings under substantially the same terms and conditions as other investors in those respective financings in order to maintain its then percentage ownership interest. Philou Ventures' right to participate in such financings shall accrue and accumulate provided that it still owns at least 100,000 shares of Preferred Stock.

On December 29, 2016, MCKEA Holdings, LLC ("MCKEA") lent us $250,000 in the form of a demand note bearing simple interest at 6.0%. MCKEA is the majority member of Philou Ventures, LLC, which is the Company's controlling shareholder. Kristine L. Ault, a former director and the wife of Milton C. Ault III, Chief Executive Officer and Chairman of the Company's Board of Directors, is the manager and owner of MCKEA. On March 24, 2017, MCKEA cancelled the $250,000 demand note to purchase 25,000 shares of Preferred Stock and received warrants to purchase 357,143 shares of common stock at $0.70 per share.

On March 20, 2017, Philou arranged for the Company to receive a $250[,000] short-term loan. Between May 5, 2017 and June 2, 2017, Philou purchased an additional 75,000 shares of Series B Preferred Stock pursuant to the Preferred Stock Purchase Agreement in consideration of the cancellation of the Company debt due to Philou from the $250[,000] short term loan and cash of $500[,000]. In addition,

40

Philou received warrants to purchase 1,071,429 shares of common stock at an exercise price of $0.70 per share of common stock.

87. Pursuant to the Preferred Stock Purchase Agreement, Philou Ventures has the right to designate additional directors:

> Philou shall have the right to designate a number of directors to the Company's Board of Directors equal to a percentage determined by the number of shares of Preferred Stock (determined on an "as converted" basis) divided by the sum of the number of shares of Common Stock outstanding plus the number of shares of Preferred Stock outstanding as determined on an as converted basis. Philou's percentage to designate a number of directors shall be determined each time Philou makes a purchase of shares of Preferred Stock and cannot be decreased unless Philou converts or sells all or part of its shares of Preferred Stock in which case the number of directors that Philou may designate will be re-calculated. The right to designate a director shall be a contractual right granted to Philou and not to subsequent owner of shares of Preferred Stock.

88. The Series B Preferred Stock is convertible upon the earlier to occur of (i) 60 months from March 24, 2017, or (ii) upon DPW reaching gross revenues of $10,000,000 in the aggregate over four consecutive quarters. For the year ending 2017, DPW reports revenue of $10,001,000. Therefore, by a mere $1,000, the Series B Preferred Stock is now convertible and there is no expiration date applicable to the conversion.

89. According to the Preferred Stock Purchase Agreement, Series B Preferred Stock has the highest priority for distribution to shareholders in the event of a dissolution, liquidation or winding up of the Company.

FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

90.     On May 21, 2018, in its 1Q 2018 10-Q the Company disclosed the following:

On April 24, 2018, pursuant to the terms of the Preferred Stock Purchase Agreement, Philou purchased an additional 25,000 shares of Series B Preferred Stock in consideration of the cancellation of short-term advances due to Philou in the aggregate amount of $250[,000]. In addition, Philou received warrants to purchase 357,143 shares of common stock at an exercise price of $0.70 per share of common stock, which have been classified as equity instruments. The Company determined that the estimated relative fair value of these warrants, which are classified as equity, was $142[,000] using the Black-Scholes option pricing model. Since the warrants were classified as equity securities, the Company allocated the $250[,000] purchase price based on the relative fair values of the Series B Preferred Stock and the warrants following the guidance in ASC No. 470, *Debt*.

The Series B Convertible Preferred Stock is convertible at any time, in whole or in part, at the option of Philou, into shares of common stock at a fixed conversion price, which is subject to adjustment for stock splits, stock dividends, combinations or similar events, of $0.70 per share. As the effective conversion price of the Series B Convertible Preferred Stock on a converted basis was below the market price of the Company's common stock on the date of issuance, it was determined that these discounts represent beneficial conversion features, which were valued at $108[,000] based on the difference between the effective conversion price and the market price of the Company's common stock on the date of issuance. These features are analogous to preference

FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  dividends and are recorded as a non-cash return to preferred

2  shareholders through accumulated deficit.

3  **Avalanche International, Corp.**

4  91.     More than two years prior to taking control of DPW, the Aults used a

5  similar tactic to acquire a controlling interest in AVLP.

6  92.     On May 14, 2014, Philou Ventures purchased from AVLP's sole officer

7  and director, John Pulos, 1,875,000 shares of AVLP's common stock in exchange

8  for $150,000, representing 73.96% ownership of the company.

9  93.     T. Ault is the Chairman of the Board of AVLP, having served in this

10  position since September 2014.  Since gaining control of DPW in September 2016

11  through the date of the filing of the Verified Shareholder Derivative Complaint on

12  July 31, 2018, T. Ault has overseen the transfer of approximately $5.6 million of

13  DPW cash into AVLP and invested in AVLP common stock through open market

14  purchases of 709,633 shares of AVLP common stock for $495,023 broken down as

15  follows: (a) 2016 – 250,900 shares, total purchase price of $85,000; (b) 2017 –

16  221,333 shares, total purchase price of $192,000; (c) 2018 first quarter – 78,200

17  shares for a total purchase price of $99,000; and (d) April 2018 – 159,200 shares for

18  a total purchase price of $119,023. In April 2018 alone, DPW made 19 separate

19  purchases of AVLP stock on 13 different trading days.

20  94.     AVLP, now doing business as MTIX International, is publicly traded

21  on the OTC under the ticker symbol AVLP.  According to AVLP:

22  Avalanche International, Corp. (the "Company" or "Avalanche") was

23  incorporated under the laws of the State of Nevada on April 14, 2011.

24  The Company had plans to distribute crystallized glass tile in the North

25  American markets to wholesale customers. On May 14, 2014, the

26  Company entered into an Agreement of Conveyance, Transfer and

27  Assignment of Assets and Assumption of Obligations (the

28

43

"Agreement") with John Pulos, its prior sole officer and director. Pursuant to the Agreement, the Company transferred all assets related to its crystallized glass tile business to Mr. Pulos and in exchange Mr. Pulos assumed and cancelled all liabilities due to him. In conjunction with the Agreement, there was a change in management and the Company began to operate as a holding company with operations at the subsidiary levels only. The Company has formed two wholly-owned subsidiaries, Smith and Ramsay Brands, LLC ("SRB") and Restaurant Capital Group, LLC ("RCG"). SRB was formed on May 19, 2014, and RCG was formed on October 22, 2015. SRB was originally formed as a manufacturer and distributor of flavored liquids for electronic vaporizers and eCigarettes and accessories; this business was discontinued in June 2015. RCG was formed to hold the Company's investments in the restaurant industry.

95.     In March 2017, AVLP entered into an agreement to acquire a third business, MTIX Ltd.

96.     According to AVLP's website, the company currently has only two holdings, MTIX Ltd. and Restaurant Capital Group, LLC.

97.     Restaurant Capital Group, LLC has one notable investment listed on its website, a restaurant called Guilia.  AVLP discloses that T. Ault is the manager of Restaurant Capital Group, LLC.

98.     ~~AVLP also has~~As of July 31, 2018, the date of the filing of the Verified Shareholder Derivative Complaint, AVLP had not filed a periodic filing with the SEC since its first quarter Form 10-Q for the period ending February 29, 2016, filed more than a year late on August 7, 2017.[4]  According to the 1Q 2016 Form 10-Q,

---

[4] On December 6, 2018, AVLP filed its Form 10-Q for the period ending May 31, 2016, over two years late (the "2Q 2016 Form 10-Q").

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

AVLP's financial condition was precarious, "[a]s a result of the Company's continued losses, at February 29, 2016, the Company's current liabilities significantly exceed current assets, resulting in negative working of $2,129,516. Further, the Company does not have adequate cash to cover projected operating costs for the next 12 months. These factors raise substantial doubt about the ability of the Company to continue as a going concern."[5] As of its quarter ended February 29, 2016, AVLP had $156,870 in total assets and almost no cash.  AVLP had total liabilities of $2,287,230 and no revenue for the three months ended February 29, 2016.

99.   AVLP last filed a Form 10-K with the SEC on April 28, 2017, for the fiscal year ending November 30, 2015, which was also filed well over a year late. According to AVLP's 2015 Form 10-K, the company had $18,322 in total assets as of November 30, 2015.  The company had total liabilities of $2,105,721 and a stockholders' deficit of $2,087,389.  AVLP had revenue of $38,900 for the year end November 30, 2015, which included $34,086 from related parties.  The company's total loss from operations was $1,394,287 for the fiscal year ended November 30, 2015.

100.   AVLP also discloses as related party transactions business dealings dating back to 2016 and 2015 with MCKEA Holdings, LLC and Cross Click Media, Inc, two companies owned by Philou Ventures and/or the Aults.  AVLP's related party disclosures included the following: "[d]uring the three months ended February 28, 2015, the [AVLP] sold $10,236 in products to Vape Nation. These sales represented 68% of total revenue. Vape Nation is 50% owned by MCKEA Holdings, LLC ("MCKEA"). MCKEA is the majority member of Philou Ventures, which is

---

[5] The 2Q 2016 Form 10-Q even painted a more dismal picture of ALVP's financial condition. AVLP repeated the going concern language that was in the 1Q 2016 Form 10-Q except, that negative working capital had increased by almost $800,000, to $2,927,449.

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

the Company's controlling shareholder. Kristine L. Ault, the wife of Milton C. Ault III, Chairman of the Company's Board of Directors, is the manager and owner of MCKEA."

101.   Companies run by T. Ault, including DPW, are involved in almost every business dealing entered into by AVLP since AVLP's change in management in May 2014. Additionally, AVLP discloses that T. Ault has personally guaranteed certain AVLP loans.  T. Ault even guaranteed a three-year lease that AVLP entered on May 15, 2014. Also, Defendant Horne has been the CFO at all relevant times hereto and a director of AVLP since June 2016, as well as AVLP's audit committee chairman.

102.   Alzamend Neuro, Inc.  ("Alzamend") was founded by T. Ault in February 2016.  AVLP's CEO Phil Mansour ~~is~~was also the CEO for Alzamend.[6]  T. Ault is Alzamend's Executive Chairman and Horne ~~is~~was the CFO.[7]  DPW loaned Alzamend $44,000.

103.   DPW also discloses that AVLP is a party to a management services agreement (the "MSA") pursuant to which AVLP provides management, consulting and financial services to Alzamend. The term of the MSA, as amended, is for the period May 1, 2016 to December 31, 2017 with AVLP having received $40,000 per month and, beginning February 2017, receiving $20,000 per month for the remainder of 2017.

104.   On March 7, 2017, Philou Ventures and AVLP entered into an agreement whereby Philou Ventures would surrender its 2,000,000 shares of AVLP common stock in exchange for 50,000 shares of newly created AVLP preferred stock that provided Philou Ventures with control over 80% of all votes entitled to vote.

---

[6]  Mansour resigned as Alzamend's CEO on November 2, 2018, effective November 5, 2018.

[7]  Horne resigned as Alzamend's CFO on November 30, 2018 with an effective date of December 15, 2018. He remained a member of Alzamend's board of directors.

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

105.    As of August 2017, Philou Ventures is AVLP's controlling shareholder.  According to DPW's 2017 10-K, "Philou Ventures is the controlling shareholder of Avalanche as well as our largest shareholder."

106.    According to DPW, the Company owns 83.8% of AVLP common stock as an investment.  According to a Schedule 13D/A filed by AVLP on May 9, 2018, DPW is the beneficial owner of 83.81% of AVLP's common stock.[8] Although DPW owns a majority of AVLP's common stock, Philou Ventures is the controlling shareholder through the voting power of the AVLP preferred stock it owns.

107.    DPW has invested a significant amount of cash in AVLP.  The capital infusions from DPW began immediately after the Aults and Philou Ventures took control of DPW. DPW entered into a series of transactions involving convertible promissory notes whereby DPW extended the due date for repayment of principal and interest by restructuring the notes. The convertible promissory notes have been consolidated into a single convertible promissory note. The amount of the note as of March 31, 2018 was approximately $5.6 million.

108.    DPW's 2017 10-K reported a total gross investment in AVLP of $12,176,000 as of December 31, 2017.   As of December 31, 2016, DPW reported a total gross investment in AVLP of only $1,090,000.   Therefore, DPW's total investment in AVLP during the calendar year 2017 increased more than $11 million in value.

109.    As of March 31, 2018, the Company reported a total gross investment in AVLP of $10,675,000, a decrease in value of approximately $1.5 million from

---

[8] ——The 83.81% beneficial ownership assumes conversion of DPW's convertible promissory notes in the aggregate face amount of $5,773,720 into 11,547,440 shares of AVLP's common stock based on a conversion price of $0.50 per share and 11,547,440 shares of AVLP's common stock based upon the exercise of DPW's warrants at $0.50 per share.  Therefore, to obtain such ownership over AVLP, DPW would need to make a large cash investment.

47

three months ago. Part of that over $10 million investment is in the form of the cash infusion of approximately $5.6 million as evidenced by the convertible promissory note described above.[9]

110.   In its 2017 10-K, the Company describes in detail the various transactions with AVLP including the cancellation and consolidation of loan agreements, which has the effect of postponing the due dates for interest and principal to be paid back to the Company:

> During the year ended December 31, 2016, the Company made a strategic decision to invest in AVLP, a related party controlled by Philou, an existing majority stockholder. The Company's investments in AVLP primarily consist of convertible promissory notes and shares of common stock of AVLP.
>
> **On October 5, 2016, November 30, 2016, and February 22, 2017, the Company entered into three 12% Convertible Promissory Notes with AVLP (the "AVLP Notes") in the principal amount of $525[,000] each.** The AVLP Notes included a 5% original issue discount, resulting in net loans to AVLP of $1,500[,000] and an original issue discount of $75[,000]. The AVLP notes accrued interest at 12% per annum and were due on or before two years from the origination dates of each note. The Company had the right, at its option, to convert all or any portion of the principal and accrued interest into shares of common stock of AVLP at approximately $0.74536 per share. Subject to adjustment, the AVLP Notes, inclusive of the original issue discount, were convertible into 2,113,086 shares of the Company's

---

[9] As of June 30, 2018, the Company's investment had deteriorated further, as DPW took unrealized losses in the value of the ALVP warrants and common stock of over $5 million, reducing its investment in ALVP to $7.68 million.

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT**

common stock. **During the period from March 29, 2017 to August 16, 2017, the Company funded $1,809[,000] in excess of the $1,500[,000] net loan amount required pursuant to the terms of the AVLP Notes**.

On September 6, 2017, the Company and AVLP entered into a Loan and Security Agreement ("AVLP Loan Agreement") with an effective date of August 21, 2017 pursuant to which the Company will provide Avalanche a non-revolving credit facility of up to $5,000[,000], inclusive of prior amounts loaned to AVLP, for a period ending on August 21, 2019, subject to the terms and conditions stated in the Loan Agreement, including that the Company having available funds to grant such credit.

**In consideration of entering into the AVLP Loan Agreement, the Company and AVLP cancelled the AVLP Notes and consolidated the AVLP Notes and prior advances totaling $3,309[,000] plus original issue discount of $165[,000] and issued a new Convertible Promissory Note in the aggregate principal amount of $3,474[,000]** (the "New Note") that is convertible into shares of AVLP at a conversion price of $0.50 per share. The New Note is due in two years and accrues interest at 12% per annum on the principal amount. Prior interest accrued under the AVLP Notes and advances will continue to be an obligation of AVLP. The New Note contains standard events of defaults. In addition, concurrent to issuing the New Note, AVLP issued to the Company a five-year warrant to purchase 6,948,800 shares of AVLP Common Stock at $0.50 per share. **Further, the Company**

**made additional advances under the AVLP Loan Agreement in the aggregate amount of $650[,000]. As a result, at December 31, 2017, the Company has provided loans to AVLP in the principal amount $4,124[,000]** and, in addition to the 12% convertible promissory notes, AVLP has issued to the Company warrants to purchase 8,248,440 shares of AVLP common stock. Future advances under the AVLP Loan Agreement, if any, will be evidenced by a convertible promissory containing a conversion price feature at $0.50 per share and warrant with an exercise price of $0.50 per share. Further, under the terms of the AVLP Loan Agreement, any notes issued by AVLP are secured by the assets of AVLP.

The warrants entitle the Company to purchase up to 8,248,440 shares of AVLP common stock at an exercise price of $0.50 per share for a period of five years. The exercise price of $0.50 is subject to adjustment for customary stock splits, stock dividends, combinations or similar events. The warrant may be exercised for cash or on a cashless basis. The Company recorded an unrealized gain on its investment in warrants of AVLP of $4,513[,000], representing the difference between the cost basis of $2,389[,000] and the estimated fair value of the warrants net of tax as of December 31, 2017, in the Company's accumulated other comprehensive income in the stockholder's equity section of the Company's consolidated balance sheet and as a change in net unrealized gains on securities available-for-sale in the Company's consolidated statements of comprehensive loss. The Company's investment in Avalanche will be revalued on each balance sheet date. The fair value of the Company's holdings in the

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Avalanche warrants was estimated using the Black-Scholes option-pricing method. The risk-free rate of 1.89% was derived from the U.S. Treasury yield curve, matching the term of our investment, in effect at the measurement date. The volatility factor of 82.4% was determined based on historical stock prices for similar technology companies with market capitalizations under $100 million. The warrant valuation is a Level 3 measurement.

In accordance with ASC No. 310, *Receivables* ("ASC 310"). The Company accounts for its convertible promissory notes in AVLP at amortized cost, which represents the amount at which the convertible promissory notes were acquired, adjusted for accrued interest and accretion of original issue discount and discount attributed to the fair value of the 8,248,440 warrants that the Company received in conjunction with its investment.  Interest is accreted using the effective interest method. The Company records interest on an accrual basis and recognizes it as earned in accordance with the contractual terms of the convertible promissory notes, to the extent that such amounts are expected to be collected. The original issue discount of $165[,000] on the New Note and the discount attributed to the fair value of the warrants of $2,389[,000] is being amortized as interest income through the maturity date. During the years ended December 31, 2017 and 2016, the Company recorded $454[,000] and $2[,000], respectively, of interest income for the discount accretion. **As of December 31, 2017 and 2016, the Company recorded contractual interest receivable attributed to the AVLP Notes and AVLP Loan Agreement of $324[,000] and $11[,000]**, respectively.

**The Company evaluated the collectability of both interest and principal for the convertible promissory notes in AVLP to determine whether there was an impairment. Based on current information and events, the Company determined that it is probable that it will be able to collect amounts due according to the existing contractual terms.** Impairment assessments require significant judgments and are based on significant assumptions related to the borrower's credit risk, financial performance, expected sales, and estimated fair value of the collateral.

**During the years ended December 31, 2017 and 2016, the Company also acquired in the open market 221,333 shares of AVLP common stock for $192[,000] and 250,900 shares of AVLP common stock for $85[,000], respectively**. At December 31, 2017, the closing market price of AVLP's common stock was $1.75. The Company has determined that its investment in AVLP marketable equity securities are accounted for pursuant to the fair value method and based upon the closing market price of common stock at December 31, 2017, the Company has recognized an unrealized gain of $550[,000].

(Emphasis added.)

111.   In summary, at March 31, 2018, DPW has provided loans to AVLP in the principal amount $5,584,000 and, in addition to the 12% convertible promissory notes, AVLP has issued to the Company warrants to purchase 11,167,440 shares of AVLP common stock.

112.   Further, any investment by DPW in AVLP is speculative. AVLP

52

1  common stock is thinly-traded with no volume at all on some trading days, according

2  to Yahoo Finance. AVLP has also defaulted on several loans to lenders other than

3  DPW.

4      113.   AVLP also does not have the resources to pay back the loans that DPW

5  provided to AVLP.   Based on ALVP's financial condition, the Individual

6  Defendants knew that it was exceedingly unlikely that AVLP would be able to repay

7  these loans when they lent the money to AVLP.   DPW cancelled the initial loan

8  agreements and entered into a new agreement, pushing off the repayment date for

9  another two years.   Although DPW claims that the principal and interest is

10  collectible, T. Ault and Horne in their respective positions with AVLP are in

11  possession of adverse inside information in order to make an impairment

12  determination as to the approximately $5.6 million plus interest convertible

13  promissory note.

14      114.   As stated by the Company, any notes issued by DPW are secured by

15  assets of AVLP, however, AVLP does not have recent financial statements for

16  investors to review in evaluating the securitization of the loans provided to AVLP.

17  This is especially true given that as of February 29, 2016, AVLP reported assets of

18  only $156,870.[10]

19      115.   Because AVLP has~~s~~d not filed any financial statements with the SEC

20  since its Form 10-Q for the first quarter of 2016 as of July 31, 2018, DPW attempted

21  to incentivize Horne with DPW stock at the time in order to get AVLP current with

22  its filings.  According to a Form 4 filed by Horne on November 28, 2017, "Horne

23  received 200,000 shares of common stock of which fifty percent (50%) of such

24  common stock shall immediately vest with the remaining balance to vest once

25  Avalanche International Corporation is current with its periodic reports with the

26  

_____

27  [10] As of June 30, 2018, DPW's notes were still not adequately secured, although the Company continued to represent that any outstanding amounts were collectible in

28  full.

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

SEC." Essentially DPW was offering Horne 100,000 shares of common stock to perform his job at AVLP. On December 1, 2017, Horne filed an amended Form 4, indicating that the issuance of this common stock is subject to shareholder approval in order to comply with NYSE American and therefore is not deemed issued.

116. DPW provided approximately $5.6 million in cash funding to AVLP with the understanding that AVLP would use ~~apportion~~a portion of these funds to purchase MTIX Ltd. ("MTIX"). AVLP contractually acquired the rights to MTIX in March 2017 and finalized its acquisition of MTIX on August 22, 2017.

117. In addition to lending AVLP approximately $5.6 million, DPW also paid off debts incurred by MTIX as disclosed in DPW's 1Q 2018 10-Q:

On December 5, 2017, the Company entered into an exchange agreement with WT Johnson pursuant to which the Company issued to WT Johnson two convertible promissory notes in the principal amount of $600[,000] ("Note A") and $1,668[,000] ("Note B"), in exchange for cancellation of amounts due to WT Johnson by MTIX Ltd., a related party of the Company.

During December 2017, the Company issued 600,000 shares of its common stock to WT Johnson & Sons upon the conversion of Note A and WT Johnson subsequently sold the 600,000 shares. The proceeds from the sale of Note A were sufficient to satisfy the entire $2,268[,000] obligation as well as an additional $400[,000] of value added tax due to WT Johnson. Concurrent with entering into the exchange agreement, the Company received a promissory note in the amount of $2,668[,000] from MTIX and cancelled Note B. At March 31, 2018 and December 31, 2017, the Company has valued the note receivable at $600[,000], the carrying amount of Note A. The Company will recognize the

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1  remainder of the amount due from MTIX upon payment of the
2  promissory note by MTIX.

3      118.   If DPW purchased MTIX directly, then DPW could not claim the $50
4  million purchase order from MTIX as revenue as described in detail in ¶¶ 124-127.
5  As discussed below in ¶¶ 124-127, as of July 31, 2018, the purchase order from
6  MTIX has~~d~~ thus far not materialized and will likely never be fulfilled.

7      119.   Furthermore, T. Ault and Horne are compensated as officers and/or
8  directors of AVLP.  According to AVLP's ~~most recent~~ Form 10-Q for the period
9  ended February 29, 2016, AVLP pays a monthly fee of $20,000 to T. Ault.  AVLP
10  has not disclosed Horne's salary as CFO but it has disclosed that he has been granted
11  at least 1,000,000 shares of stock options to purchase AVLP common stock.

12      120.   DPW is investing millions of dollars to fund AVLP's operations to the
13  direct benefit of T. Ault, K. Ault and Horne, and to the direct detriment of DPW and
14  its shareholders. Indeed, DPW is in dire need of a substantial cash infusion in order
15  to maintain its business as a going concern.

16      121.   DPW raised the cash that it provided to AVLP by issuing tens of
17  millions of shares of DPW common stock at below market prices and entering into
18  future receipts agreements at ~~usurious~~unreasonable rates of interest as described
19  below in ¶¶ 128-160.  These funds were then funneled into AVLP. These actions
20  harmed DPW and its shareholders.

21      122.   The Aults and Horne violated DPW's Code of Ethics, which states in
22  part, "[d]irectors, officers and employees may not use Company assets, property,
23  information or position for personal gain (including gain of friends or family
24  members)."

25      123.   The actions of the Individual Defendants in permitting and/or
26  orchestrating dealings with AVLP was improper and ~~violated the duty of~~
27  ~~loyalty.~~breached their fiduciary duties.

28

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**MTIX Purchase Order**

124.   DPW has touted a 3-year $50 million purchase order from MTIX ("MTIX Purchase Order") that the Company received in March 2017.  MTIX is owned by AVLP and for this reason DPW reports information about the MTIX Purchase Order under 'Related Parties' on its 1Q 2018 10-Q.

125.   In its 2017 10-K, the Company states the following, "During the year ended December 31, 2017, we recognized $174[,000] in revenues resulting from our relationship with MTIX Ltd., a company formed under the laws of England and Wales ("MTIX").  MTIX was acquired by AVLP on August 22, 2017 and is therefore deemed to be a related party.  In March 2017, the Company was awarded a 3-year, $50 million purchase order by MTIX to manufacture, install and service the Multiplex Laser Surface Enhancement ("MLSE") plasma-laser system.  Management believes that the MLSE purchase order will be a source of revenue and generate significant cash flows for the Company. However, at December 31, 2017, the $174[,000] in revenues had not yet been received and was reflected on the financial statements as accounts receivable, related party."

126.   The Company states the following in its 1Q 2018 10-Q, "Management believes that the [MTIX] purchase order will be a source of revenue and generate significant cash flows for the Company.  However, at March 31, 2018, the $1,967[,000] in revenues recognized during the three months ended March 31, 2018 and year ended December 31, 2017, had not yet been received and was reflected on the financial statements as accounts receivable, related party."  Therefore, the Company which is cash poor has yet to receive any cash at all for the MTIX Purchase Order.  Furthermore, the receivables for the MTIX Purchase Order are not close to the $50 million promised.

127.   As a related party, with an overlapping CFO (Horne) and Chairman of the Board (T. Ault), the Individual Defendants knew, or should have known, that

MTIX does not have the resources to fund a $50 million purchase order and that it was exceedingly unlikely that this purchase order would ever be fulfilled.  Moreover, as discussed above, DPW has paid off debts incurred by MTIX as revealed in the 1Q 2018 10-Q seemingly because MTIX did not have the available cash.  The Company has not written off any of the receivable amount due from MTIX or disclosed an allowance for doubtful accounts for the MTIX receivables in its 1Q 2018 10-Q.  Instead of properly recognizing the unlikely fulfillment of the MTIX Purchase Order, the Individual Defendants have publicly touted this agreement through press releases and social media activity, including the press release on June 18, 2018 announcing T. Ault's Executive Employment Agreement.

**Future Receipts Agreements**

128.  The Company has been entering into unfair loan agreements and mortgaging the future by securing these loans with future receipts on unfavorable terms during the second half of 2017 and into 2018.

129.  According to the Company's 2017 10-K: "Between July 6, 2017 and September 13, 2017, the Company received funding as a result of entering into multiple Agreements for the Purchase and Sale of Future Receipts with TVT Capital LLC pursuant to which the Company sold in the aggregate $4,068[,000] in future receipts of the Company for $2,889[,000]. Under the terms of the agreements, the Company will be obligated to pay the initial daily amount of $19[,000] until the $4,068[,000] has been paid in full. As of December 31, 2017, the Company had repaid $1,526[,000].  The term future receipts means cash, check, ACH, credit card, debit card, bank card, charged card or other form of monetary payment."  This equates to interest payments of $1,179,000 or 41%.  Furthermore, the Company is required to repay $133,000 per week until the remaining balance of $2,585,000 is repaid in full.

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

130. During the quarter ended March 31, 2018, the Company entered into a total of nine additional agreements ("Future Receipts Agreements") pursuant to which the Company sold its future receipts (defined as any monetary payment received by the Company) of up to $5,768,900 for $4,100,000. Essentially the Company is forgoing more than $1.6 million in order to have cash immediately. Moreover, the Company bears the risk for repayment regardless of whether or not the Company has any receipts, therefore in actuality the Future Receipts Agreements are loan agreements where the Company is the debtor.

131. The Future Receipts Agreements are described as follows according to Form 424B5 Prospectus Supplement filed by the Company with the SEC on May 17, 2018:

> During the quarter ended March 31, 2018, we entered into a total of nine Agreements for the Purchase and Sale of Future Receipts (collectively, the "Agreements on Future Receipts") pursuant to which we sold up to $5,768,900 in our "future receipts" for a purchase price in the amount of $4,100,000. The term "future receipts" means cash, check, ACH, credit card, debit card, bank card, charge card or other form of monetary payment. The Agreements on future receipts have been personally guaranteed by our Chief Executive Officer and in one instance has also been guaranteed by Philou Ventures, LLC ("Philou"). The terms of the Agreements on future receipts are reflected below.

> On January 10, 2018, we entered into two Agreements for the Purchase and Sale of Future Receipts (together, the "Agreements") with TVT Capital LLC ("TVT"), pursuant to which Agreements we sold up to (i) $476,000 in our future receipts for a purchase price of $350,000 ("Agreement No. 1") and (ii) $1,700,000 in our future receipts for a

purchase price of $1,250,000 ("Agreement No. 2"). Under the terms of Agreement No. 1, we are obligated to pay $9,445 on a weekly basis until the purchase price of $350,000 has been paid in full. In connection with entering into Agreement No. 1, we paid a $10,500 origination fee. Under the terms of Agreement No. 2, we are obligated to pay $33,730 on a weekly basis until the purchase price of $1,250,000 has been paid in full. In connection with entering into Agreement No. 2, we paid a $37,500 origination fee.

On January 18, 2018, we entered into a Future Receivables Sale Agreement with Libertas Funding LLC ("Libertas"), pursuant to which we sold the rights of up to $594,000 in our future receivables for a purchase price of $400,000 ("Agreement No. 3"). In connection with entering into Agreement No. 3, we paid a $12,000 origination fee. Under the terms of Agreement No. 3, beginning in April 2018, we are obligated to pay $56,191 on a weekly basis until the purchase price of $594,000 has been paid in full.

On January 25, 2018, we entered into two agreements for the Purchase and Sale of Future Receipts with TVT, pursuant to which we sold up to (i) $562,125 in future receipts of our company to TVT for a purchase price of $375,000 ("Agreement No. 4") and (ii) $337,275 in our future receipts for a purchase price of $225,000 ("Agreement No. 5"). Under the terms of Agreement No. 4, we are obligated to pay $22,310 on a weekly basis until the purchase amount of $562,125 has been paid in full. In connection with entering into Agreement No. 4, we paid an origination fee in the amount of $13,545. Agreement No. 4 also

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

includes a warrant to purchase 56,250 shares of our common stock at an exercise price of $2.25 per share and a warrant to purchase 37,500 shares of our common stock at an exercise price of $2.50 per share. Under the terms of Agreement No. 5, we are obligated to pay $13,385 on a weekly basis until the purchase amount of $337,275 has been paid in full. In connection with entering into Agreement No.5, we paid an origination fee in the amount of $6,750. Agreement No. 5 also includes warrants to purchase 56,250 shares of our common stock at an exercise price of $2.25 per share.

On January 25, 2018, we entered into a Future Receivables Sale Agreement with Libertas, pursuant to which we sold up to $148,500 in our future receivables to Libertas for a purchase price of $100,000 ("Agreement No. 6"). We are obligated to pay $14,048 on a weekly basis until the purchase amount of $148,500 has been paid in full. In connection with entering into Agreement No. 6, Libertas received an additional discount for due diligence in the amount of $3,000. Agreement No. 6 also includes warrants to purchase 125,000 shares of our common stock at an exercise price of $2.50 per share. Agreement No. 6 has been guaranteed by Philou.

On March 23, 2018, we entered into two agreements for the purchase and sale of future receipts with C6 Capital, LLC ("C6"), pursuant to which we sold up to (i) $979,300 in future receipts of our company to TVT for a purchase price of $700,000 ("Agreement No. 7") and (ii) $419,700 in future receipts of our company for a purchase price of $300,000 ("Agreement No. 8"). Under the terms of Agreement No. 7,

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

we are obligated to pay $25,770 on a weekly basis until the purchase amount of $979,300 has been paid in full. In connection with entering into Agreement No.7, we paid an origination fee in the amount of $14,000. Under the terms of Agreement No. 8, we are obligated to pay $11,045 on a weekly basis until the purchase amount of $419,700 has been paid in full. In connection with entering into Agreement No.8, we paid an origination fee in the amount of $6,000.

On March 27, 2018, we entered into a future receivables sale agreement with Libertas, pursuant to which we sold up to $552,000 in future receivables to Libertas for a purchase price of $400,000. In connection with entering into this agreement, we paid an origination fee in the amount of $12,000. Under the terms of Agreement No. 9, we are obligated to pay $13,143 on a weekly basis until the purchase amount of $552,000 has been paid in full. As additional consideration, we also issued to Libertas 150,000 shares of its common stock.

132.   In the aggregate, the Company had paid origination fees as part of the Future Receipts Agreements totaling more than $100,000 through the quarter ended March 31, 2018.

133.   The Company issued 150,000 shares of common stock as part of the consideration for one of the agreements (Agreement No. 9).  The Company also granted stock options and warrants as part of the Future Receipts Agreements.

134.   Thus, the Company is paying $5,768,900 for $4,100,000 for short term financing during the first quarter of 2018, with the obligation to make repayment in full in approximately 10 weeks.  The total interest being charged on these loans is $1,668,900 or approximately 41% for a repayment period of only 10 weeks. The repayment schedule on the Future Receipts Agreements requires the Company to

FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

make payments on a weekly or daily basis, which can amount to more than $100,000 for some weeks depending on the timing of the various repayment schedules. In addition, the Company had to pay origination fees and provide stock in order to induce the lenders.

135.   As of March 31, 2018, the Company reports total current liabilities of $15,995,000 on its balance sheet.   The Company's current liabilities include $3,775,000 liability for advances on future receipts and $2,776,000 for short term advances. It also includes accounts payable of $4,680,000 and notes payable of $3,160,000.  The Company reports total current assets of $11,205,000 as of March 31, 2018.  The Company's current assets include cash of $630,000 and marketable securities of $1,938,000. as of March 31, 2018.   The Company also discloses accounts receivable of $1,565,000 from non-related parties as of March 31, 2018.

136.   The Company's balance sheet demonstrates that the Company has accrued significant short-term liabilities without the cash or liquid assets necessary to satisfy the obligations. as of March 31, 2018.   As a result, the Company's independent auditors have raised substantial doubt as to the Company's ability to continue as a going concern. The Company has also raised its concern regarding the going concern issue as of July 31, 2018, the date of the filing of the Verified Shareholder Derivative Complaint. The going concern issue still remains a substantial challenge for the Company.

137.   In sum, during the second half of 2017 and first quarter of 2018, the Company "sold" future receipts of $9,836,900 for $6,989,000, which equals interest of approximately 41%.

138.   These future receipts loan agreements provide for extremely high rates of interest and very short durations.  These loans are the type that would be offered by a loan shark or other predatory lender.

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

139.   The terms of the Future Receipts Agreements and other loans are unfair to the Company and its shareholders. This is especially true given the at least $1 million in cash compensation per annum being paid the three Officer/Director Defendants by DPW alone. This does not even take into account the cash infusion DPW made into AVLP, a company controlled by Philou Ventures and the Aults, nor the compensation being paid to Horne as AVLP's CFO and T. Ault in his capacity as ALVP's Chairman of the Board.

**Stock Issuances**

140.   The Company not only entered into the Future Receipts Agreements to raise cash but also has been regularly issuing shares since the beginning of 2017, and these issuances have become even more prolific since November 2017 ~~until the present~~. These stock issuances have diluted the shares outstanding and caused, in part, the steep decline in the price per share.

141.   As of April 5, 2017, the number of shares of common stock outstanding was only 9,216,853. A little more than a year later, as of April 13, 2018, the Company had 43,562,860 shares of common stock outstanding. As of May 18, 2018, the Company had 59,256,783 shares of common stock outstanding.

142.   Although the Company's stated purpose for these stock issuances is to finance DPW's ongoing operations, the Company has proceeded to make loans to related parties including AVLP, which were not in the best interests of the Company or its shareholders.

143.   Furthermore, the Company has issued shares to pay for various services under unfavorable terms to the Company and, in some cases, without proper disclosure to shareholders to ascertain what services were provided and being paid for.

144.   For example, as disclosed in the Company's 1Q 2018 10-Q, "[o]n September 9, 2017, the Company approved the issuance of 100,000 shares of our

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

common stock to Spartan Capital for capital advisory services.  On February 2, 2018, the Company amended the terms of the consulting agreement with Spartan Capital and agreed to issue an additional 200,000 shares of the Company's common stock."

145.   Shares have been issued to consultants for services rendered, although the nature of the services and amounts owed to the consultants have not been disclosed by the Company.  Between October 3, 2017 and December 28, 2017, the Company issued 612,000 shares of its common stock as payment for services to its consultants.  Between January 1, 2018 and March 31, 2018, the Company issued an additional 1,683,059 shares of its common stock to its consultants, which the Company valued at $3,033,000, for services rendered.

146.   ~~More recently~~Subsequently, on May 8, 2018, the Company issued 400,000 shares of its common stock as "payment for services to a consultant." According to the 1Q 2018 10-Q, the shares were valued at $328,000.

147.   The Company has also issued shares in exchange for forgiveness of past debts, usually under terms favorable to the lender. This is becoming a repetitive cycle whereby the Company needs to borrow money to pay off past debts.  Discussed below are many examples of the Company issuing stock to pay for principal and accrued interest on prior loans.

148.   For example, in the 1Q 2018 10-Q the Company disclosed that, on May 15, 2018, the Company entered into securities purchase agreements with certain investors in which ~~we~~it sold an aggregate of 7,691,775 shares of ~~our~~DPW common stock, and five-year warrants to purchase such number of shares of common stock equal to the shares of common stock purchased by the investors. The Company received aggregate consideration of $6 million, consisting of cash of $3,225,000 and the cancellation of short term advances of $2,775,000.

149.   DPW has also frequently issued stock at lower than fair market value as measured by its trading price per share in the marketplace.  The Company has

disclosed many examples of this practice whereby debt was satisfied by issuing shares at steeply discounted per share values further diluting shareholder ownership interests while at the same time depressing the Company's market price.

150.   For example, as disclosed in the 2017 10-K, "[o]n December 13, 2017 and December 14, 2017, the entire $1,111[,000] of principal on the November 5% Convertible Note was satisfied through the issuance of 1,851,667 shares of the Company's common stock." At the close of trading on December 13, 2017, DPW closed at $5.05 per share and at close of trading on December 14, 2017, DPW closed at $5 per share.  Therefore, the Company issued shares with a fair market value of over $9,000,000 in order to satisfy the principal of a $1,111,000 note.

151.   Another example, also disclosed in the 2017 10-K, "[o]n December 28, 2017, principal and accrued interest of $198[,000] and $5[,000], respectively, on the 12% Convertible Note was satisfied through the issuance of 368,760 shares of the Company's common stock."  On December 28, 2017, DPW stock closed at $3.69.  Therefore, the Company satisfied a debt of $203,000 by issuing shares of common stock with a fair market value of over $1,000,000.

152.   Another example is disclosed in the 2017 10-K, "[d]uring December 2017, the entire principal and accrued interest of $880[,000] and $54[,000], respectively, on the 10% Convertible Notes was satisfied through the issuance of 1,557,417 shares of the Company's common stock."  The Company's common stock was trading in the marketplace at a high of $5.95 and a low of $1.60 during the month of December.  Therefore the 1,557,417 in shares had a value ranging between a high of $9,266,631 and low of $2,491,867.

153.   The Company also disclosed in its 2017 10-K that, "[d]uring the period from November 27, 2017 to December 6, 2017, the entire $530[,000] of principal on the Convertible Note was satisfied through the issuance of 963,636 shares of the

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Company's common stock." During these 8 trading days, DPW's share price was never below $1 and had a high of $5.01.

154. The practice of issuing shares at lower than fair market value as measured by its trading price per share in the marketplace has continued in 2018. As a result, shareholder ownership interest haves been further diluted and the stock price further depressed.

155. For instance, on January 3, 2018, DPW stock closed at $3.08 per share. According to the 1Q 2018 10-Q, "[o]n January 3, 2018, accrued interest of $23[,000] on the 10% Convertible Notes was satisfied through the issuance of 37,750 shares of the Company's common stock." Therefore, the Company satisfied a $23,000 debt using stock that had a fair market value of $116,270.

156. For example, on January 10, 2018, DPW stock closed at $2.70 per share. On that same day, according to the 1Q 2018 10-Q, "principal and accrued interest of $202[,000] and $6[,000], respectively, on the 12% Convertible Note was satisfied through the issuance of 377,678 shares of the Company's common stock." Therefore, the Company satisfied a $208,000 debt using stock that had a fair market value of $1,019,730.

157. In another example, on January 12, 2018, DPW stock closed at $2.73 per share. According to the 1Q 2018 10-Q, "[o]n January 12, 2018, principal and accrued interest of $550[,000] and $3[,000], respectively, on the 5% Convertible Note was satisfied through the issuance of 921,645 shares of the Company's common stock." Therefore, the Company satisfied a $553,000 debt using stock that had a fair market value of $2,516,090.

158. The Company has also engaged in raising capital by issuing equity at below market prices. For instance, as disclosed in the 2017 10-K, "[o]n December 5, 2017 the Company entered into subscription agreements with investors for the sale of 640,000 shares of common stock at $1.25 per share for the aggregate purchase

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

price of $800,000." On December 5, 2017 DPW stock closed at $3.66 per share. Therefore, the Company agreed to provide shares with a fair market value of approximately $2,342,000 for $800,000.

159. The Company has also issued warrants on favorable terms, as disclosed in the 2017 10-K, "[b]etween November 27, 2017 and December 28, 2017, the Company issued a total of 1,871,864 shares of its common stock upon the cash and cashless exercise of warrants to purchase an aggregate of 2,113,465 shares of its common stock. These warrants were issued between November 2016 and August 2017 in conjunction with various common stock and debt financings. The Company received cash of $642[,000] as a result of these warrant exercises."

160. Another example, according to the 1Q 2018 10-Q, "[d]uring January 2018, the Company issued a total of 1,866,471 shares of its common stock upon the cash and cashless exercise of warrants to purchase an aggregate of 2,187,646 shares of its common stock. These warrants were issued between August 2017 and December 2017 in conjunction with various common stock and debt financings. The Company received cash of $867[,000] as a result of these warrant exercises."

**The Shelf Registration**

161. The Company filed a Form S-3 Shelf Registration Statement with the SEC on December 18, 2017, amended it on January 8, 2018, and it was declared effective on January 11, 2018 (the "Shelf Registration"). Pursuant to the Shelf Registration, DPW was permitted to sell shares of the Company's common stock, having an aggregate offering price of up to $100 million from time to time.

162. Between February 27, 2018 and March 31, 2018, the Company, through its sales agent, H.C. Wainwright & Co., LLC ("HCW") received net proceeds of $5,928,000 through the sale of 5,120,812 shares of common stock pursuant to the Shelf Registration.

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

163.    Between April 1, 2018 and May 15, 2018, the Company through HCW, sold 7,929,950 shares of the Company's outstanding stock for net proceeds of $7,477,000 pursuant to the Shelf Registration.

164.    The Company is paying HCW a commission in an amount equal to 5% of the gross sales price per share sold, as well as reimbursing HCW up to a maximum of $60,000 in expenses.

165.    On May 17, 2018, the Company filed a Form 424B5 prospectus supplement to the Shelf Registration detailing stock issuances for the purpose of raising $5.6 million.   The filing states: "[w]e intend to use a portion of the net proceeds raised pursuant to this offering to fund the proposed acquisition of Enertec and to loan $1,000,000 to an unrelated party."   ~~The Company has not provided any~~No further information was provided about who this unrelated party ~~is~~was and why the Company ~~is~~was issuing shares to finance a loan to this person or entity.

166.    Further, the Company continue~~d~~s to rely on the Shelf Registration to fund past transactions at least through May 31, 2018. For example, on March 8, 2018, the Company purchased cryptocurrency mining equipment for $3.2 million. As of May 17, 2018, the Company paid a total of $1,676,000. The Company disclosed that it intend~~ed~~s to fund the remaining balance of $1,524,000, or approximately 48% of the aggregate purchase price, through the proceeds derived through its on-going Shelf Registration.  That remaining balance has not been paid as described in ¶ 177.

167.    In addition to the commissions earned by HCW, the Company has incurred fees, commissions and other costs in connection with its financing activities. These additional fees and commissions have been substantial, including the following from the 1Q 2018 10-Q:

> In connection with the financing, pursuant to an engagement agreement
> with Alliance Global Partners ("AGP"), a licensed broker-dealer with

68

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

FINRA, the Company agreed to pay to AGP a cash fee, or placement agent fee, equal to 5% of the aggregate gross proceeds raised. Such fee was paid at the closing of the offering. In addition, AGP shall receive a cash fee equal to 5% of such cash exercise price proceeds received by the Company, payable within 48 hours of our receipt of any cash exercise price proceeds from the exercise of any warrants sold, provided that no such fee is due and payable hereunder in the event the warrants are not exercised for cash. AGP is also entitled to receive a warrant to purchase 150,000 shares of common stock with an exercise price of $1.00, which warrant shall be exercisable for 5-years via cashless exercise until registered and via cash thereafter.

*** 

The Company engaged Divine Capital Markets, LLC ("Divine") to act as Placement Agent (the "Placement Agent") for the 2017 private placement of the Series C Preferred Stock and warrants. For its services, the Placement Agent received, in addition to a 10.0% commission on the sale of each Unit and a 3.0% non refundable expense allowance, warrants to purchase 10% of the Units sold at 120% of the Unit purchase price. The warrants to purchase 2.1 Units equates to a warrant to purchase 182,003 shares of the Company's common stock at $0.72 per share and a second warrant to purchase 182,003 shares of the Company's common stock at $1.00 per share. On May 8, 2018, the Company issued 279,190 shares of common stock pursuant [to] a cashless exercise of these warrants.

168.   As reported by the Company in its 1Q 2018 10-Q, for the three months ended March 31, 2018, net cash provided by financing activities was $11,892,000, which included financing activities related to the sale of 5,120,812 shares of

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

common stock through HCW for net proceeds of $6,243,000, gross proceeds from the Company's debt financings and from advances of future receipts of $5,542,000 and proceeds from the exercise of options and warrants of $965,000.

169.   As a result, the Company's stock has been heavily diluted and many of these issuances have been at prices well below market value and have cost the Company a substantial amount of money in fees, commissions and other expenses.

170.   The Company has continued to issue shares to Ault-controlled related parties, as well as warrants and other options, on very favorable terms to the related parties. For example, on October 5, 2017, Ault & Company purchased 75,000 shares of DPW common stock at $0.60 per share and a warrant to purchase up to 75,000 shares of DPW common stock at $0.60 per share for an aggregate purchase price of $45,000. The shares and warrants were issued by the Company on May 8, 2018.

171.   Philou Ventures also received favorable terms when it received Series B Convertible Stock according to the 1Q 2018 10-Q, "the effective conversion price of the Series B Convertible Preferred Stock on a converted basis was below the market price of the Company's common stock on the date of issuance, it was determined that these discounts represent beneficial conversion features, which were valued at $108[,000] based on the difference between the effective conversion price and the market price of the Company's common stock on the date of issuance."

**Cryptocurrency**

172.   Beginning in December 2017, DPW joined the cryptocurrency frenzy.

173.   The Company has been actively promoting its cryptocurrency endeavors through press releases, social media activity, and presentations to the public. The social media accounts are filled with posts regarding DPW's purported advancements in its cryptocurrency business and the prospects for its future cryptocurrency endeavors.

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

174.   DPW's stock saw a sharp increase in price at the end of 2017 as a result of the hype surrounding cryptocurrency.  On November 21, 2017, DPW stock closed at $0.56.  Less than a month later, on December 13, 2017, the stock hit an all-time high of $5.95.  The stock traded in the $3.00-$5.00 range the remainder of December 2017. During this time many large holders sold their interests for huge gains includeding Twitchwell Fund LLC and Bellridge Capital, LP.   Following the December 2017 hype over DPW's foray into cryptocurrency, the stock began a precipitous drop and has not closed above a dollar since April 30, 2018.  On July 10, 2018, the price of DPW stock closed at $0.51.

175.   In January 2018, DPW formed Super Crypto Mining, a wholly-owned subsidiary of DPW.   Super Crypto Mining has set a goal of having 10,000 active mining machines by the end of 2018.  The Company claimsed that it iswas on track to have 10,000 cryptocurrency miners by December 31, 2018.  CurrentlyBased on the Company's disclosures, however, the Company has apparently only acquired 2,100 cryptocurrency mining machines thus far based on the two deals described below. Therefore, the Company iswas not on pace for 10,000 cryptocurrency miners by the end of the year and is still paying down debts incurred as part of the acquisition of its cryptocurrency mining machines.

176.   The Company has seemingly overpaid for its cryptocurrency mining equipment. On January 25, 2018, the Company issued two 5% promissory notes, each in the principal face amount of $2.5 million for an aggregate debt of $5 million. The Company reports that the proceeds from these two promissory notes were then used to purchase 1,000 Antminer S9s mining equipment machines manufactured by Bitmain Technologies, Inc. While the price for these machines fluctuate, the manufacturer has sold the machines on its website for anywhere from $1,010 to $2,725 during 2018.   Amazon.com has had these machines for sale for approximately $3,000. The Company instead inexplicably bought these machines

FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

for $5,000 each and incurred debt to do so.  According to the Company, between March 23 and March 27, 2018, the Company paid the entire outstanding principal and accrued interest for a total of $5,101,127 related to this purchase of cryptocurrency mining machines.

177.  On March 8, 2018, Super Crypto Mining entered into another agreement with Blockchain Mining Supply & Services Ltd. to acquire an additional 1,100 Antminer S9s manufactured by Bitmain Technologies, Inc. for an aggregate price of $3,200,000, less than $3,000 per unit.  As of May 17, 2018, the Company paid a total of $1,676,000. The Company disclosed that it intendsed to fund the remaining balance of $1,524,000, or approximately 48% of the aggregate purchase price, through the proceeds derived through its on-going Shelf Registration. That remaining balance has not been paid.[11]

178.  Furthermore, on June 18, 2018, DPW announced that it is launching a line of crypto-mining units called the "AntEater" in order to compete against Bitmain Technologies, Inc.  The Company said that they anticipate that the Anteater will be available for delivery in four weeks and can be reserved on its website.  Upon information and belief, no Anteater machines have been delivered to the public as of the date of this filing and the Company has provided no further update on the status of the Anteater.

179.  The Company has repeatedly made revenue projections for its cryptocurrency mining operations.  On June 6, 2018, the Company claimed that Super Crypto Mining is currently mining between $450,000 to $500,000 in bitcoin monthly.  As of May 31, 2018, the Company had recognized merely $166,000 of

---

[11] A lawsuit was filed against the Company and its subsidiary Super Crypto Mining, Inc. on November 28, 2018 (*Blockchain Mining Supply and Servs. Ltd. v. Super Crypto Mining, Inc. et al.*, Docket No. 1:18-cv-11099 (S.D.N.Y. Nov 28, 2018)). According to the complaint, DPW failed to make payment on the remaining mining machines it ordered and never took possession of those machines.

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

digital currencies on its balance sheet and $0 as of December 31, 2017.  In the LD Micro presentation made by T. Ault on June 6, 2018, the Company slideshow states that as of March 31, 2018, the Company successfully mined $237,000 in cryptocurrency assets and that the Company expects to mine $876,786 as of June 30, 2018. That means that for the three-month period, April 1, 2018 through June 30, 2018, only $213,262 cryptocurrency assets ~~are being~~were expected to be mined per month. These figures are far less than the $450,000 to $500,000 that is purportedly being mined monthly.

180.   On June 8, 2018, the Company announced that it has repaid $500,000 of debt that the Company recently borrowed by using bitcoin as currency.  The Company touted this news as "significant both for its shareholders as well as the cryptocurrency community worldwide."  The Company has not disclosed the terms of the repayment, including who they repaid and what valuation was used for the bitcoin.  Moreover, the Company did not disclose whether the use of bitcoin to make a partial payment of this short-term loan was negotiated prior to the parties entering into the loan.  Without this information, it is impossible for an investor to know whether this is a "milestone" as the Company claims or an arrangement that was already negotiated and factored into the initial payments terms.

**Financial Statement Reporting and Internal Controls**

*The Restatement*

181.   On November 14, 2017, the Company filed a Form 8-K 'Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review' disclosing that DPW's auditors Marcum LLP ("Marcum") uncovered issues with the Company's previously issued financial statements including, "the Company's accounting treatment of a related party transaction in an investment in real property and certain omitted disclosures in the subsequent event footnote."

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

182.   Marcum had previously informed DPW on October 10, 2017, that the Company had misclassified related party real estate transactions and failed to provide adequate disclosure regarding those related party transactions.

183.   Marcum and the Company determined that as a result of these misstatements and omissions, DPW's previously issued Form 10-Q for the quarter ended June 30, 2017, as filed with the SEC on August 21, 2017, should no longer be relied upon.

184.   The November 14, 2017 Form 8-K disclosed that the then CEO Defendant Kohn purchased certain property in Israel using ~~the Company's~~Company funds ~~for~~of $300,000 to purportedly serve as a facility for the Company's business operations in Israel and that this information would be added as an amendment to the Company's June 30, 2017 10-Q, which the Company would now have to restate because it was not properly disclosed in the June 30, 2017 Form 10-Q.

185.   A week later, in a Form 8-K filed with the SEC on November 22, 2017, the Company disclosed that the property in Israel is actually being used by Roni Kohn, Defendant Kohn's daughter.  At the time, Kohn was the CEO of DPW.

186.   Along with the November 22, 2017 Form 8-K, the Company attached a Trust Agreement and Tenancy in Common Agreement with Roni Kohn.  The Company states in this 8-K that *the agreements were entered on November 16, 2017 but with an effective date of May 14, 2017* (ostensibly the date that the property was purchased).  According to the agreements, *executed more than five months after the property was purchased*, Roni Kohn will be given the right to purchase the property at a nominal price with such right vesting monthly if her father remains with the Company, and will be fully vested after five years.  Specifically, according to the Tenancy in Common Agreement, "effective October 1, 2017, for each completed calendar month of employment of Kohn by Coolisys, Trustee [Roni Kohn] shall have the right to purchase a twenty three and one-third one-thousandths (0.002333)

interest of Coolisys' Property Interest for $1.00. By way of example only, assuming that Kohn is employed by Coolisys for 120 calendar months, Trustee shall have the right to purchase 100% of the Coolisys Property Interest for $120.00. However, such right shall be accelerated to 60 months if Kohn is continuously employed as an officer of the Company."

187.   The Company never disclosed the gifting of a house to Kohn's daughter until its auditors flagged the issue. It was only then that the Company disclosed what occurred; however, the Company, through the Individual Defendants (except for Defendant Bentz), did not make Kohn's daughter pay for the house or otherwise undo this unfair transaction.

188.   In connection with the restatement, DPW filed an amended June 30, 2017 Form 10-Q with the SEC on November 14, 2017, to include the following disclosure in the notes to the Company's financial statements concerning the previously undisclosed related party transaction:

> During the three months ended June 30, 2017, our Chief Executive Officer Amos Kohn purchased certain real property that will serve as a facility for the Company's business operations in Israel. The Company made $300,000 of payments to the seller of the property that will be applied to either (i) an ownership interest, that would be transferred to the Company upon the approval of certain governmental authorities that authorize foreign ownership of real property in Israel or (ii) a leasing arrangement providing for the Company's use of the property should such authorization not be obtained. The payments are classified as Other investments, related party in the accompanying condensed consolidated balance sheet at June 30, 2017.

189.   As a result of the accounting improprieties, the Company restated its balance sheet to reclassify the $300,000 from "Prepaid expenses and other currents

assets" line item to a noncurrent asset line item labeled "Other investments".  Prior to the restatement, current assets were inflated, by $300,000, which makes the Company appear more solvent than it actually was (or less insolvent that it actually was).

190.   In addition to the restating of the related party transaction involving Defendant Kohn and his daughter, there were additional items that were required to be restated. DPW restated its June 30, 2017 Form 10-Q filed with the SEC on November 14, 2017 to add the following disclosures to its "Note 16 Subsequent Events", which occurred prior to the filing of the June 30, 2017 Form 10-Q with the SEC on August 21, 2017:

> On July 7, 2017, the Company entered into an asset purchase agreement to acquire the intellectual property of Coolisys.com, consisting of the common law rights associated with the trademarks and name as well as the domain name and content of www.Coolisys.com. The aggregate purchase price of $81[,000] was comprised of 50,000 shares of common stock, valued at $31[,000] based on the closing price of the Common Stock on the date of the acquisition, and $50[,000].

> On July 14, 2017, as a result of a notice that Microphase received from Gerber identifying several events of default under the terms of the Revolving Credit Facility, Microphase and Gerber entered into a Forbearance Agreement (See Note 8). The events of default were primarily related to (i) the change in control that occurred on June 2, 2017, when Digital Power acquired a majority interest in Microphase, and (ii) borrowings under the Revolving Credit Facility exceeding the collateral borrowing base. The Forbearance Agreement accelerated the repayment of $250[,000], that was secured by eligible inventories and

equipment, by an amount of $20[,000] per week until such borrowings were repaid and required the Company to provide a corporate guarantee for amounts advanced under the Revolving Credit Facility, which guarantee was provided on July 20, 2017.

Between July 6, 2017 and August 21, 2017, Milton C. Ault, III, the Company's Executive Chairman, personally guaranteed the repayment of (i) $1,091[,000] to TVT Capital, (ii) $400[,000] from the sale of the Convertible Note and (iii) $880[,000] from the sale of the Convertible Notes. These personal guarantees were necessary to facilitate the consummation of these financing transactions. Mr. Ault's payment obligations would be triggered if the Company failed to perform under these financing obligations. Our board of directors has agreed to compensate Mr. Ault for his personal guarantees. The amount of annual compensation for each of these guarantees, which will be in the form of non-cash compensation, is 2% of the amount of the obligation.

191.   The additional subsequent events include a reference to an asset purchase agreement to acquire intellectual property belonging to Coolisys that was entered into on July 7, 2017.  The Company did not file the asset purchase agreement with the SEC on or around July 7, 2017.   The Company, however, disclosesd in its 2017 10-K that the Company had "formed" Coolisys on April 25, 2017.  As a result, it is not clear why the Company purchased intellectual property and how it was valued.

192.   The second additional disclosure details Microphase defaulting on a loan as a result of the Company acquiring a majority interest in Microphase, accelerating the repayment by $20,000 per week.  The Company failed to disclose and properly account for the default and the subsequent accelerated repayment as a

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

cost of acquiring Microphase in its SEC filings.  The Individual Defendants had to know that the change in control transaction would trigger a default under the Revolving Credit Facility, which is usually a provision for most credit facilities.

193.   Further, the last additional disclosure involves personal guarantees by Defendant T. Ault and additional compensation he received in the form of undisclosed non-cash compensation valued at 2% of the personal guarantees.

194.   Prior to restating its June 30, 2017 Form 10-Q on November 14, 2017, the Company had disclosed other similar subsequent events in its originally filed June 30, 2017 Form 10-Q with the SEC on August 21, 2017. For example, the Company reported that on July 6, 2017 it received funding by entering into agreements whereby the Company "sold in the aggregate $1,091,220 in Future Receipts of the Company for $780,000" to TVT Capital, the same company involved in the restatement. This selective disclosure about transactions involving TVT Capital is indicative of the Individual Defendants failure to make full and fair disclosure of certain subsequent events in violation of Generally Accepted Accounting Principles ("GAAP"), specifically Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 855. The Company also discloses in its originally filed June 30, 2018~~7~~ Form 10-Q entering into subscription agreements with six investors on July 24, 2017 and securities purchase agreements that were entered on July 25, 2017.  The Company's disclosures also include that on August 3, 2017, Coolisys purchased an interest in Power-Plus Technical Distributors, LLC.

195.   The Company's failure to include certain subsequent events in its initial SEC filings appears to have been the result of selective omissions and/or lack of internal controls.  The Individual Defendants knew about ~~its~~their duty to disclose subsequent events, and in fact did disclose similar subsequent events, but chose not to disclose these other subsequent events until it was flagged by the Company's

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1   auditor and a restatement was necessary.

2   *Internal Control Deficiencies*

3      196.  Beginning in November 2017, the Company ~~has~~ conceded in multiple

4   SEC filings that its internal controls are ineffective and in need of remediation.

5      197.  The Company disclosed the following in its Form 8-K filed with the

6   SEC on November 14, 2017:

> 7   Due to the Restatement described above, the Company's management
>
> 8   and Audit Committee reevaluated Part I, Item 4 ("Controls and
>
> 9   Procedures") in the previously filed June 30, 2017 Form 10-Q and have
>
> 10   now concluded that the Company's disclosure controls and procedures
>
> 11   and internal control over financial reporting were not effective as of that
>
> 12   date. The Board has been actively engaged in developing a remediation
>
> 13   plan to address the identified ineffective controls that existed as of June
>
> 14   30, 2017. Implementation of the remediation plan is in process and
>
> 15   consists of, among other things, redesigning the procedures to enhance
>
> 16   the identification, capture, review, approval and recording of contract
>
> 17   terms and required disclosures.

18      198.  In its 2017 Form 10-K filed with the SEC on April 17, 2018, six months

19   after disclosing the implementation of its remediation program, the Company

20   disclosed that "[o]ur management has concluded that as of December 31, 2017, our

21   internal control over financial reporting was not effective."

22      199.  Subsequently, in its next periodic filing with the SEC on May 21, 2018,

23   DPW's 1Q 2018 10-Q, the Company again disclosed that its internal controls were

24   still not effective:

> 25   Our principal executive officer and principal financial officer, with the
>
> 26   assistance of other members of the Company's management, have
>
> 27   evaluated the effectiveness of the design and operation of our disclosure

28

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this quarterly report and has determined that our disclosure controls and procedures were not effective as of March 31, 2018 due to certain material weakness as described herein.

Management has identified the following two material weaknesses:

(i)     a lack of sufficient internal accounting resources to provide reasonable assurance that information is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosures and

(ii)    a lack of segregation of duties to ensure adequate review of financial statement preparation.

200.    Further, according to the 1Q 2018 10-Q:

Management, in coordination with the input, oversight and support of our Board of Directors, has identified the measures below to strengthen our control environment and internal control over financial report.

During January 2018 we hired a new Chief Financial Officer and engaged the services of a financial accounting advisory firm.  Further, until we expand our internal accounting department, the Chairman of the Audit Committee shall perform the following:

•       Assists with documentation and implementation of policies and procedures and monitoring of controls,

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

- •     Reviews all anticipated transactions that are not considered in the ordinary course of business to assist in the early identification of accounting issues and ensure that appropriate disclosures are made in the Company's financial statements.

We are currently working to improve and simplify our internal processes and implement enhanced controls, as discussed above, to address the material weakness in our internal control over financial reporting and to remedy the ineffectiveness of our disclosure controls and procedures.

201.   The Company's CFO Horne, the CFO that was hired by the Company in January 2018, is the same person who was Chairman of the Audit Committee during the period that the Company failed to have internal controls in place that purportedly caused the restatement. Further, Horne is also currently providing services as the CFO for multiple companies, including AVLP (a related party he is charged with bringing its financial statements current since its last filed financial statements, which were for the firstsecond quarter of 2016), Targeted Medical Pharma, Inc. (another SEC reporting company who has failed to file any financial statements since that company's 2015 Form 10-K, filed with the SEC on April 14, 2015), and Alzamend (up through December 15, 2018, a private company that is another related party to both DPW and AVLP) and as a result Horne iswas clearly incapable of devoting the time necessary to remediate the Company's internal control issues, which is harminghas harmed the Company and its shareholders.

202.   By hiring a CFO of multiple public companies and by spending its assets in the ways described throughout, the Company has not focused its resources

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

on remediating its internal control issues and expanding its internal accounting department all to the detriment of the Company and its shareholders.

203.   By failing to have internal controls in place the ~~Company is violating its~~Current Director Defendants, and especially the Audit Committee Defendants, are violating the Company's Code of Ethics, which states in part, "[t]he internal controls are the backbone of the integrity of the Company's financial records and financial statements."

204.   The need for effective internal controls and an expanded internal accounting department has ~~increased in recent months~~continued to expand due to the significant increase in financing, acquisitions and other transactions by the Company.

205.   As of July 30, 2018, there ha~~s~~d not been any disclosures regarding the progress of the Company's remediation efforts or AVLP's progress in bringing its financial statements current.

*Disclosure Issues*

206.   On November 20, 2017 the NYSE admonished DPW for "failure to make immediate public disclosure of all material information concerning its affair~~s~~" relating to ~~failure to report~~not publicly disclosing board and management changes as required by SEC rules.

207.   From December 15, 2017 to February 12, 2018, DPW filed five amendments to five prior filings with the SEC to disclose the required additional details regarding DPW's capital transactions, including the fact that each of these transactions close~~d~~ on previously undisclosed later dates.

208.   T. Ault has failed to disclose his beneficial ownership interest over shares held by Philou Ventures on his many Form 4s filed with the SEC.  T. Ault is a beneficial owner of all shares held by Philou Ventures as disclosed by the Company in its 2017 Proxy Statement.  The SEC rules require that T. Ault file a

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Form 4 for all transactions made by Philou Ventures as he is a beneficial owner according to the SEC's definition.  In contrast, T. Ault's wife, K. Ault, correctly discloses her beneficial ownership over Philou Ventures in the Form 4s that were filed on her behalf with the SEC.

209.   On September 20, 2016, Philou Ventures, in a letter signed by K. Ault, waived its right to require the resignation of Rosenberg as a director of the Company and also limited its right to designate from four directors to two directors.  The letter also granted the right to the remaining two Board members, Kohn and Rosenberg, to appoint a Board member. The Company then issued a Form 8-K on September 22, 2016 noting these changes to the Securities Purchase Agreement.

210.   In the Company's September 22, 2016 Form 8-K, the Company disclosed that following the resignations of three board members, the Board consisted of Kohn and Rosenberg.  Kohn and Rosenberg then filled one of the open Board seats with Robert O. Smith.

211.   On October 13, 2016, pursuant to the September 4, 2016 Securities Purchase Agreement, Horne and K. Ault were appointed as members of the Board. Then according to a Form 8-K filed by the Company on March 21, 2017: "On March 16, 2017, the Board of Directors appointed Mr. Milton "Todd" Ault, III, age 47, as Executive Chairman of the Board."

212.   According to the 2017 Proxy Statement, however, in its Proposal No. 1 "Election of Directors", the Company states that pursuant to the September 5, 2016 Securities Purchase Agreement it has the right to designate up to four directors to the Board.  The Company discloses that it has used its right to designate T. Ault, K. Ault, and Horne.  This is in direct contradiction with the publicly filed letter from September 20, 2016 and the Company's Form 8-K filed on September 22, 2016, reducing Philou Venture's right to appoint just two directors.

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

*Financial Reporting of Microphase Acquisition*

213.   DPW announced on June 5, 2017 that it acquired a controlling interest in Microphase in exchange for 1,842,448 shares of DPW common stock and 378,776 shares of DPW Series D Preferred Stock, which shares of DPW Series D Preferred Stock are convertible into an aggregate of 757,552 shares of common stock and warrants to purchase an aggregate of 1,000,000 shares of common stock

214.   As part of this acquisition, the Company valued Microphase's intangible assets at $2.6 million and goodwill at nearly $3.2 million.  The Company also reports significant liabilities that were acquired from Microphase.

215.   The Company discloses a plethora of issues with Microphase's operations, raising doubts as to the valuation of the goodwill and other intangible assets acquired and the Company's decision to purchase the entity, including the following:

> During the past three fiscal years Microphase has incurred losses from operations. These losses are attributable to lower volumes of its products sold to major defense contractors partially as a result of the overall reduction in defense spending and sequestration by the U.S. Congress. As of June 30, 2017, Microphase had an accumulated deficit of approximately $18 million.  Since the financial crisis of 2008, Microphase has been significantly short of capital needed to acquire parts for production of its products to complete orders for such products. At times, Microphase has not had the cash available to make advance payments for the purchase of parts, and then, as a consequence, Microphase would not receive the parts from its vendors required to finish a customer order. This would then delay the delivery of products to customers, and would also delay recognition of the resulting revenues and the receipt of cash from the customer. Sometimes after

experiencing a delay in delivery of an order from Microphase, the customer would not place its next order with Microphase, resulting in a loss of business.

***

In addition, Microphase is incurring significant legal, accounting, and other expenses related to being a reporting company without there being a trading market for any of its securities. As a result of these expenditures, Microphase will have to generate and sustain increased revenue to achieve and maintain future profitability.

216.   Furthermore, as discussed above, Microphase defaulted on a loan when DPW acquired the company due to the change of control transaction. As a result, the repayment was accelerated and DPW had to provide a repayment guarantee.

217.   DPW has an enormously overstated balance sheet, including inflated goodwill from the Microphase acquisition which was acquired using Company stock as currency and MTIX receivables that are likely never to be collected.

218.   DPW needs to meet a $6 million threshold in shareholder's equity in order to remain listed on the NYSE American.  By inflating the value of Microphase, an asset on its balance sheet, DPW is able to increase its shareholder's equity.

_Other Misleading Statements_

219.   The Company has also made many misleading statements about its ownership interests and future prospects.  For example, in a presentation at LD Micro on June 6, 2018, T. Ault presents a slideshow, which was filed with the SEC, that states that the Company owns 100% of 456 Lux Hotel in TriBeCa.  On the Company's website, however, it is disclosed that "DPW presently owns 100% of 456 Lux Hotel NYC, LLC, which in turn is expected to own up to 28% of NYREIC 456 LP."  While the Company's website clarifies that the Company does not own 100% of the forthcoming hotel, it is still unclear what the Company's ownership

FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  interest is.  T. Ault's presentation at LD Micro is misleading by not including that

2  the 100% ownership is ownership of an LLC and not ownership of the actual hotel

3  being built at that address.

4    220.   The Company has also ~~recently~~ touted ~~a new~~its ownership over I.AM

5  Inc. and a partnership with David J. Krause and Deborah J. Krause.  The Company's

6  press release issued on May 24, 2018 fails to explain the events that led to DPW's

7  ownership.  According to the Company's SEC filings, I.AM owes DP Lending (a

8  wholly-owned subsidiary of the Company engaged in the business of providing

9  capital financing for small businesses), $1,715,363 in outstanding principal pursuant

10  to a loan and security agreement that the parties entered.   I.AM, seemingly unable

11  to pay the principal on the loan, sold 98.1% or 981 shares of the company to DP

12  Lending in exchange for $981.  In the event that I.AM is able to make payments on

13  the loan at a future date, DP Lending will transfer to I.AM on a pro rata basis up to

14  471 shares of the 981 shares of I.AM purchased by DP Lending and therefore,

15  decreasing DP Lending's ownership interest to 51%.   The loan to I.AM is one of

16  the largest loans that DP Lending provided to an unrelated party.

17    221.  The Company ~~currently has~~had a 9% ownership interest of WSI

18  Industries (NASDAQ: WSCI) ("WSI") through the acquisition of WSI's common

19  stock.  The Company then expressed interest in purchasing a controlling interest in

20  WSI.  In response, in a letter dated March 19, 2018, WSI rejected DPW's offer.  WSI

21  expressed doubt as to DPW's ability to finance its offer.  WSI stated that DPW would

22  need approximately $7,000,000 to finance the offer based upon DPW's proposed

23  $6.00 per share price and DPW's desire to reach beneficial ownership of 50%.  WSI

24  also expressed doubt about the quality and accuracy of the information found in

25  DPW's SEC filings.  WSI noted, amongst other issues, the Company's need to

26  restate its June 30, 2017 financial statements and the November 20, 2017

27  admonishment by the NYSE American stock exchange for DPW's "failure to make

28

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

immediate public disclosure of all material information concerning its affairs." WSI also noted that from December 15, 2017 to February 12, 2018, DPW filed five amendments to five prior SEC filings to disclose required additional details regarding DPW's capital transactions.

*T. Ault's Prior Legal Issues*

222.   In addition to being sanctioned by FINRA and violating the FINRA Settlement, along with the bankruptcy filings of Zealous Holdings, Inc. and his own personal bankruptcy, neither of which were discharged and both of which were dismissed, T. Ault has been involved in extensive litigation involving investors, including but not limited to:

(a) *Bodnar Capital Management, LLC v. Ault Glazer Capital Partners, LLC, Zealous Asset Management, LLC and Milton Ault, III et al.*, Case No. 3:08-cv-0199 (D. Conn. Feb. 2008) - Bodnar Capital Management invested in Ault, Glazer and Bodnar Acquisition Fund which was renamed the Ault Glazer Capital Fund upon the resignation of Stephen Bodnar from Ault, Glazer, Bodnar. Bodnar Capital Management requested return of its investment in the fund at the time of the resignation. This request could not be readily accommodated by the fund. Bodnar Capital Management sued the entities above to recover this original investment. Judgment was entered against all defendants and satisfied as of January 3, 2011.

(b) *Bodnar Capital Management, LLC v. Milton Ault, III, William B. Horne, Zealous Holdings, Inc., Ault Glazer & Co., LLC, et al.*, Case No.: 3:08-CV-1601 (D. Conn. Feb. 23, 2009) – Plaintiff alleged fraud, breach of fiduciary duty, and breach of contract. A default judgment was entered on June 18, 2009, against Milton "Todd" Ault, III and Zealous Holdings, Inc. in the amount of $1,492,936.47 with interest to run from the date of the entry of the default judgment.

(c) *Motivated Minds, LLC v. Ault Glazer Capital Partners, LLC, et al.*, Case No.: CV2009-003478 (Ariz. Superior Court Feb. 4, 2009) - Plaintiff filed a

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

complaint against Defendants for Breach of Contract. Plaintiff alleged damages in an amount of $500,000 pre and post-judgment interest and attorneys' fees and costs. Default judgment was entered on July 17, 2009 for $500,000, costs of $426 and attorney's fees of $1,071. That default judgment was later renewed on June 26, 2014, in the amount of $1,425,562.43. The renewal of the default judgment has not been disclosed by DPW as required.

(d) *Kent G. Wyatt, Sr. v. Adult Entertainment Capital, Inc., et al.*, Case No.: A574309 (Nevada Dist. Ct., 8th Dist. Oct. 24, 2008) – a default judgment was entered on December 26, 2008 against Adult Entertainment Capital, Inc and Zealous Trading Group, Inc.  T. Ault was the CEO of Adult Entertainment Capital, Inc. Following the entry of a default judgment, Plaintiffs' filed a motion to hold defendants in contempt. Defendants eventually signed a settlement of the entire litigation for at least $525,000, however, it is not known whether the settlement terms were ever satisfied.

(e) *Louis Glazer, et al. v. Milton Ault III, et al.*, Case No.: BC407274 (Cal. Super. Ct. Feb. 06, 2009) – Plaintiffs' filed a complaint alleging breach of fiduciary duty and fraud, amongst other claims.  A default judgment was entered against T. Ault and his codefendants on October 5, 2010.  During the litigation a bench warrant was issued for T. Ault on at least 2 occasions, as well as one bench warrant being issued for K. Ault.  The plaintiffs were awarded $1,416,000, certain shares of stock and reimbursement of attorney's fees.  Defendants' failed to comply and satisfy the judgment.  A settlement agreement was later reached but the Plaintiffs never received any money due under the settlement agreement.  On February 14, 2013, T. Ault filed an appeal from the default judgment.  An opinion by Judge Aldrich of the California Court of Appeals was filed on August 12, 2014, affirming the lower court's judgment and ordering T. Ault to pay costs.  The affirming of the lower

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

court's judgment and requiring of T. Ault to pay costs has never been disclosed by DPW as required.

(f) *Alpha Capital Anstalt v. Milton Charles Ault, III*, Case No.: 602444/2009 (N.Y. Sup Ct. Jan. 25, 2010) – a complaint was filed on August 7, 2009 against T. Ault.  In this case a dozen hedge funds invested over $4.2 million in Zealous, Inc. based on representations that the financing would be used for Zealous, Inc.'s business.   Instead, the plaintiffs allege that they were the victims of a scam perpetrated by T. Ault.  The complaint alleges that "[t]he financing was a scam.  Ault never intended to use the money for Zealous.  He intended to, and did, use plaintiffs' money to fund [his] lifestyle, which included the development of a 'swinger's ranch' in the Catskills and other pornographic – related endeavors."  Plaintiffs do not have further information regarding the outcome of this case.

**The Board, Stock Options and Executive Officers' Terms of Employment**

223.   In a Form 8-K filed with the SEC on December 4, 2017, DPW announced that it no longer had an independent board.  Specifically, the Company announced that it had notified the NYSE American on November 29, 2017 that the Company was no longer in compliance with Rule 801(h) of the NYSE American Company Guide because the Company's Board was not comprised of at least 50% independent directors.   The Form 8-K continued: "On November 28, 2017, the Board of Directors approved the issuance cash compensation, and 200,000 shares of common stock and warrants to purchase 1,000,000 shares of common stock subject to vesting and shareholder approval, to Mr. William Horne, a director of the Company, for services.  As a result of this compensation, Mr. Horne may not be deemed independent within the meaning of Section 803A(2) of the NYSE American Company Guide."

224.   The Company then rescinded the compensation to Horne and also clarified that the Company in fact did not provide notice to the NYSE American,

FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

stating in relevant part: "[t]hat Form 8-K also inadvertently indicated that notification of non compliance was filed with the NYSE American, which notification was not filed…This Amendment is being filed to clarify that effective December 8, 2017, the Board of Directors agreed to rescind the issuance of 200,000 shares of common stock and warrants to purchase 1,000,000 shares of common stock to Mr. William Horne, and, as a result of such rescission, Mr. Horne continues to be deemed an independent director within the meaning of Rule 803A(2)…this Amendment will clarify that the Company is in compliance with Rule 801(h) of the Guide because, as a smaller reporting company, the Company's Board of Directors is comprised by at least 50% independent directors."

225.   Less than two months later, on January 25, 2018, the Company appointed Horne as CFO and entered into a five-year employment agreement, discussed below, that pays him an annual base salary of $250,000 cash compensation in addition to other benefits.

226.   K. Ault resigned from the Board on January 23, 2018 in connection with the appointment of Bentz to the Board, apparently in an effort to continue to comply with Rule 801(h) requiring the Board to be comprised of at least 50% independent directors.

227.   The Company's directors and executive officers have received large stock options.   For example, on November 28, 2017, the Board approved the following stock options: Smith received options for 200,000 shares, Rosenberg received options for 100,000 shares, K. Ault received options for 100,000 shares, T. Ault received options for 500,000 shares, Kohn received options for 100,000 shares and Horne received options for 100,000 shares.

*T. Ault's Compensation and Terms of Employment*

228.   On September 22, 2016, the Company entered into an Independent Contractor Agreement with T. Ault to "assist the Company in developing a business

strategy, identifying new business opportunities, developing a capital raising program and implementing of a capital deployment program." T. Ault began receiving $15,000 in cash per month as a consultant to the Company commencing on November 1, 2016. Thus, from November 1, 2016 through December 31, 2016, T. Ault received $30,000 in cash compensation.

229. T. Ault received $669,750 in total compensation during the year ended December 31, 2017, including $207,500 in cash. For the first three months ended March 31, 2018, T. Ault was paid $100,000 in cash.

230. On April 13, 2018 the Company and T. Ault executed an Amended and Restated Independent Contractor Agreement ("Restated Agreement") that paid T. Ault $33,333 in cash per month effective November 15, 2017. The Restated Agreement had a termination date of April 30, 2018 but was renewable on a monthly basis by agreement of the parties. The effective date being approximately five (5) months prior to the date that the parties entered into the Restated Agreement.

231. Between July 6, 2017 and March 31, 2018, T. Ault personally guaranteed the repayment of $12,598,000 in loans to the Company. According to the 1Q 2018 10-Q, "[o]ur board of directors has agreed to compensate Mr. Ault for his personal guarantees. The amount of annual compensation for each of the guarantees, which will be in the form of non-cash compensation, is approximately 1.5% of the amount of the obligation." This equates to approximately $189,000 in non-cash compensation for guaranteeing the $12,598,000 in loans.

232. On June 18, 2018, the Company announced that the "independent directors of DPW who comprise the membership of the Compensation Committee have completed and recommended approval of the proposed Executive Employment Agreement with Milton "Todd" Ault, III, the Company's Chairman and CEO. The Board of Directors subsequently approved the Agreement."

233. T. Ault's Executive Employment Agreement is for a term of ten (10)

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

years continuing through June 16, 2028 and then automatically renews for successive one-year periods thereafter unless it is properly terminated by either party.

234.  According to T. Ault's Executive Employment Agreement, he will receive a base salary of $400,000 cash compensation annually and "[i]n addition, the Base Salary as then in effect shall be subject to such further upward adjustments as shall be determined annually by the Compensation Committee of the Board of Directors."

235.  According to T. Ault's Executive Employment Agreement, he will be entitled to an annual bonus "if the Company meets or exceeds criteria adopted by the Compensation Committee for earning Bonuses which shall be adopted by the Compensation Committee annually" and "[i]n addition to the foregoing, additional bonuses may be awarded by the Compensation Committee."

236.  Also, T. Ault's Executive Employment Agreement grants him 1,000,000 shares of common stock, which shall vest over 48 months beginning on January 1, 2020.  These shares will vest immediately if the Company's revenues reach or exceed $100,000,000 for a fiscal year.

237.  Furthermore, T. Ault's Executive Employment Agreement grants him an option to purchase 500,000 shares of common stock, exercisable for a period of 5 years at $0.80 per share.

238.  Moreover, T. Ault is eligible for performance-based awards based on criteria detailed in T. Ault's Executive Employment Agreement.

239.  For 2018, T. Ault is to receive $400,000 in cash compensation and will have received $33,333.33 per month through July 31, 2018 or $233,333.33 for his base salary.

*Horne's Compensation*

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

240.   Horne is concurrently the CFO of DPW and at least two other publicly traded companies, including related party AVLP.   The other publicly traded company that Horne currently acts as CFO is Targeted Medical Pharma, Inc. ("Targeted Medical Pharma").   Horne ~~is~~was also the CFO for Alzamend up until his resignation at the end of 2018.   Horne is on the board of directors of numerous companies, including Alzamend and AVLP.

241.   Horne is paid $250,000 annually pursuant to a five-year employment agreement that he entered with DPW on January 25, 2018.   Upon signing the Horne Executive Employment Agreement, Horne received a $25,000 signing bonus.   In addition, Horne is eligible for bonuses, performance awards and other compensation as approved by the Compensation Committee.

242.   As part of the Horne Executive Employment Agreement, he also received a grant of 1,000,000 shares of common stock, which vest in installments of 200,000 shares annually over five (5) years beginning on January 1, 2019.   These shares will vest immediately, like T. Ault's Executive Employment Agreement, if the Company's revenues reach or exceed $100,000,000 for a fiscal year. Additionally, Horne received options to purchase 500,000 shares of common stock at $2.32 per share and vesting over 60 months.

243.   Horne's compensation is not disclosed for his role as CFO of AVLP, due to ~~AVLP not filing a periodic report since its Form 10-Q for the period ending February 29, 2016~~AVLP's most current publicly filed ~~with the SEC on August 7, 2017~~financial statement being as of June 30, 2016.   Targeted Medical Pharma has not filed a periodic report since filing a Form 10-K with the SEC on April 14, 2016 for the period ending December 31, 2015.   For 2015, Horne received a salary of $257,154 and total compensation of $277,525 as CFO of Targeted Medical Pharma. For 2014, Horne received a salary of $275,000 and total compensation of $325,000 as CFO of Targeted Medical Pharma.   Because Targeted Medial Pharma is not

FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

current in its SEC filings, Horne's compensation as CFO is unknown for 2016, 2017 and 2018.

244.   From the date of his appointment as a non-employee director of DPW on October 13, 2016, through December 31, 2016, Horne was paid $3,333 in cash compensation and option awards valued at $32,145. For 2017, prior to becoming CFO, Horne received $80,000 in cash compensation and option awards valued at $92,250 service as a "non-employee director."

245.   Thus far, for For 2018, Horne has received $20,833.33 per monthis to receive $250,000 in cash compensation from January 1, 2018 through July 31, 2018, totaling approximately $145,833.33for his base salary per the Horne Executive Employment Agreement.

*Kohn's Compensation*

246.   For 2016, Kohn received $234,866 in cash compensation, option awards valued at $366,409, and other compensation of $36,269, for total compensation of $637,544.

247.   Kohn signed an Executive Employment Agreement with the Company dated November 30, 2016, with an effective date of September 22, 2016, having a 24-month term and continuing thereafter for an indefinite term until a new agreement has been entered into between Kohn and DPW.

248.   Kohn's base salary under the Kohn Executive Employment Agreement is $300,000 in cash per annum increasing to $350,000 per annum provided that the Company achieves revenues in the aggregate amount of at least $10 million. The Kohn Executive Employment Agreement also provides for cash performance bonuses and stock option or other equity incentive grants as determined by the Compensation Committee.

249.   In addition, Kohn received a stock option grant signing bonus pursuant to the Kohn Executive Employment Agreement under which he received a ten-year

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

option to purchase 1 million shares of DPW common stock at $0.65 per share under the following  vesting conditions: (a) options to purchase 500,000 shares of DPW common stock vest on September 22, 2016 (the Effective Date); (b) options to purchase 250,000 shares of DPW common stock vest ratably over six months beginning with the first month after the Effective Date; and (c) options to purchase 250,000 shares of DPW common stock vest ratably over twelve months beginning with the first month after the effective date. The Kohn Executive Employment Agreement was amended on February 22, 2017, to also provide Kohn a ten-year warrant to purchase 317,460 shares of DPW common stock at an exercise price of $0.01 subject to vesting.

250.  For 2017, Kohn received $300,000 salary in cash, option awards valued at $92,250 and other compensation of $36,269, for total compensation of $425,250.

251.   The Company's total revenue for 2017 was $10,001,000.  Therefore, by a mere $1,000 in revenue, the salary increase clause of Kohn's employment agreement was triggered and Kohn's base salary increased to $350,000 annually.

252.  ~~Thus far in 2018 through July 31,~~For 2018, Kohn ~~has received $204,166.67~~is to receive $350,000 in cash compensation for his base salary per the Kohn Executive Employment Agreement.

**DAMAGES TO DPW CAUSED BY THE INDIVIDUAL DEFENDANTS**

253.  As a direct and proximate result of the Individual Defendants' misconduct, DPW failed to maintain proper internal controls and caused the Company to file materially false and misleading financial statements and other filings with the SEC.

254.  As a direct and result of Individual Defendants' misconduct, DPW has raised funds using a variety of methods unfair to the Company and its shareholders, resulting in significant damage to the Company's finances and its stock price.

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

255.   As a direct and proximate result of the Individual Defendants' misconduct, DPW has improperly provided loans to related parties including millions of dollars to AVLP for the benefit of the ~~Individual Defendants~~Aults and Horne and damaging the Company.

256.   As a direct and proximate result of the Individual Defendants' misconduct, DPW has provided the Officer/Director Defendants with excessive compensation while the Company struggles to raise capital and has going concern issues. Further, the terms of many of the loans and securities used to raise capital have been on unfair terms. Indeed, paying more than 40% interest as demonstrated by the terms of the Future Receipts Agreements is prima facie unfair to the Company.

257.   As a direct and proximate result of the Individual Defendants' misconduct, DPW has expended and will continue to expend significant sums of money to rectify the issues caused by the Individual Defendants.

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

258.   Plaintiffs bring this action derivatively in the right and for the benefit of DPW to redress injuries suffered, and to be suffered, by DPW as a direct result of breaches of fiduciary duty and unjust enrichment.

259.   Plaintiffs are shareholders of DPW, were shareholders of DPW at the time of the wrongdoing alleged herein, and have been shareholders of DPW continuously since that time.

260.   Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

261.   DPW is named as a nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.    Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

262.   The wrongful acts complained of herein subject, and will continue to subject, DPW to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

263.   Indeed, some of the wrongful acts complained of herein were unlawfully concealed from DPW shareholders.

264.   As a result of the facts set forth herein, Plaintiffs have not made any demand on the Current Director Defendants to institute this action since demand would be a futile and useless act because a majority of the Current Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

265.   As of July 31, 2018, the date of ~~this~~the filing of the Verified Shareholder Derivative Complaint, the Current Board consists of the following six (6) individuals: defendants T. Ault, Kohn, Horne, Bentz, Rosenberg, and Smith.

266.   Three of the six Current Director Defendants are also officers of the Company (CEO T. Ault, CFO Horne and President Kohn), being paid collectively at least $1 million in cash compensation annually. They also receive bonuses and equity incentive compensation as well. Plaintiffs allege that these same Officer/Director Defendants compensation is excessive in light of the financial challenges faced by the Company and the plethora of related party transactions consummated by the Individual Defendants on terms unfair to the Company and its shareholders. The wrongful acts complained of herein show multiple breaches by the Current Director Defendants of their fiduciary duties of loyalty, due care and oversight.

267.   Therefore, for the reasons detailed below, the Board lacks a majority comprising independent and disinterested directors. As a result, demand is futile and the Current Director Defendants are incapable or unwilling to institute and vigorously prosecute this action.

## CURRENT DIRECTOR DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

### Milton C. Ault, III

268.   T. Ault is the CEO of the Company and has served in this position since December 2017.  T. Ault has also served as a Director of the Company since March 2017. As conceded by the Company in the 2017 Proxy Statement, T. Ault is not an independent director.

269.   T. Ault is a highly compensated employee of the Company with a base salary of $400,000 in cash and total compensation of $669,750 during the year ended December 31, 2017.  This compensation is especially significant given the Company's solvency issues and the going concern opinion provided by its auditors. Therefore, T. Ault cannot independently consider any demand to sue himself for

breaching his fiduciary duties to DPW, because that would expose him to liability and threaten his livelihood.

270. T. Ault, alongside Horne and Kohn, make up the three directors of Coolisys.

271. T. Ault is also a member of AVLP's board of directors, serving with Horne.

272. T. Ault is the Chairman of Alzamend, a company that he founded, ~~which~~where Horne also ~~serves~~previously served as CFO.

273. T. Ault also owns Philou Ventures and Ault & Company.

274. As of April 13, 2018, T. Ault beneficially owns 5,666,503 shares of DPW's common stock or 12.19% of common stock outstanding.

275. According to the 2017 Proxy Statement:

Mr. Ault was appointed Executive Chairman of the Board on March 16, 2017. Mr. Ault is a seasoned business professional and entrepreneur that has spent more than twenty-seven years identifying value in various financial markets including equities, fixed income, commodities, and real estate. Mr. Ault founded on February 25, 2016 Alzamend Neuro, Inc., a biotechnology firm dedicated to finding the treatment, prevention and cure for Alzheimer's Disease and has served as its Chairman since. Mr. Ault has served as Chairman of Ault & Company, a holding company since December 2015, and as Chairman of Avalanche International Corp since September 2014. Since January, 2011, Mr. Ault has been the Vice President of Business Development for MCKEA Holdings, LLC, a family office. Through this position, Mr. Ault has consulted for a few publicly traded and privately held companies, providing each of them the benefit of his diversified experience, that range from development stage to seasoned businesses.

FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

He was the President, Chief Executive Officer, Director and Chairman of the Board of Zealous, Inc. from August 2007 until June 4, 2010 and again from February 2011 through May 1, 2011. Mr. Ault was a registered representative at Strome Securities, LP, from July 1998 until December 2005, where he was involved in portfolio management and worked on several activism campaigns including Taco Cabana, Jack In The Box (formerly Foodmaker), and 21st Century Holdings Co. Mr. Ault became majority shareholder of Franklin Capital Corp and was elected to its board of directors in July 2004 and became its Chairman and Chief Executive Officer in October 2004 serving until January 2006, and again from July 2006 to January 2007. In April 2005, the company changed its name to Patient Safety Technologies, Inc. (OTCQB: PSTX) ("PST") and purchased SurgiCount Medical, Inc. Stryker Corporation (NYSE:SYK) acquired PST at the beginning of 2014 in a deal valued at approximately one hundred twenty million dollars ($120,000,000). PST's wholly owned operating subsidiary, SurgiCount Medical, Inc., is the company that developed the SafetySponge® System; a bar coding technology for inventory control that aims to detect and prevent the incidence of foreign objects left in the body after surgery. We believe that Mr. Ault's business background demonstrates he has the qualifications to serve as one of our directors and as Chairman.

**William B. Horne**

276. Horne is an executive officer of the Company, serving as the Company's CFO.

277. Horne was appointed a director by Philou Ventures pursuant to the Securities Purchase Agreement that gave Philou Ventures the right to designate two

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1   directors.

2   278.   Horne is a highly compensated employee of the Company which

3   includes a base salary of $250,000 cash, a $25,000 cash signing bonus in January

4   2018 and other compensation.  This compensation is especially significant given the

5   Company's solvency issues and the going concern opinion provided by its auditors.

6   Therefore, Horne cannot independently consider any demand to sue himself for

7   breaching his fiduciary duties to DPW, because that would expose him to liability

8   and threaten his livelihood.

9   279.   Horne, alongside T. Ault and Kohn, make up the three directors of

10   Coolisys.

11   280.   Horne is a member of AVLP's board of directors, serving alongside T.

12   Ault.  Horne is also the CFO of AVLP.

13   281.   Furthermore, Horne is was previously the CFO of Alzamend, a and is

14   still a director of the company that was founded by T. Ault.

15   282.   According to the 2017 Proxy Statement:

16   Mr. Horne has served as an independent member of our board of

17   directors since October 13, 2016. He has served as the Chief Financial

18   Officer of Targeted Medical Pharma, Inc. (OTCBB: TRGM) since

19   August 2013 and has served as a member of our board of directors since

20   October 2016. Mr. Horne is a director of and chief financial officer to

21   Avalanche International, Co. Mr. Horne previously held the position of

22   Chief Financial Officer in various companies in the healthcare and

23   high-tech field, including OptimisCorp, from January 2008 to May

24   2013, a privately held, diversified healthcare technology company

25   located in Los Angeles, California. Mr. Horne served as the Chief

26   Financial Officer of Patient Safety Technologies, Inc. (OTCBB:

27   PSTX), a medical device company located in Irvine, California, from

28

June 2005 to October 2008 and as the interim Chief Executive Officer from January 2007 to April 2008. In his dual role at Patient Safety Technologies, Mr. Horne was directly responsible for structuring the divestiture of non-core assets, capital financings and debt restructuring. Mr. Horne held the position of Managing Member & Chief Financial Officer of Alaska Wireless Communications, LLC, a privately held, advanced cellular communications company, from its inception in May 2002 until November 2007. Mr. Horne was responsible for negotiating the sale of Alaska Wireless to General Communication Inc. (NASDAQ: GNCMA). From November 1996 to December 2001, Mr. Horne held the position of Chief Financial Officer of The Phoenix Partners, a venture capital limited partnership located in Seattle, Washington. Mr. Horne has also held supervisory positions at Price Waterhouse, LLP and has a Bachelor of Arts Magna Cum Laude in Accounting from Seattle University. We believe that Mr. Horne's extensive financial and accounting experience in diversified industries and with companies involving complex transactions give him the qualifications and skills to serve as one of our directors.

283.   Horne was the CFO of Patient Safety Technologies, Inc. while T. Ault was the CEO of the Company. Horne was also a named defendant in a lawsuit along with T. Ault from their time together at Patient Safety Technologies, Inc.

284.   In 2017, prior to becoming CFO, Horne received $172,250 for his service as a "non-employee director", including $80,000 in cash.

**Amos Kohn**

285.   Kohn is an executive officer of the Company, serving as the President of DPW and the CEO for Coolisys. He is also DPW's former CEO and CFO.

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

286.   As of April 13, 2018, Kohn beneficially owns 1,405,156 shares of common stock or 3.14% of common stock outstanding.

287.   As conceded by the Company in the 2017 Proxy Statement, Kohn is not an independent director.

288.   Kohn is a highly compensated employee of the Company with total compensation of $425,250 in 2017 and $637,544 in 2016.   Kohn is receiving a base salary in cash of $350,000 per annum for 2018.   This compensation is especially significant given the Company's solvency issues and the going concern opinion provided by its auditors.   Therefore, Kohn cannot independently consider any demand to sue himself for breaching his fiduciary duties to DPW, because that would expose him to liability and threaten his livelihood.

289.   As discussed, Company funds were used to purchase a house for Kohn's daughter when he was the Company's CEO and the Company failed to properly disclose the related party transaction.   Kohn cannot independently consider any demand to sue himself for breaching his fiduciary duties to DPW because that would expose him to liability.

290.   Kohn is the Chairman of Coolisys and with Horne and T. Ault comprise Coolisys' three directors.

291.   According to the 2017 Proxy Statement:

Mr. Kohn has served as a member of our board of directors since 2003, as our President and Chief Executive Officer since 2008. From March 2011 until August 2013 Mr. Kohn also served as interim Chief Financial Officer. Mr. Kohn has more than 20 years of successful global executive management experience, including multiple C-level roles across private and established publicly-traded companies. Mr. Kohn has successfully managed cross-functional teams, driven corporations to high profitability, built customer loyalty and led businesses through

FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

expansion and sustained growth. His areas of expertise include operations, technology innovation, manufacturing, strategic analysis and planning and M&A. Mr. Kohn was Vice President of Business Development at Scopus Video Networks, Inc., a Princeton, New Jersey company that develops and markets digital video networking products (2006-2007); Vice President of Solutions Engineering at ICTV Inc., a leading provider of network-based streaming media technology solutions for digital video and web-driven programming, located in Los Gatos, California (2003-2006); Chief Architect at Liberate Technologies, a leading company in the development of a full range of digital media processing for telecom and cable TV industries, located in San Carlos, California (2000-2003); and Executive Vice President of Engineering and Technology at Golden Channel & Co., the largest cable television multiple-systems operator (MSO) in Israel, where he had executive responsibility for developing and implementing the entire nationwide cable TV system (1989-2000). Mr. Kohn holds a degree in electrical and electronics engineering and is named as an inventor on several United States and international patents. We believe that Mr. Kohn's extensive executive-level management experience in diversified industries, including, but not limited to, power electronics, telecommunications, cable television, broadcast and wireless, as well as his service as a director on our board since 2003, give him the qualifications and skills to serve as one of our directors.

**Robert O. Smith**

292.   As of April 13, 2018, Smith beneficially owns 244,997 shares of DPW common stock.

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT**

293.    Smith has a long history with the Company, having previously served as the Company's President, CEO and Chairman of the Board.    Kohn served alongside Smith for most of their time at DPW.

294.    Smith is a member of the Audit Committee and Compensation Committee

295.    According to the 2017 Proxy Statement:

Mr. Smith serves as one of our independent directors. Previously, he served as a member of our Board of Directors from November 2010 until May 2015, and served as a member of our Advisory Board from 2002 until 2015. He is currently a C-level executive consultant working with Bay Area high-tech firms on various strategic initiatives in all aspects of their business. From 2004 to 2007, he served on the Board of Directors of Castelle Corporation. From 1990 to 2002, he was our President, Chief Executive Officer and Chairman of the Board. From 1980 to 1990, he held several management positions with Computer Products, Inc., the most recent being President of their Compower/Boschert Division. From 1970 to 1980, he held managerial accounting positions with Ametek/Lamb Electric and with the JM Smucker Company. Mr. Smith received his BBA degree in Accounting from Ohio University. We believe that Mr. Smith's executive-level experience, including his previous service as our President, Chief Executive Officer and Chairman of the Board, his extensive experience in the accounting industry, and his service on our Board from November 2010 until May 2015, give him the qualifications and skills to serve as one of our directors.

296.    In 2017, Smith received total compensation of $214,500 for his service on the Board, including $30,000 in cash.

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

297.   Smith owns unvested stock options that vest monthly and entitle him to DPW common stock.

**Mordechai "Moti" Rosenberg**

298.   As of April 13, 2018, Rosenberg beneficially owns 145,833 shares of DPW common stock.

299.   Pursuant to the Philou Ventures Agreement discussed above, Rosenberg was to resign from the Board.  Two weeks after that agreement was executed, without further explanation, Philou Ventures waived its right to require the resignation of Rosenberg as a director of the Company and he remained in his position.

300.   Rosenberg is a member of the Audit Committee and Compensation Committee

301.   According to the 2017 Proxy Statement:

Mr. Rosenberg serves as one of our independent directors. He has served as an independent consultant to various companies in the design and implementation of homeland security systems in Europe and Africa since 2010. From 2004 to 2009, he served as a special consultant to Bullet Plate Ltd., a manufacturer of armor protection systems, and NovIdea Ltd., a manufacturer of perimeter and border security systems. From 2000 to 2003, Mr. Rosenberg was the general manager of ZIV U.P.V.C Products Ltd.'s doors and window factory. Mr. Rosenberg is an active reserve officer and a retired colonel from the Israeli Defense Force (IDF), where he served for 26 years and was involved in the development of weapon systems. In the IDF, Mr. Rosenberg served in various capacities, including platoon, company, battalion, and brigade commander, head of the training center for all IDF infantry, and head of the Air Force's Special Forces. Mr. Rosenberg received a B.A in

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT**

History from the University of Tel Aviv and a Master of Arts in Political Science from the University of Haifa in Israel. We believe that Mr. Rosenberg's business background give him the qualifications to serve as one of our directors.

302.   In 2017, Rosenberg received total compensation of $112,250 for his service on the Board, including $20,000 in cash.

303.   Rosenberg owns unvested stock options that vest monthly and entitle him to DPW common stock.

**Jeff Bentz**

304.   As of April 13, 2018, Bentz beneficially owns 30,556 shares of DPW common stock.

305.   Bentz is a member of the Audit Committee and Compensation Committee.

306.   According to the Company's 2017 10-K:

Mr. Bentz is an experienced businessman who has served since 1994 as President of North Star Terminal & Stevedore Company, a full-service stevedoring company located in Alaska and whose major areas of business include terminal operations and management, stevedore services, and heavy equipment operations. He also has served as a director and advisor to several private companies and agencies. Mr. Bentz obtained a B.A. in Business and Finance from Western Washington University in 1981. We believe that Mr. Bentz's executive-level experience, including his operational and financial oversight of companies with multiple profit centers and his extensive experience in the real estate and commercial services industries give him the qualifications and skills to serve as one of our directors.

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

307.   The Current Director Defendants have longstanding ties to one another, which makes them incapable of independently considering a demand to commence litigation against themselves and the other Individual Defendants.

308.   According to the 2017 Proxy Statement: "Our Board has undertaken a review of the independence of each director and director nominee and has determined that Messrs. Smith, Horne and Rosenberg are independent, and that each director who serves on or is nominated for each of its committees is independent, as such term is defined by standards of the SEC and the NYSE American. None of Messrs. Kohn and Ault nor Ms. Ault meets the independence standards."  This was issued prior to Horne becoming DPW's CFO.  With Horne becoming CFO, he is now not independent for that reason alone.

309.   According to the Schedule 14A Preliminary Proxy Statement filed with the SEC on July 30, 2018, DPW admits that: "none of Messrs. Horne, Kohn or Ault meets the independence standards."

310.   The Current Director Defendants receive lavish compensation in the form of both cash and stock awards, including stock options, for their role as directors and/or officers of the Company.

311.   Demand upon the Audit Committee Defendants (Rosenberg, Smith, and Bentz) would be futile.  The Audit Committee Defendants failed to adequately perform their oversight responsibilities as required by the Audit Committee Charter.  As a result, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties.

312.   Demand upon the Compensation Committee Defendants (Rosenberg, Smith, and Bentz) would be futile.  The Compensation Committee Defendants failed to adequately perform their oversight responsibilities and violated their duty of loyalty by approving excessive cash compensation for Defendants T. Ault, Horn and Kohn while the Company was cash starved, especially in light of the of the usurious

FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

rates of interest paid on the Future Receipts Agreements and other cash funneled to Ault-controlled related parties such as ALVP.   As a result, the Compensation Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties.

313.   The Individual Defendants' conduct described herein and summarized above demonstrates a pattern of misconduct that could not have been the product of legitimate business judgment as it was based on intentional, reckless, and disloyal misconduct.   Thus, none of the Individual Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).   As a majority of the Individual Defendants face– a substantial likelihood of liability especially the Officer/Director Defendants, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.

314.   Based on the foregoing, the Current Director Defendants face a sufficiently substantial likelihood of liability and accordingly, there is a reasonable doubt as to each Defendant's disinterestedness in deciding whether pursuing legal action would be in the Company's best interest.   Accordingly, demand upon the Current Director Defendants is excused as being futile.

## CAUSES OF ACTION

## COUNT I

**(Against ~~the Individual~~ Defendants T. Ault, Kohn and Horne for Breach of Fiduciary Duty)**

315.   Plaintiffs incorporate by reference and reallege each of the foregoing allegations  as though fully set forth herein.

316.   ~~The Individual Defendants~~T. Ault, Kohn and Horne owed  and  owe DPW fiduciary obligations, including the obligations of good faith, fair dealing,

loyalty and care. Among other things, ~~the Individual Defendants~~T. Ault, Kohn and Horne were and are required to act in furtherance of the best interests of DPW and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. ~~Each director and officer of the Company owes~~T. Ault, Kohn and Horne owe to the Company and its shareholder the fiduciary duty to exercise good faith and diligence in the administration of the Company's affairs. ~~The Individual Defendants owed~~T. Ault, Kohn and Horne owe a fiduciary duty to DPW to supervise the issues of its press releases and public filings and ensure that they were truthful, accurate and complete.

317. ~~The Individual Defendants~~T. Ault, Kohn and Horne breached their duties of loyalty, care and good faith by: (i) failing to act in the best interests of the Company; (ii) participating in transactions for the benefit of ~~the Individual Defendants~~themselves that harmed the Company; (iii) mismanaging the Company's finances; (iv) failing to implement and maintain a system of effective internal controls and procedures; (v) failing to adhere to the Company's applicable Code of Ethics; (vi) improperly awarding themselves generous and excessive compensation; and (vii) permitting the Company to issue materially false and misleading financial statements and other SEC filings.

318. ~~The Individual Defendants~~T. Ault caused the Company to engage in the schemes set forth herein including participating in transactions with related parties for the benefit of himself including transactions with AVLP while T. Ault serves as the chairman of AVLP, is compensated by AVLP and his company Philou Ventures controls AVLP.  T. Ault orchestrating the dealings with AVLP violates the duty of loyalty and DPW's Code of Ethics.  T. Ault has repeatedly failed to act in the best interests of the Company as described herein including allowing the Company to enter into the Future Receipts Agreements at unreasonably high interest rates and issue tens of millions of shares of the Company's common stock under the terms and

110

for the purposes described herein. While the Company has suffered as a result of the schemes set forth herein, T. Ault has received excessive compensation.  T. Ault had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations.  The Individual Defendants Furthermore, T. Ault had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts even though such facts were available to theim.  Such material misrepresentations and omissions were committed knowingly or recklessly.  Finally, T. Ault had actual knowledge that that the Company's internal controls were not adequately maintained and failed to maintain adequate internal controls.

319.  The Individual Defendants had actual or constructive knowledge that they had Horne caused the Company to engage in the schemes set forth herein including participating in transactions for the benefit of the Individual Defendants himself including the related party transactions with AVLP, failing to while Horne is serving as the CFO of AVLP and AVLP's audit committee chairman. Horne orchestrating the dealings with AVLP violates the duty of loyalty and DPW's Code of Ethics.  While serving as DPW's CFO, Horne has repeatedly failed to act in the best interests of the Company and awarding themselves as described herein including allowing the Company to enter into the Future Receipts Agreements at unreasonably high interest rates and issue tens of millions of shares of the Company's common stock under the terms and for the purposes described herein. Horne has received excessive compensation.

320. 319.   The Individual Defendants had actual knowledge that as DPW's CFO while the Company was engaging in has suffered as a result of the schemes set forth herein, and that internal controls were not adequately maintained.  Horne had actual or constructive knowledge that the Company issued materially false and

misleading statements and failed to correct the Company's public statements and representations.   Furthermore, Horne had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the scheme and to fail to maintain adequate internal controls, he failed to ascertain and to disclose such facts even though such facts were available to theim. Such improper conduct was material misrepresentations and omissions were committed knowingly or recklessly.  Finally, Horne had actual knowledge that that the Company's internal controls were not adequately maintained and failed to maintain adequate internal controls.

320.  ThisKohn caused the Company to engage in the schemes set forth herein including participating in transactions for the benefit of himself including orchestrating the use of Company funds to purchase a house for his daughter and then failing to disclose this related party transaction at a time when Kohn was DPW's President, CEO and CFO.  Kohn's related party transaction with his daughter violates the duty of loyalty and DPW's Code of Ethics.  While serving as DPW's President and CEO of Coolisys, Kohn repeatedly failed to act in the best interests of the Company as described herein including allowing the Company to enter into the Future Receipts Agreements at unreasonably high interest rates and issue tens of millions of shares of the Company's common stock under the terms and for the purposes described herein.  While the Company has suffered as a result of the schemes set forth herein, Kohn has received excessive compensation as an officer of the Company. While serving in various executive officer positions, Kohn had actual knowledge that the Company issued materially false and misleading statements and failed to correct the Company's public statements and representations.  Furthermore, Kohn had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that he failed

112

to ascertain and to disclose such facts even though such facts were available to him. Such material misrepresentations and omissions were committed knowingly or recklessly.   Finally, Kohn had actual knowledge that that the Company's internal controls were not adequately maintained and failed to maintain adequate internal controls.

321.   The conduct by T. Ault, Kohn and Horne was not a good-faith exercise or prudent business judgment to protect and promote the Company's corporate interests.

322.   By reason of the foregoing, DPW has sustained and continues to sustain damages.

323.   Plaintiffs, on behalf of DPW, has no adequate remedy at law.

## COUNT II
**(Against ~~the Individual~~ Defendants Smith, Rosenberg and Bentz for Breach of Fiduciary Duty)**

324.   Plaintiffs incorporate by reference and reallege each of the foregoing allegations  as though fully set forth herein.

325.   Smith, Rosenberg and Bentz owed  and  owe  DPW  fiduciary obligations, including the highest duty of loyalty.

326.   Among other things, Smith, Rosenberg and Bentz were and are required to act in furtherance of the best interests of DPW and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Smith, Rosenberg and Bentz owe to the Company and its shareholder the fiduciary duty to exercise good faith and diligence in the administration of the Company's affairs.  Smith, Rosenberg and Bentz owe a fiduciary duty to DPW to supervise the issuance of its press releases and public filings and ensure that they were truthful, accurate and complete.

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

327.   Smith, Rosenberg and Bentz breached their duties of loyalty and good faith by: (i) failing to act in the best interests of the Company; (ii) permitting transactions for the benefit of the Officer/Director Defendants that harmed the Company; (iii) mismanaging the Company's finances; (iv) failing to implement and maintain a system of effective internal controls and procedures; (v) failing to adhere, and ensuring the Officer/Director Defendants adhered, to the Company's applicable Code of Ethics; (vi) improperly reviewing, recommending and/or approving the Officer/Director Defendants generous and excessive cash compensation; and (vii) permitting the Company to issue materially false and misleading financial statements and other SEC filings.

328.   Smith is the chairperson of the Audit Committee and a member of the Compensation Committee and NG Committee.  In these roles, Smith had actual or constructive knowledge that the Officer/Director Defendants engaged in the schemes set forth herein.  As a member of the NG Committee, Smith breached his fiduciary duties loyalty and good faith by permitting the Officer/Director schemes to continue unabated and failing to report the wrongdoing to the public or to appropriate authorities.  As a member of the Compensation Committee, Smith breached his duty of loyalty and acted in bad faith by reviewing, recommending and/or approving the Officer/Director Defendants excessive cash compensation while the Company was cash-starved.  As the chairperson of the Audit Committee, Smith had actual or constructive knowledge that the Company issued materially false and misleading statements, and he failed to correct the Company's public statements and representations.  Moreover, Smith had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that he failed to ascertain and to disclose such facts even though such facts were available to him.  Smith breached his fiduciary duties of loyalty and good faith, and his duties pursuant to the Audit Committee

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Charter, by approving the statements described herein which were made during his tenure on the Audit Committee, which he knew or was reckless in not knowing contained improper statements and omissions. Finally, Smith had actual knowledge that the Company's internal controls were not adequately maintained and failed to maintain adequate internal controls.

329. Rosenberg is a member of the Company's Audit Committee, Compensation Committee, and NG Committee. In these roles, Rosenberg had actual or constructive knowledge that the Officer/Director Defendants engaged in the schemes set forth herein. As a member of the NG Committee, Rosenberg breached his fiduciary duties loyalty and good faith by permitting the Officer/Director schemes to continue unabated and failing to report the wrongdoing to the public or to appropriate authorities. As a member of the Compensation Committee, Rosenberg breached his duty of loyalty and acted in bad faith by reviewing, recommending and/or approving the Officer/Director Defendants excessive cash compensation while the Company was cash-starved. As a member of the Audit Committee, Rosenberg had actual or constructive knowledge that the Company issued materially false and misleading statements, and he failed to correct the Company's public statements and representations. Moreover, Rosenberg had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that he failed to ascertain and to disclose such facts even though such facts were available to him. Rosenberg breached his fiduciary duties of loyalty and good faith, and his duties pursuant to the Audit Committee Charter, by approving the statements described herein which were made during his tenure on the Audit Committee, which he knew or was reckless in not knowing contained improper statements and omissions. Finally, Rosenberg had actual knowledge that the Company's internal controls were not adequately maintained and failed to maintain adequate internal controls.

115

330.   Bentz is a member of the Company's Audit Committee, Compensation Committee, and NG Committee.  In these roles, Bentz had actual or constructive knowledge that the Officer/Director Defendants engaged in the schemes set forth herein.  As a member of the NG Committee, Bentz breached his fiduciary duties of loyalty and good faith by permitting the Officer/Director schemes to continue unabated and failing to report the wrongdoing to the public or to appropriate authorities.  As a member of the Compensation Committee, Bentz breached his duty of loyalty and acted in bad faith by reviewing, recommending and/or approving the Officer/Director Defendants excessive cash compensation while the Company was cash-starved.  As a member of the Audit Committee, Bentz had actual or constructive knowledge that the Company issued materially false and misleading statements, and he failed to correct the Company's public statements and representations.  Moreover, Bentz had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that he failed to ascertain and to disclose such facts even though such facts were available to him. Bentz breached his fiduciary duties of loyalty and good faith, and his duties pursuant to the Audit Committee Charter, by approving the statements described herein which were made during his tenure on the Audit Committee, which he knew or was reckless in not knowing contained improper statements and omissions.  Finally, Bentz had actual knowledge that the Company's internal controls were not adequately maintained and failed to maintain adequate internal controls.

331.   The conduct by Smith, Rosenberg and Bentz was in bad faith and in violation of their fiduciary duty of loyalty.

332.   By reason of the foregoing, DPW has sustained and continues to sustain damages.

333.   Plaintiffs, on behalf of DPW, has no adequate remedy at law.

## COUNT III

116

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**(Against Defendant K. Ault for Breach of Fiduciary Duty)**

334.   Plaintiffs incorporate by reference and reallege each of the foregoing allegations  as though fully set forth herein.

335.   K. Ault owed DPW fiduciary obligations, including the duty of good faith and loyalty.

336.   Among other things, K. Ault was required to act in furtherance of the best interests of DPW and its shareholders so as to benefit all shareholders equally and not in furtherance of her personal interest or benefit. K. Ault owed to the Company and its shareholder the fiduciary duty to exercise good faith and diligence in the administration of the Company's affairs.

337.   K. Ault breached her fiduciary duties of loyalty and good faith by orchestrating the scheme to first obtain control of the Company, along with her husband T. Ault, and then using the Company for her own personal benefit while serving on the Board.  K. Ault put the personal interests of herself, and her husband T. Ault, ahead of the Company and its shareholders while serving on the Board. Prior to resigning from the Board on January 23, 2018, K. Ault oversaw transactions with AVLP and other related party entities in direct violation of the duty of loyalty and DPW's Code of Ethics.

338.   K. Ault had actual or constructive knowledge that the Officer/Director Defendants engaged in the schemes set forth herein.  K. Ault breached her duty of loyalty and acted in bad faith by permitting the Officer/Director schemes to continue unabated and failing to report the wrongdoing to the public or to appropriate authorities. K. Ault breached her duty of loyalty and acted in bad faith by approving the Officer/Director Defendants excessive compensation.  K. Ault had actual or constructive knowledge that the Company issued materially false and misleading statements, and she failed to correct the Company's public statements and representations.   K. Ault had actual knowledge of the misrepresentations and

117

1  omissions of material facts set forth herein, or acted with reckless disregard for the
2  truth, in that she failed to ascertain and to disclose such facts even though such facts
3  were available to her.  Such material misrepresentations and omissions were
4  committed knowingly or recklessly.

5      339.  K. Ault's conduct was in bad faith and in violation of the duty of
6  loyalty.

7      340.  By reason of the foregoing, DPW has sustained and continues to sustain
8  damages.

9      341.  Plaintiffs, on behalf of DPW, has no adequate remedy at law.

10  **COUNT IV**

11  **(Against Defendants T. Ault, Kohn and Horne for Unjust Enrichment)**

12  ~~324.~~342.  Plaintiffs incorporate by reference and reallege each of the
13  foregoing allegations  as though fully set forth herein.

14  ~~325.~~343.  Through the wrongful course of conduct and actions
15  complained of herein, ~~the Individual Defendants~~T. Ault, Kohn and Horne were
16  unjustly enriched at the expense of, and to the detriment of DPW. The wrongful
17  conduct was continuous and resulted in ongoing harm to the Company.  ~~The~~
18  ~~Individual Defendants~~T. Ault, Kohn and Horne were unjustly enriched pursuant to
19  receiving compensation, director remuneration, and/or compensation from related
20  parties while breaching their fiduciary duties owed to the Company, as alleged
21  herein.

22  ~~326.~~344.  Plaintiffs, as shareholders of DPW, seek restitution from ~~the~~
23  ~~Individual Defendants~~T. Ault, Kohn and Horne, and seek an order of this Court
24  disgorging all profits, benefits, and other compensation obtained by ~~the Individual~~
25  ~~Defendants~~T. Ault, Horne and Kohn, from their wrongful course of conduct and
26  fiduciary breaches.

27  ~~327.  Plaintiff, on behalf of DPW, has no adequate remedy at law.~~

28

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## COUNT III

### (Derivatively COUNT V

(**Against the Individual Defendants Smith, Rosenberg, Bentz and K. Ault for Gross MismanagementUnjust Enrichment**)

328.1. Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

329. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of DPW in a manner consistent with the operations of a publicly held corporation.

330. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of fiduciary duty alleged herein, DPW has sustained significant damages.

331. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

332. Plaintiff, on behalf of DPW, has no adequate remedy at law.

345. Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

346. Smith, Rosenberg, Bentz and K. Ault were unjustly enriched pursuant to receiving director remuneration while breaching their fiduciary duties owed to the Company, as alleged herein.

347. Plaintiffs, as shareholders of DPW, seek restitution from Smith, Rosenberg, Bentz and K. Ault, and seek an order of this Court disgorging all compensation obtained by them from the Company.

119

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under the law and demand is excused;

B.     Directing Individual Defendants to account to DPW for all damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

C.     Directing DPW to take all necessary actions to reform its corporate governance and internal procedures to comply with applicable laws and protect the Company and its shareholders from a recurrence of the events described herein, including, but not limited to, a shareholder vote resolution for amendments to DPW's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote on corporate governance policies;

D.     Directing DPW to appoint independent directors and take other necessary actions to the Board composition to protect the Company and its shareholders from a recurrence of the events described herein;

E.     Awarding to DPW restitution from the Individual Defendants and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants.

F.     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

G.     Granting such other and further relief as the Court may deem just and proper.

///////

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: ~~July 31, 2018~~March 11, 2019                    Respectfully submitted,

**FARUQI & FARUQI, LLP**

By: */s/ Benjamin Heikali*

Benjamin Heikali (SBN 307466)
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: 424-256-2884
Facsimile: 424-256-2885
E-mail: bheikali@faruqilaw.com

*~~Attorneys for Plaintiffs~~*

~~OF COUNSEL:~~

**FARUQI & FARUQI, LLP~~S~~**
Stuart J. Guber (admitted *pro hac vice*)
Alex B. Heller (admitted *pro hac vice*)
~~101 Greenwood Avenue,~~ 1617 John F. Kennedy Boulevard
Suite ~~600~~1550
~~Jenkintown~~Philadelphia, PA 19~~104~~63
Telephone: 215-277-5770
Facsimile:  215-277-5771
E-mail: sguber@faruqilaw.com
            aheller@faruqilaw.com

*Attorneys for Plaintiffs*

121

**FIRST AMENDED** **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**