Benjamin Heikali (SBN 307466)
E-mail: bheikali@faruqilaw.com
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: (424) 256-2884
Facsimile: (424) 256-2885

Stuart J. Guber (admitted *pro hac vice*)
Alex B. Heller (admitted *pro hac vice*)
E-mail: sguber@faruqilaw.com
aheller@faruqilaw.com
**FARUQI & FARUQI, LLP**
1617 John F. Kennedy Boulevard
Suite 1550
Philadelphia, PA 19103
Telephone: 215-277-5770
Facsimile: 215-277-5771

*Attorneys for Plaintiffs Ethan Young and Greg Young*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ETHAN YOUNG and GREG YOUNG, Derivatively on Behalf of Nominal Defendant, DPW HOLDINGS, INC.,<br><br>Plaintiffs,<br><br>vs.<br><br>MILTON C. AULT, III, AMOS KOHN, WILLIAM B. HORNE, JEFF BENTZ, MORDECHAI ROSENBERG, ROBERT O. SMITH, and KRISTINE AULT,<br><br>Defendants,<br><br>and<br><br>DPW HOLDINGS, INC.,<br><br>Nominal Defendant. | CASE NO.: 2:18-cv-06587-SJO-PLA<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED DERIVATIVE COMPLAINT**<br><br>Hearing Date: May 6, 2019<br>Time: 10:00 a.m.<br>Courtroom: 350 West 1st Street, Courtroom 10C<br>Judge: Hon. S. James Otero<br><br>Amended Complaint filed: March 11, 2019 |

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT .......... 1

II. FACTUAL BACKGROUND .......... 2

A. The Defendants .......... 2

III. ARGUMENT .......... 4

A. Legal Standard .......... 4

1. 12(b)(6) Motion to Dismiss .......... 4

2. Standard of Review .......... 4

B. The Amended Complaint Properly States a Claim for Breach of Fiduciary Duty .......... 6

1. Officer Director Defendants .......... 6

a. Claims Against T. Ault .......... 7

b. Claims Against Horne .......... 8

c. Claims Against Kohn .......... 10

2. Claims Against K. Ault .......... 12

3. Claims Against Smith, Rosenberg and Bentz .......... 13

4. Claims Based on the Future Receipts Agreements .......... 16

5. Claims Based on Compensation .......... 17

6. Claims Based on Share Issuances .......... 18

7. Claims Involving Cryptocurrency .......... 19

C. The Amended Complaint Properly States a Claim for Unjust Enrichment .......... 20

IV. CONCLUSION .......... 20

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362 (Del. 2006) .... 13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .... 4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .... 5

*David v. Baker*, 129 Fed. App'x 358 (9th. Cir. 2005) .... 4

*In re EZCORP Inc. Consulting Agreement Derivative Litig.*, C.A. No. 9962-VCL, 2016 WL 301245 (Del. Ch. Jan. 25, 2016) .... 5

*Nelson v. Emerson*, No. CIV.A. 2937-VCS, 2008 WL 1961150 (Del. Ch. May 6, 2008) .... 15

*Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35 (Del. 1996) .... 4, 14

*Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403 (Del. 1988) .... 5

*In re Syntex Corp. Sec. Litig.*, 95 F.3d 922 (9th Cir. 1996) .... 4

*Telxon Corp. v. Bogomolny*, 792 A.2d 964 (Del. Ch. 2001) .... 4

*Telxon Corp. v. Meyerson*, 802 A.2d 257 (Del. 2002) .... 18

*In re Trados Inc. S'holder Litig.*, 73 A.3d 17 (Del. Ch. 2013) .... 5

*Walling v. Beverly Enters.*, 476 F.2d 393 (9th Cir. 1973) .... 4

*In re Walt Disney Co. Derivative Litig.*,
825 A.2d 275 (Del. Ch. 2003) .......... 4, 14

*In re Walt Disney Co. Derivative Litig.*,
906 A.2d 27 (Del. 2006) .......... 6

*Weinberger v. UOP, Inc.*,
457 A.2d 701 (Del. 1983) .......... 5

*Wilkinson Floor Covering, Inc. v. Cap Call, LLC*,
No. 160256/2016,
2018 WL 2293196 (N.Y. Sup. Ct. May 16, 2018) .......... 16

*Wyler Summit P'ship v. Turner Broad. Sys., Inc.*,
135 F.3d 658 (9th Cir. 1998) .......... 4

## I.    PRELIMINARY STATEMENT

This is a derivative action brought on behalf of DPW Holdings, Inc. ("DPW" or the "Company") against its current Board of Directors (the "Board"), a former director and certain of its current executive officers (collectively, the "Individual Defendants") seeking to remedy the Individual Defendants' breaches of fiduciary duty and unjust enrichment. Plaintiffs Ethan and Greg Young ("Plaintiffs") filed their first complaint on July 31, 2018 ("Original Complaint").    Plaintiffs' First Amended Verified Shareholder Derivative Complaint was filed on March 11, 2019 ("Amended Complaint").

Defendant Milton "Todd" Ault, III ("T. Ault") is the Chairman and Chief Executive Officer ("CEO") of DPW.   After acquiring a controlling interest of the Company in September 2016, T. Ault has put a non-independent six-person Board in place that now includes himself and two other of the Company's executive officers.   Millions of dollars have been funneled out of DPW and into several Ault-related parties to the detriment of the Company and its shareholders.   In order to finance these transactions, the Board has executed "Future Receipts Agreements" that have saddled DPW with substantial liabilities. In a desperate attempt to raise cash the Board has also heavily diluted the Company's common stock.   The rapid issuance of common stock occurred at the same time as DPW's stock price was being artificially inflated through rampant promotion that heralded cryptocurrency projects that never materialized and purported $50 million purchase orders from related parties that have never been fulfilled.   The dilution and short-term financing arrangements have funded the excessive salaries and bonuses paid to the officers, while also funding significant cash transfers to Avalanche International Corp. ("AVLP"), an Ault related-party employing defendant William Horne ("Horne").   During T. Ault's tenure, the Company has failed to make proper disclosures with the SEC, struggled with internal control issues and has made many misleading statements to the investing public.

This Court previously held that "demand is excused as futile because Plaintiffs have pled sufficient facts showing that a majority of the Board is not independent or uninterested." (ECF No. 42, at 7) (the "Order").   The Court then dismissed Plaintiffs'

Original Complaint with leave to amend due to certain pleading deficiencies identified in the Order, which were satisfied by the well-plead allegations of the Amended Complaint. Defendants do not challenge the Court's conclusion that demand is excused as futile in its Motion to Dismiss the First Amended Verified Derivative Complaint. (ECF No. 46) ("MTD"). The Individual Defendants now seek to avoid any liability for their conduct by attempting to argue that the Amended Complaint fails to set forth viable claims. Plaintiffs' Amended Complaint contains well plead allegations as discussed below. The Amended Complaint details the egregious self-dealing and destruction of the financial viability of DPW as the result of bad faith failure of the Individual Defendants to carry out their duties as directors, committee members and officers of DPW. For the reasons set forth below, the Individual Defendants' MTD should be denied.

## II. FACTUAL BACKGROUND

### A. The Defendants

In September 2016, T. Ault and his wife Kristine Ault ("K. Ault" and, collectively, the "Aults") acquired a controlling interest in DPW using their company Philou Ventures, LLC ("Philou"). ¶¶ 2, 74[1]. In exchange for $1.5 million, Philou received 40% of DPW's common stock and the right to appoint a number of directors to DPW's Board. ¶¶ 2, 74, 76. As part of the agreement by Philou, all of DPW's directors, other than the Company's then CEO and President Amos Kohn ("Kohn"), were to resign and Philou would appoint four new directors of its choosing. ¶¶ 39, 76. The remaining board seats were then filled by K. Ault, Horne, Robert O. Smith ("Smith"), and Mordechai Rosenberg ("Rosenberg"). ¶¶ 77-79. T. Ault then joined the Board and became Executive Chairman. ¶ 79.

In December 2017, T. Ault took over the position of CEO along with remaining as the Executive Chairman of the Board. ¶ 26. After Ault became CEO, Kohn kept his position as the President of the Company and the CEO of the Company's subsidiary, Coolisys Technologies, Inc. ("Coolisys"). ¶ 39. Kohn also served as interim CFO of the

[1] All references herein to "¶__" are to the corresponding paragraphs of the Amended Complaint (ECF No. 44).

Company from July 2017 until January 2018. ¶ 39. Horne then took over as CFO in January 2018 while remaining a director (collectively, T. Ault, Kohn and Horne are referred to herein as the "Officer Directors"). ¶ 37. The Officer Directors receive collective cash compensation of more than $1 million annually as well as substantial equity compensation and incentive awards. ¶ 10. Following Horne's appointment as CFO, K. Ault resigned as a director and Jeff Bentz ("Bentz") was appointed as the sixth director. ¶¶ 43, 46. The purportedly independent directors now consist of Smith, Rosenberg and Bentz (collectively referred to herein as the "Committee Member Directors"). ¶¶ 50-52.

T. Ault has served as Chairman of AVLP since September 2014, a separate entity that is thinly traded on the OTC under the ticker symbol AVLP and has disclosed substantial doubts about its ability to continue as a going concern due to negative working capital. ¶¶ 56, 58, 112. DPW discloses that AVLP is a related party entity that has received at least $10 million from DPW since September 2016, when T. Ault took control of DPW. ¶ 26. Horne serves as CFO and a director of AVLP. ¶ 37. T. Ault also serves as Chairman of Alzamend Neuro, Inc. ("Alzamend"), a company he founded in 2016. ¶ 26. At the time the Original Complaint was filed, Horne also served as CFO of Alzamend. ¶ 37.

T. Ault has a checkered past that is discussed at length in the Amended Complaint. ¶¶ 29-36, 222. T. Ault has been suspended by FINRA and ordered to pay fines and restitution. ¶¶ 29-31. T. Ault filed for bankruptcy for a company where he previously served as CEO and chairman. ¶¶ 33-35. He then filed for personal bankruptcy and proceeded to fail to comply with multiple bankruptcy procedures. ¶ 36. T. Ault and his prior companies have also had numerous lawsuits filed against them based on fraud, breach of fiduciary duties and other improprieties, which remain undisclosed by the Company. ¶ 36. Previously, Horne was the CFO of Patient Safety Technologies, Inc. while T. Ault was the CEO of that company. ¶ 283. Horne was a named defendant in a lawsuit along with T. Ault as a result of their time together at Patient Safety Technologies, Inc. ¶ 283.

## III. ARGUMENT

### A. Legal Standard

#### 1. 12(b)(6) Motion to Dismiss

On a motion to dismiss it is defendant's burden to show that plaintiff cannot state a claim for relief. *David v. Baker*, 129 Fed. App'x 358, 360 (9th. Cir. 2005). For purposes of evaluating a motion to dismiss, all factual uncertainties in the complaint must be construed in the light most favorable to the plaintiff. *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996). The Court will dismiss only those claims for which it appears beyond doubt that plaintiff can prove no set of facts which would entitle him to relief. *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). Any existing ambiguities must be resolved in favor of the pleading. *Walling v. Beverly Enters.*, 476 F.2d 393, 396 (9th Cir. 1973). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In a shareholder derivative action, once the plaintiffs have satisfied the demand futility analysis (as here), a much more lenient standard becomes applicable to plaintiffs' causes of action. Delaware courts have repeatedly made clear that the standard for failure to state a claim is "notably lower than is true in the context of motions to dismiss for failure to make a presuit demand." *Telxon Corp. v. Bogomolny*, 792 A.2d 964, 974 (Del. Ch. 2001). Unlike the particularity requirement for demand futility, notice pleading is all that is required on a motion to dismiss for failure to state a claim. *Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 39 (Del. 1996). Here, where Plaintiffs met the demand futility requirement, under the more lenient notice pleading standards, the causes of action are generally sustained. *See In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 285 (Del. Ch. 2003).

#### 2. Standard of Review

This Court previously found DPW lacks a majority of disinterested and independent directors. Order at 12. According to Delaware case law, when a company's board lacks a

majority of disinterested and independent directors, "[e]ntire fairness, Delaware's most onerous standard, applies[.]" *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013). In *Trados*, "the Board lacked a majority of disinterested and independent directors, making entire fairness the applicable standard." *Id.* at 43.

T. Ault, K. Ault, Horne and Kohn have all been involved with transactions in which they stood on both sides and should have the burden of proving the entire fairness of those transactions. *See Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 406 (Del. 1988) ("It is well established in Delaware that one who stands on both sides of a transaction has the burden of proving its entire fairness"); *see also Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) ("When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain . . . where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts") (citations omitted). When a controlling shareholder is involved in a self-dealing transaction, the applicable standard of review is entire fairness.[2] *In re EZCORP Inc. Consulting Agreement Derivative Litig.*, C.A. No. 9962-VCL, 2016 WL 301245, *11 (Del. Ch. Jan. 25, 2016).

Under any standard of review, Plaintiffs have proffered "enough facts to state a claim to relief that is plausible on its face" against each of the Individuals Defendants. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Even under the strictest standard of review, the business judgment rule, the Individual Defendants are liable because the transactions and decisions described at length in the Amended Complaint lack "any rationally conceivable basis" and were not logical in advancing any of DPW's objectives. *See Trados*, 73 A.3d at 43. The business judgment standard sets forth a presumption that, "in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the

---

[2] T. Ault acquired a controlling interest in DPW in September 2016. ¶ 2. This Court previously recognized T. Ault's control over DPW. Order at 1, 10-11.

company." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 52 (Del. 2006) (*quoting Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds*). Here, the Individual Defendants are not insulated by the business judgment rule because none of them acted in good faith and in the best interests of the Company.

### B. The Amended Complaint Properly States a Claim for Breach of Fiduciary Duty

The allegations of the Amended Complaint satisfy the concerns raised in the Court's Order. The Court noted that the Original Complaint, "fails to separately plead specific claims for a breach of fiduciary duty against each of these individual directors" and instead "plead a breach of fiduciary duties against the 'Individual Defendants' as a whole." Order at 14-15. Plaintiffs' Amended Complaint satisfies this issue by separating the Individual Defendants into three groups for the breach of fiduciary duty cause of action: Officer Directors, Committee Member Directors and former director K. Ault, and then describing specific misconduct against each of the Individual Defendants: T. Ault (¶ 318), Horne (¶ 319), Kohn (¶ 320), Smith (¶ 328), Rosenberg (¶ 329), Bentz (¶ 330), and K. Ault (¶¶ 337-38). Plaintiffs also describe the misconduct of the subgroups: Officer Directors (¶ 317) and Committee Member Directors (¶ 327).

The Court's Order previously found that the majority of the original complaint alleges specific instances of misconduct against Defendants T. Ault, K. Ault, Horne and Kohn. Order at 14. The Amended Complaint adds specific instances of misconduct against Smith, Rosenberg and Bentz both as individual directors and in their roles as the sole members of all three of the Board's committees. ¶¶ 328-30, 327. Plaintiffs have properly alleged that the Committee Member Directors, and each of the Individual Defendants, breached their duties of loyalty and good faith. Each of the Individual Defendants are not protected by the exculpation provision for these claims. For these reasons, and the reasons described in greater detail below, the Amended Complaint pleads sufficient facts for the Court to effectively analyze each of the Individual Defendants' liability.

#### 1. Officer Director Defendants

The Officer Director Defendants have acted together and have all benefited as a result of the scheme set forth in the Amended Complaint. The Officer Director Defendants manage the Company and are responsible for the day to day operations with T. Ault as the ringleader. The Officer Director Defendants are not afforded the protection of the Company's exculpatory provision when acting in their capacity as officers. Order at 11. The Officer Director Defendants also have effective control over the Board. The Board cannot have a majority vote without at least one of the Officer Director Defendants voting with the Committee Member Directors. As this Court has astutely observed: "As both a controlling shareholder of DPW and a director of AVLP, T. Ault clearly has substantial influence over Horne's employment at both companies, and Horne may feel strongly subject to T. Ault's dominion." Order at 10. Similarly, "Kohn holds senior officer positions at two companies at which T. Ault has considerable influence and used $300,000 of DPW funds to purchase a house in Israel for personal use completely unrelated to the Company's business endeavors." Order at 12.

**a. Claims Against T. Ault**

In the MTD, the Defendants do not provide much defense to the claims against T. Ault. T. Ault is the ringleader of this scheme and, along with his wife K. Ault, took control of DPW in September 2016 through Philou and proceeded to use DPW for their own personal gain to the detriment of the Company's outside shareholders.

Once T. Ault gained control of DPW, the Company began funneling millions of dollars to related-party AVLP as both purported loans and investments. ¶¶ 108, 111. A little more than two years prior to gaining control of DPW, the Aults also used Philou to take control of AVLP. ¶ 56. T. Ault is the chairman of AVLP and Horne is the CFO, two roles that they also perform for DPW. ¶ 127. AVLP is a thinly traded security that has very minimal assets on its balance sheet to make any repayments (according to the most recent financial information available) and the substantial investments into AVLP are imprudent and without business justification. ¶¶ 96-99, 112-15. The actions of T. Ault in orchestrating dealings with AVLP was improper and violated the duty of loyalty. ¶ 123.

Amongst other things, T. Ault is liable for blatant self-dealing that allowed him to collect significant compensation from both entities while funneling DPW's cash to an entity that he controls. ¶ 318. T. Ault funded the self-dealing transactions and the Officer Directors' compensation through the Future Receipts Agreements and stock dilution while also engaging in rampant promotion including touting cryptocurrency projects that never materialized and purported $50 million purchase orders from related parties that have never been fulfilled. ¶¶ 124-27, 173-180, 318. These actions have greatly harmed the shareholders and the Company. ¶ 318.

**b. Claims Against Horne**

Horne and T. Ault have had a long history of working together including at Patient Safety Technologies, Inc. beginning in 2005 where Horne was CFO and T. Ault was CEO. ¶ 283. Just months prior to joining DPW's Board, in June 2016, Horne was appointed as the CFO and a director of AVLP, as well as AVLP's Audit Committee Chairman. ¶ 56. The Aults then put Horne on DPW's Board almost immediately upon taking control of DPW. ¶ 37. A little over a year later, Horne officially became CFO of DPW. *Id.* Horne was involved on both sides of all of DPW's transactions with AVLP. ¶ 319.

The MTD touts the hiring of Horne as the CFO, claiming that this hire was in an effort to strengthen DPW's control environment and internal control over financial reporting. MTD at 7-8. This reasoning is flawed because Horne was already DPW's Audit Committee Chairman during the time of the internal control and financial reporting issues that he is now supposedly tasked with rectifying. ¶ 201. Horne was also serving as CFO of AVLP, making him woefully conflicted. *Id.* Horne was also CFO of another one of T. Ault's company's, Alzamend. *Id.* Horne also had obligations to at least three other companies, making him an inappropriate choice to fix DPW's internal control and financial reporting issues; issues in which he played a significant role in creating and was purportedly being hired to rectify. ¶¶ 201-02.

Horne stands on both sides of the transactions with AVLP and benefits by AVLP obtaining funds from DPW. Horne's self-dealing transactions breached his fiduciary duties

to the Company. ¶ 319. Horne also breached DPW's Code of Ethics: "[d]irectors, officers and employees may not use Company assets, property, information or position for personal gain (including gain of friends or family members)." ¶ 63. The funds sent to AVLP, and used to compensate the Officer Directors, were acquired by DPW using the destructive Future Receipts Agreements and the dilution of the Company's common stock, for which Horne is also liable. ¶ 319.

The MTD incorrectly and disingenuously claims that the Amended Complaint contains "no allegations concerning any action that Horne took *as an officer*." MTD at 3. This is not only patently false based on the specific allegations of the Amended Complaint but also is nonsensical in that Horne has been the CFO of DPW since January 25, 2018 and his duties encompass all financial dealings of the Company, including the transactions with AVLP, the Future Receipts Agreements and the dilution of the Company's common stock, which all occurred both before *and* after he became CFO. ¶¶ 37, 319. As the CFO, Horne also has responsibility over the Company's internal control deficiencies, the material misstatements made to the public and the Company's other financial reporting issues detailed in the Amended Complaint. ¶ 319.

There were transactions when Horne was serving as a director and Audit Committee Chairman of DPW at the same time as he was serving as AVLP's CFO, thereby personally benefitting while having full knowledge of the inability of AVLP to repay any loans received from DPW and AVLP's lack of assets and revenue. ¶¶ 108-10. Although Horne was not yet DPW's CFO, the exculpation clause does not protect him from his bad faith self-dealing. The Amended Complaint includes not only numerous transactions with AVLP prior to Horne becoming CFO of DPW but also transactions that occurred on or after January 25, 2018, when he was CFO, and misrepresentations related to AVLP. For example, during the month of April 2018, DPW made 19 open market purchases amounting to 159,200 shares of AVLP for a total purchase price of $119,023. ¶ 93. These purchases are in addition to the $99,000 of AVLP common stock that the Company purchased during the first quarter of 2018. *Id.* While Horne has been CFO of both companies, DPW has

continued to claim that the MTIX purchase order was still collectible and would be a source of significant cash flows (despite not receiving a single dollar owed). ¶¶ 126-27.[3]

Defendants falsely claim that only two Future Receipts Agreements were entered while Horne was an officer. MTD at 13. In fact, the Amended Complaint references *three* Future Receipts Agreements that were entered into in March 2018. ¶ 131. Two of these agreements were entered into on March 23, 2018 and combined saw the Company accept $1,000,000 in exchange for $1,399,000. *Id.* These two agreements require weekly payments of $25,770 and $11,045, respectively, until the total amount due is paid off in full. *Id.* The Company also paid a combined $20,000 origination fee for these loans. *Id.* On March 27, 2018, the Company entered into another Future Receipts Agreement in which the Company accepted $400,000 in exchange for $552,000. *Id.* The March 27 agreement requires the Company to pay $13,143 per week, as well as a $12,000 origination fee *and* issue 150,000 shares of DPW common stock to the lender. *Id.* Moreover, three other Future Receipts Agreements were entered into on January 25, 2018, the day that Horne became CFO. *Id.* Further, the Company has entered into more Future Receipts Agreements that occurred more recently and were not included in the Amended Complaint, as disclosed in the Company's SEC filings.[4]

**c. Claims Against Kohn**

---

[3] There have also been more recent loans made to AVLP that were not included in the Amended Complaint. According to DPW's September 30, 2018 Form 10-Q, filed with the SEC on November 15, 2018, loans to AVLP increased by $871,000 to a total of $6,407,000 compared to the $5,536,000 reported on DPW's June 30, 2018 10-Q, filed with the SEC on August 15, 2018. It is Plaintiffs' position that Horne cannot be exculpated for any of the transactions with AVLP while he was serving on DPW's Board due to the bad faith self-dealing that occurred and that these additional loans are a continuance of what is already alleged in the Amended Complaint.

[4] DPW announced in a Form 8-K filed with the SEC on December 31, 2018 that the Company has defaulted on two promissory notes entered on October 10, 2018 and November 29, 2018 with Cavalry Fund I LP in the total amount of $888,150. The Company filed another Form 8-K with the SEC on January 7, 2019, announcing that the Company was in default on a note that it entered on September 21, 2018 in the amount of $526,316 with Bellridge Capital L.P.

The Amended Complaint sets forth the claims that Kohn used Company funds to provide his daughter with a house in Israel. ¶¶ 184-89. The MTD does not provide any defense to this transaction. MTD at 18. The MTD instead argues that the transaction with his daughter is the only instance in which Kohn is acting as an officer, and then requests that the Court dismiss the breach of fiduciary duty claims that are purportedly connected to his role as a director. MTD at 18. Contradicting Defendants' request to dismiss the Amended Complaint in its entirety, Defendants have all but conceded that Kohn should remain in this case for the transaction involving the house gifted to his daughter. Defendants are also incorrect that the gifting of the house to Kohn's daughter is the only instance of Kohn acting as an officer. As detailed below, Kohn has been DPW's CEO, CFO and/or President during all of the misconduct detailed at length in the Amended Complaint. Furthermore, the Court has previously found that "the facts alleged support a substantial likelihood that Kohn is liable for a breach of his duty of good faith, a determination unaffected by the applicability of the exculpatory provision." Order at 11.

When the house was gifted, Kohn was DPW's President, CEO, CFO, and Principal Accounting Officer. ¶ 320. As the Court noted, "Plaintiffs plead particularized facts demonstrating a substantial likelihood that Kohn is liable for his conscious failure to disclose a transaction which directly benefitted a family member." Order at 12. The Court continued, "the purported willingness of Kohn to materially misrepresent the nature of the benefits provided to his daughter until an audit revealed the discrepancy strikes the Court as egregious enough to render Kohn likely to face personal liability." *Id.* Plaintiffs also raise an issue with the attempted cover up, as discussed by this Court: "the Complaint gives rise to a reasonable inference that the Company's failure to include the subsequent events and transactions surrounding the 'gifting' were the result of selective omissions by Kohn and others." *Id.* The Board did not make Kohn's daughter pay for the house or otherwise undo this unfair transaction. ¶ 187. Instead, back-dated agreements were eventually filed providing specifics on the transaction with Kohn's daughter. ¶ 186.

To reiterate, the MTD argues that the transaction with Kohn's daughter is the only

instance in which he is acting as an officer, and then requests that the Court, "dismiss the breach of fiduciary duty of care claims asserted against Kohn, *as a director*, including, *inter alia*, claims premised upon the Future Receipts Agreements, the issuances of DPW's stock, excessive compensation, and internal controls." MTD at 18. Kohn served as DPW's CEO until December 2017 and DPW's CFO from July 2017 until January 2018. ¶ 39. Kohn has served as the Company's President since 2008. ¶ 39. As detailed at length in Plaintiffs' Amended Complaint, the transactions with AVLP began immediately after the Aults took over control of DPW in 2016. ¶ 107. As of December 31, 2017, DPW reported an investment of $12,176,000 into AVLP with numerous transactions detailed in the Amended Complaint that all occurred while Kohn was the CEO and CFO of DPW. ¶¶ 108, 110. The Future Receipts Agreements likewise began when Kohn was CEO as described in the Amended Complaint. ¶ 129. The prolific stock issuances also began while Kohn was the CEO. ¶¶ 140-41. The attempt to shield Kohn from liability by claiming that he was only acting as a director while he was engaging in misconduct as the CEO, CFO and/or President of the Company is an inaccurate portrayal of the facts.

**2. Claims Against K. Ault**

The Amended Complaint contains specific allegations that K. Ault acted in bad faith and breached her fiduciary duty of loyalty. ¶¶ 337-38. K. Ault was never an independent director. K. Ault was a controlling shareholder of DPW and entered into transactions that directly benefitted her and T. Ault to the detriment of DPW's shareholders. *Id.* K. Ault was conflicted in all dealings with AVLP as a significant shareholder of both DPW and AVLP, and also because her husband T. Ault is drawing a salary and other compensation from both companies. *Id.*

The Ault's company, Philou, became controlling shareholder of DPW in September 2016. ¶ 43. K. Ault was appointed as a DPW director on October 13, 2016 until she resigned on January 23, 2018. *Id.* While the MTD notes that K. Ault was not on the Board when the employment agreements with T. Ault and Horne were executed, the MTD conveniently omits that she was a member of the Board when the employment agreement

with Kohn was entered. MTD at 14. Kohn's employment agreement was dated November 30, 2016 but interestingly given an effective date of September 22, 2016, more than two months prior to the signing. ¶ 40. Kohn's employment agreement was then amended on February 22, 2017 – while K. Ault was still on the Board – to provide Kohn with a ten-year warrant to purchase 317,460 shares of DPW common stock at an exercise price of $0.01 subject to vesting. ¶ 41. As for T. Ault, he entered into his first agreement with DPW on September 22, 2016, after the Aults took control of DPW and only a few weeks prior to K. Ault becoming an official member of the Board. ¶ 228. Under that agreement, T. Ault began receiving his $15,000 a month compensation on November 1, 2016, after K. Ault became a director. *Id.*

The MTD claims that the "scheme" to obtain control of the Company refers to the purchase of the Series B Preferred Stock by Philou while K. Ault was a director. MTD at 14. While the Series B preferred stock helps ensure the Aults keep their control over DPW (*see* ¶¶ 83-89), it is only one of many maneuvers by the Aults to keep control over DPW. The actual "scheme" was the Aults' company Philou acquiring a controlling interest in DPW, putting the Aults and other cronies in positions of power and then funneling tens of millions of dollars to AVLP, a company that the Aults control. ¶¶ 4-10. K. Ault was then compensated as a DPW director while her husband received lucrative compensation from both DPW and AVLP. ¶¶ 27, 43, 119.

**3. Claims Against Smith, Rosenberg and Bentz**

The Delaware Supreme Court holds that the "fiduciary duty of loyalty . . . encompasses cases where the fiduciary fails to act in good faith." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006). "Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith." *Id.* As discussed *supra*, the business judgment rule only protects directors acting on an informed basis, in good faith, and in honest belief that the action taken was in the best interest of the company. Further, as discussed *supra*, entire fairness

review may be appropriate for all of the Individual Defendants because this Court has previously found that DPW does not have an independent Board. Under either standard of review, the Amended Complaint more than sufficiently demonstrates, on a motion to dismiss, that Smith, Rosenberg and Bentz breached their fiduciary duties of loyalty and good faith. Additionally, notice pleading is all that is required on a motion to dismiss for failure to state a claim where plaintiffs have already met the demand futility requirement. *Solomon*, 672 A.2d at 39; *Disney*, 825 A.2d at 285.

The Amended Complaint now includes individual allegations against Smith (¶ 328), Rosenberg (¶ 329) and Bentz (¶ 330) that cannot be exculpated. Smith, Rosenberg and Bentz are the only members of all three of the Board's committees. DPW has committee charters that lay out the responsibilities of its committee members. According to the Audit Committee Charter, the Company's auditors report directly to the Audit Committee and the Audit Committee "serves as an independent monitor of the Company's financial reporting process and internal control over financial reporting . . . [i]n discharging its oversight role, the Committee is empowered to investigate any matters brought to its attention." ¶ 64. According to the Compensation Committee Charter, the Compensation Committee is tasked with "reviewing and recommending executive compensation policies and practices to the Board, reviewing and recommending to the Board salaries, bonuses and other benefits paid to Company officers, and administering Company stock option plans and other benefit plans." ¶ 65. Smith, Rosenberg and Bentz were grossly negligent in carrying out their duties as the sole members of the Board's only three committees. The Committee Member Directors acted together as one. When a board committee fails, liability is imputed to all members of that committee. It is not Plaintiffs' burden at the pleading stage to describe the actions of each committee member behind closed doors when the entire three-person committee failed to carry out the committee's duties appropriately. None of the Committee Member Directors have even publicly questioned or separated themselves from the actions of the committees they sit on or the Board as a whole. To require Plaintiffs to plead specifics of what occurred in the committee meetings is an

especially high standard at the pleading stage where, as here, the Court has already determined that demand is excused as futile.

The MTD cites *Nelson v. Emerson* for the proposition that plaintiffs are required to identify who specifically approved the challenged compensation package and quoted the case as support for saying that the plaintiff in that case was not excused from pleading specifics by any lack of information. MTD at 11. Defendants quoted the case out of context and conveniently omit that *Emerson* is completely distinguishable from Plaintiffs' case. In *Emerson*, the plaintiff was a director of the company he was challenging, had access to all of the company's books and records and never challenged the compensation while he was a director. *Nelson v. Emerson*, No. CIV.A. 2937-VCS, 2008 WL 1961150, at *9 (Del. Ch. May 6, 2008). The *Emerson* complaint "fatally" failed to include any information about the amount or specific instances of the alleged excessive compensation. *Id.* at *10 ("By no facts, I mean none that quantify what compensation the [defendants] received and when, much less any that support an inference that the non-pled amounts exceeded what was rational and proper"). This is what the court in *Emerson* meant when it said, "not at all excused by any lack of information on [plaintiff's] part" and not the meaning that Defendants conveniently provide. *Id.* at *9; MTD at 11.

As the MTD cites, "[b]ad faith may be inferred where the directors knew or should have known that illegal conduct was taking place, yet took *no steps* in a good faith effort to prevent or remedy the situation." MTD at 6 (citing *Okla. Firefighters Pension & Ret. Sys. v. Corbat*, No. CV 12151-VCG, 2017 WL 6452240, *17 (Del. Ch. Dec. 18, 2017)). The MTD claims that once the auditors brought the issue regarding the failure to report the related party transaction involving Kohn's daughter and disclose additional subsequent events as required, the "Audit Committee took action when a red flag was presented." MTD at 6. The "action" referred to by the Defendants is the Audit Committee causing the amended Form 10-Q to be filed. Defendants had no choice but to amend the Form 10-Q once its independent public auditor flagged these issues. Defendants neglect to mention that agreements between Kohn's daughter and the Company were then back-dated and

filed. ¶ 186. Defendants further do not address the fact that Kohn's daughter was not forced to pay for the house and that the transaction with Kohn's daughter was left undisturbed, therefore no steps were actually taken in a good faith effort to remedy the situation. ¶ 187. The Committee Member Directors acted in bad faith and must have already known about the purchase of the house for Kohn's daughter, as well as the failure to disclose the related party transaction and the selective omissions of material subsequent events. ¶ 195. The Committee Member Directors also acted in bad faith by reviewing and recommending excessive cash compensation to the Officer Director Defendants while the Company has a going concern opinion, was entering into Future Receipts Agreements, and was making significant investments in the Aults' other companies. ¶¶ 328-30.

The Future Receipts Agreements and stock issuances are disclosed at length by DPW in its financial statements and other SEC filings. The Committee Member Directors have a duty to review these filings and should have been well aware of this toxic debt that the Company was incurring. Once again, the Committee Member Directors took *no steps* in a good faith effort to prevent or remedy the situation and instead allowed it to continue. They provided no oversight whatsoever. For the reasons discussed below, and at length in the Amended Complaint, the Future Receipts Agreements have been harmful to the Company and are without any business rationale, especially when viewed in conjunction with the excessive executive compensation and the cash given to AVLP. *Id.*

#### 4. Claims Based on the Future Receipts Agreements

The MTD once again falsely claims that the Future Receipts Agreements are not usurious loans "because the Future Receipts Agreements are not loans or usurious transactions." MTD at 13. The MTD is relying on a technicality created by the New York courts under the definition of New York criminal usury. *See Wilkinson Floor Covering, Inc. v. Cap Call, LLC*, No. 160256/2016, 2018 WL 2293196, *2 (N.Y. Sup. Ct. May 16, 2018) ("because plaintiffs' obligation to pay them future receivables is conditioned on plaintiffs' receipt of such, the agreements at issue are not loans"). Plaintiffs are not alleging criminal usury and this New York case is wholly irrelevant. More importantly, the

Amended Complaint does allege that the Future Receipts Agreements entered by Defendants require that the Company "bears the risk for repayment regardless of whether or not the Company has any receipts, therefore in actuality the Future Receipts Agreements are loan agreements where the Company is the debtor." ¶ 130. The Future Receipts Agreements require substantial repayments on a daily and weekly basis over a short duration. ¶¶ 129, 131, 134. The Defendants argument has no bearing on a breach of fiduciary duty claim and in no way provides a rebuttal to the prima facie unfair agreements described at length in the Amended Complaint. *See* ¶¶ 128-39. During the second half of 2017 and first quarter of 2018 the Company "sold" future receipts of $9,836,900 for $6,989,000, which equals interest of approximately 41%. ¶¶ 121, 137, 139.

The Company used the funds raised through the Future Receipts Agreements, and also significant stock issuances, to provide cash to AVLP. ¶ 121. DPW has classified some of these cash infusions as investments into AVLP and others as loans. ¶¶ 109-11. The purported loans to AVLP accrue interest at 12% per annum, *significantly* less than the more than 40% being paid on the Future Receipts Agreements, and DPW has pushed back the repayment of the interest and principal of the AVLP loans repeatedly. *See* ¶ 110.

The MTD claims that because the Amended Complaint alleges that the Company entered into the Future Receipts Agreements, and not a particular individual, that this somehow calls for a dismissal of claims related to these egregious agreements. MTD at 13. Officers run the day to day operations of a company. T. Ault, Kohn and Horne were all officers when some or all of the Future Receipts Agreements were entered. ¶¶ 128-39. Kohn even had a dual role as CEO and CFO for the Future Receipts Agreements that were entered into prior to T. Ault taking over as CEO in December 2017. ¶ 39.

**5. Claims Based on Compensation**

The Compensation Committee is tasked with "reviewing and recommending to the Board salaries, bonuses and other benefits paid to Company officers[.]" ¶ 65. The Amended Complaint alleges that the Committee Member Directors breached their fiduciary duties by reviewing and recommending the compensation paid to the Officer

Director Defendants. ¶ 327. The Amended Complaint further alleges that the Officer Director Defendants improperly awarded themselves excessive compensation. ¶ 317. The MTD erroneously states, "Ault, Horne and Kohn were not on the Compensation Committee, so they did not award compensation, excessive or otherwise, to themselves." MTD at 12. Defendants are wrong. According to the Compensation Committee charter, the committee presents their recommendations to the Board to be approved by the Board itself. ¶ 65. In order for the Board to have a majority vote on compensation, at least one of the Officer Director Defendants would have to affirmatively vote on the recommended compensation. As alleged in the Amended Complaint, and discussed above, the Officer Director Defendants were conspiring, and any affirmative vote on compensation by one of the Officer Director Defendants is for their own personal benefit even if they are not voting on their own compensation directly. *See Telxon Corp. v. Meyerson*, 802 A.2d 257, 265 (Del. 2002) ("Like any other interested transaction, directoral self-compensation decisions lie outside the business judgment rule's presumptive protection, so that, where properly challenged, the receipt of self-determined benefits is subject to an affirmative showing that the compensation arrangements are fair to the corporation").

**6. Claims Based on Share Issuances**

As for DPW's issuance of more than 50 million shares of common stock in a little over a year, discussed at length in Plaintiffs' Amended Complaint (*see* ¶¶ 140-71), Defendants claim that there are "no allegations that any Director engaged in fraud in connection with the securities issued to unrelated parties or for personal gain." MTD at 9. Plaintiffs do in fact allege personal gain. The stock issuances were one of the two main ways that the Company raised funds (the other being through the future receipts agreements). ¶ 140. These funds were then funneled to AVLP and other related party entities for the personal gain of T. Ault, Horne and other related parties, and the funds were used to compensate the Officer Directors and the Board while the Company was cash starved and floundering. ¶¶ 139-40, 142. For the issuances that were at below market price, the MTD argues that a corporation in financial distress is given considerable latitude

in fixing the price for its issuances. MTD at 10. The financial distress, however, was self-inflicted and, rather than stop the cash transfers to AVLP and cash compensation to the Individual Defendants so that the cash could be used for operations, the Board used its stock as currency to pay off principal and interest on loans at much greater than fair market value. *See, e.g.,* ¶¶ 154-58. There are also issuances to Ault-controlled related parties, Ault & Company and Philou, at favorable terms as discussed in the Amended Complaint. ¶¶ 170-71. Finally, the MTD does not address the allegations pertaining to the Company's practice of issuing of shares to pay for various services under unfavorable terms to the Company and without proper disclosure that make it impossible for shareholders to ascertain what services were provided and being paid for. ¶¶ 144-46.

**7. Claims Involving Cryptocurrency**

Cryptocurrency is not even mentioned once in the MTD. Plaintiffs' Amended Complaint alleges that the Company is not on track to reach 10,000 cryptocurrency mining machines as promised (¶ 175), the Company has overpaid for its cryptocurrency mining equipment (¶ 176), the Company never fulfilled its agreement to purchase additional mining machines and was subsequently sued for breach of contract (¶ 177 n.11), the Company has not delivered its "AntEater" machines to the public within four weeks of the announced launch as promised (¶ 178), and the Company has inflated its cryptocurrency-related revenue projections (¶ 179). The MTD also does not discuss the rapid rise and precipitous fall in the Company's stock price, driven by cryptocurrency hype that the Individual Defendants helped to foster and other misleading statements made by the Individual Defendants as alleged throughout the Amended Complaint. ¶¶ 124-27, 174, 213, 217-21. A few weeks prior to the Original Complaint being filed, on July 10, 2018, DPW common stock was trading for $0.51, a steep decline from a high of $5.95 on December 13, 2017. ¶ 174. As of the close of trading on April 8, 2019, the Company is trading for $0.27 a share; this comes after a 20-1 reverse stock split on March 15, 2019 that raised the trading price to $1.60, only to see the price drastically decline once again.[5]

---

[5] Source: *Yahoo! Finance*, last accessed April 9, 2019. Information regarding the reverse

### C. The Amended Complaint Properly States a Claim for Unjust Enrichment

The Amended Complaint properly states a claim for unjust enrichment that is not duplicative of the breach of fiduciary duty claims and is not barred due to written contracts or stockholder approval.

T. Ault and Horne are both compensated by AVLP and AVLP is in turn funded by DPW. ¶¶ 119-20. According to the most recent available financial information provided by AVLP, T. Ault is receiving $20,000 a month from AVLP. ¶ 119. There is no public information provided by AVLP regarding Horne's compensation as CFO of AVLP, however, AVLP has disclosed that Horne was granted at least 1,000,000 shares of stock options to purchase AVLP common stock. *Id.* DPW and AVLP also provided funds to Alzamend, another entity controlled by Ault where Horne acted as CFO. ¶¶ 102-03.

Stock compensation has been provided to all members of the Board outside of any employment contract, including the large stock option grants that were provided to each director on November 28, 2017. ¶ 227. Director fees were paid to the Committee Member Directors, K. Ault, and also paid to Horne when he was a director. ¶¶ 38, 43-45. There is also the increase in Kohn's compensation; although contemplated by the employment contract, the actual increase in salary is a result of reported revenue and not the contract. ¶ 251. The Company has also entered into employment agreements and backdated the agreements months prior to the actual agreements being executed. ¶¶ 230, 247. Furthermore, Kohn has been unjustly enriched as a result of the house that was provided to his daughter. ¶¶ 184-89. Thus, Plaintiffs have sufficiently pled allegations for unjust enrichment against all Individual Defendants.

## IV. CONCLUSION

For each of the foregoing reasons, Defendants' MTD should be denied in its entirety.

Dated: April 15, 2019

**FARUQI & FARUQI, LLP**

By: */s/ Stuart J. Guber*

---

stock split and subsequent trading price is not included in Plaintiffs' Amended Complaint as it occurred after the filing of the Amended Complaint.

Attorneys for Plaintiffs
Stuart J. Guber (admitted *pro hac vice*)
Alex B. Heller (admitted *pro hac vice*)
1617 John F. Kennedy Boulevard
Suite 1550
Philadelphia, PA 19103
Telephone: 215-277-5770
Facsimile: 215-277-5771
E-mail: sguber@faruqilaw.com
aheller@faruqilaw.com

**FARUQI & FARUQI, LLP**
Benjamin Heikali (SBN 307466)
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: 424-256-2884
Facsimile: 424-256-2885
E-mail: bheikali@faruqilaw.com

*Attorneys for Plaintiff*